Thomas H. Nelson, OSB 783150
20820 E. Glacier View Road
Zigzag, OR  97049
Phone: 503.622.3262
Email: thnelson@gmail.com
         bzoudlaw.110@gmail.com

Brandon Mayfield, OSB 00824
14631 SW Millikan Way
Beaverton, OR  97003
Phone: 503.941.5101
Email: mayfieldbrandon@hotmail.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
### Portland Division

| | |
|---|---|
| **Iran Thalassemia Society**, *et al*.,   Plaintiffs,   vs.   **Office of Foreign Assets Control**, *et al.*,   Defendants. | Civil No. 3:22-CIV-1195  **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## I. Introduction

Today in Iran, innocent children are suffering and dying unnecessarily. Their sufferings and deaths are the immediate and direct result of President Trump's 2018 order that OFAC impose unilateral "maximum pressure" sanctions on Iran. Those sanctions cut off the delivery of critical humanitarian aid, specifically (1) specialized and unique wound dressings for suffering plaintiff children and (2) iron-chelating medicine for plaintiff children dying slowly from iron toxicity. Already over 600 individuals have died because of the OFAC maximum pressure sanctions. The lethal impact of those

sanctions is anomalous, for Congress has consistently and repeatedly condemned and prohibited the President from using economic sanctions to curtail deliveries of humanitarian aid to foreign destinations and, more specifically, to Iran.

Today in Iran, some plaintiff children - those suffering from a genetic blood disorder called thalassemia - are dying gradually as their vital organs succumb to iron toxicity because a life-saving iron-chelating drug has been cut off by OFAC's maximum pressure sanctions.[1] Other plaintiff children - those suffering from a genetic skin disease named epidermolysis bullosa - are enduring excruciating pain because OFAC's new sanctions have eliminated the availability of the only specialized wound dressings that can be removed without tearing at their tender "butterfly" skin.[2] President Trump, contrary to the commitments that the United States made to Iran, the other parties to the Joint Comprehensive Plan of Action ("JCPOA"),[3] and the United Nations, withdrew from the agreement and imposed his unilateral "maximum pressure" economic sanctions on Iran because he thought that one of President Obama's signature achievements was a "bad deal." Under the JCPOA, Iran had agreed to severe restrictions on its nuclear activities in return for the other parties' dropping the economic sanctions against Iran then in place.

By way of background, OFAC's power to draft, impose, and enforce sanctions arises primarily from the International Emergency Economic Powers Act of 1977, 50 U.S.C. §§ 1701-1707. When President Trump withdrew from the JCPOA, OFAC re-

---

[1] Facts regarding the medical conditions of plaintiff children suffering from thalassemia are set forth in the Report of Dr. Mohammad Nourbakhsh, attached as Exhibit 1. Facts regarding plaintiff Iran Thalassemia Society and its Secretary, Mr. Younos Arab, are attached as Exhibits 2A and 2B.
[2] Facts regarding the medical conditions of plaintiff children suffering from epidermolysis bullosa are set forth in the Declaration of Dr. Mohammad M. Parvizi, attached as Exhibit 3.
[3] The JCPOA parties are referred to as "P5+1," which are the five permanent members of the U.N. Security Council (China, France, Russia, United Kingdom, United States plus Germany).

imposed all prior economic sanctions it had removed under the provisions of the JCPOA and, in addition, imposed numerous additional new sanctions. Among the most crippling new sanctions was designating virtually all significant Iranian banking entities as Specially Designated Nationals ("SDNs"), which had the effect of removing foreign banks and financial institutions' ability to engage in commerce with Iran. The net result of these designations was to make it exceedingly difficult for Iran to pay for *any* international goods and services - including life-saving humanitarian aid that plaintiffs in this litigation need. This is because any foreign bank's dealings with a designated SDN can trigger OFAC "secondary sanctions" on the bank, including a prohibition from dealing with the U.S. banking system. Such an OFAC sanction in many if not most cases could be the equivalent of an economic death sentence for the sanctioned foreign bank.

For thalassemia patients, many are suffering from iron toxicity and some are dying because the most effective iron-chelating drug, Desferal®, a drug manufactured by Novartis (a Swiss/American pharmaceutical company), is no longer available. For epidermolysis bullosa patients, the result of the maximum pressure sanctions was a March 2019 decision by Mölnlycke Health Care of Sweden to cease selling its critical dressing, Mepilex®, to Iranian purchasers.[4] Consequently, today Iranian children afflicted by epidermolysis bullosa are suffering excruciating pain as their wound dressings are changed,[5] and some are succumbing to consequences of the unavailability of Mepilex® such as sepsis.

---

[4] Exhibit 4, undated Letter from Kristin Hedlund, Executive Vice President, Legal and General Counsel, Mölnlycke Health Care Company, to EB Home (an Iranian NGO). The envelope of the letter is stamped in Persian script with the date "28/12/1397," which corresponds to March 19, 2019 in the Gregorian calendar.

Page 3 – MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Although the devastating impact of OFAC's maximum pressure sanctions on the weakest members of society is well known, OFAC has taken no effective affirmative steps to address the situation. This is borne out by a recent United Nations investigation. Specifically, the United Nations appointed a Special Rapporteur, Prof. Alena Douhan, to assess the negative impact of unilateral coercive measures on the enjoyment of human rights by the Iranian people. From May 7 to May 18 of this year she conducted her investigation in Iran and, while a final report is scheduled for release in September of this year, she provided her preliminary comments during a press conference on May 18 in Tehran.[6] The United Nations summarized her presentation at the press conference as follows:

> At a press conference . . . the independent expert underlined that the complex set of unilateral sanctions against Iran, coupled with secondary sanctions against third-parties, overcompliance and zero-risking policies by businesses and financial institutions, exacerbate existing humanitarian and economic challenges and negatively affect the lives of the people, in particular the most vulnerable.[7]

During her press conference, Special Rapporteur Douhan specifically mentioned the impact that the sanctions are having on the availability of critical medical supplies for sufferers of epidermolysis bullosa and thalassemia.[8]

In this litigation, plaintiffs seek a permanent injunction prohibiting OFAC from imposing economic sanctions upon those who would engage in humanitarian aid to Iran. Alternatively and more narrowly, plaintiffs urgently request such an injunction for entities that would provide medical dressings and iron-chelating drugs to plaintiffs. The

---

[5] See Exhibit 3, Declaration of Dr. Parvizi, paragraph 15.
[6] Those comments accompany this Memorandum as Exhibit 5. They are available on the Internet at https://www.ohchr.org/sites/default/files/2022-05/Iran-country-visit-conclusions-SR-UCM-17May2022%20-EnglishPersian.docx.

very existence of that injunction would help remove the fear that sellers and their intermediaries have that crushing sanctions will be imposed on them if they deal with Iranians and Iranian banks. Finally, plaintiffs' counsel are ready at any time, day or night, to work with OFAC to secure the expedited delivery of the requested life-saving products to Iran.

## II. The Court Should Grant a Preliminary Injunction

A.    <u>Introduction: Criteria for Granting a Preliminary Injunction</u>

In order for a court to grant a preliminary injunction, the court must consider (1) that likelihood that plaintiffs will succeed on the merits, (2) whether plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief, (3) whether the balance of equities tips in plaintiffs' favor, and (4) whether an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

After the *Winter* decision, the Ninth Circuit provided specific guidance regarding the issuance of preliminary injunctions. In *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("*Alliance*"), the court instructed that plaintiffs need *not* show a "likelihood of success on the merits"; rather, they need only show that "serious questions" exist as to success on the merits. The degree of proof regarding success on the merits is tied to the strength of plaintiffs' claims regarding the three other factors, *viz.*, "irreparable harm," "balance of equities," and "public interest." If plaintiffs' showing regarding those three factors is strong, the required degree of proof on the "success on

---

<sup>7</sup> The UN summary, Exhibit 6, is available on the Internet at https://iran.un.org/en/183027-un-special-rapporteur-negative-impact-unilateral-coercive-measures-concludes-visit-iran.
<sup>8</sup> Exhibit 5, Comments of UN Special Rapporteur Doulan, at 4-5.

the merits" element is lessened. *Alliance*, 632 F.3d 1127, 1131 (9th Cir. 2011).[9] Therefore, although plaintiffs seeking a preliminary injunction must make a showing on each factor, the Ninth Circuit and several other circuits employ a "'version of the sliding scale' approach where 'a stronger showing of one element may offset a weaker showing of another.'" *Id*. Under this approach, a court may issue a preliminary injunction where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff[s]. . ., so long as the plaintiff[s] also [show] that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135.

A consideration of each of the four factors establishes that plaintiffs easily meet the *Alliance for the Wild Rockies* criteria.

B.    <u>Plaintiffs' Success on the Merits of Claims</u>

Plaintiffs are alleging two claims:

(1) Violation of the statutory limitations on the President's power regarding imposition of the delivery of humanitarian goods under the International Emergency Economic Powers Act, 50 U.S.C. § 1702(b)(2), the Trade Sanction Reform and Export Enhancement Act, 22 U.S.C. Ch. 79, and the Iran Financial Sector Sanctions, 22 U.S.C. § 8513a, and

(2) Negligence by OFAC under the Alien Tort Claims Act of 1789, 28 U.S.C. § 1350.

That there are at a minimum serious questions regarding plaintiffs' success on the merits under both of the claims is discussed below.

---

[9] For example, a stronger showing of irreparable harm to plaintiffs might offset a lesser showing of likelihood of success on the merits. *See, e.g., Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). The circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiffs] favor." *Id*. That test was described in this circuit as one alternative on a continuum. *See, e.g., Lands Council*, 537 F.3d at 987.

1. The Violations of Statutory Prohibitions

Before discussing the specific statutes plaintiffs allege OFAC has violated, it is appropriate briefly to mention a fundamental principle of statutory construction.

a. Statutory Construction

A number of statutory provisions directly address OFAC's authority to impose sanctions upon humanitarian aid to Iran, and each condemns and prohibits the practice. In each case these prohibitions are part of a Congressional authorization empowering the President to impose economic sanctions on a particular industry or activity. As the three statutes that restrict the President's power are discussed, it is important to keep in mind one of the cardinal rules of statutory construction: "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[10] The fact that OFAC's maximum pressure sanctions have today almost completely eliminated the transfer of humanitarian aid to Iran suggests that OFAC places primary if not exclusive emphasis upon the portions of the statutes that empower the President while paying scant or no attention to the portion protecting humanitarian aid.

With this background we turn to the three statutes prohibiting OFAC interference with humanitarian aid.

b. IEEPA

IEEPA follows the norm of Congressional authorization of Presidential action followed by Congressional protection of humanitarian transfers. Section 1702(b)(2) of the IEEPA, 50 U.S.C. § 1702(b)(2) provides, "The authority granted to the President by

---

[10] *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoted in *Corley v. United States*, 556 U.S. 303, 314 (2009)).

this section [specifying the President's powers under IEEPA] *does not include* the authority *to regulate or prohibit*, directly or indirectly . . . donations by persons subject to the jurisdiction of the United States of articles, such as . . . *medicine intended to relieve human suffering* . . ." (Emphasis added.) Stated succinctly, Congress expressly withheld OFAC's power to regulate, directly or indirectly, U.S. persons' donations of humanitarian aid. OFAC's designation of virtually all of the banks in Iran without making any reasonable accommodation for humanitarian aid has regulated the possibility of that aid out of existence. For proof of this point one need look no further than the deteriorating physical condition of those who suffer from epidermolysis bullosa and thalassemia caused by OFAC's regulatory interdiction of life-saving medicines available everywhere but in Iran. But for OFAC's sanctions, those individuals would not be suffering and dying.

   c. <u>Trade Sanction Reform and Export Enhancement Act</u>

The captioned statute provides in Section 7202:

> Except as provided in sections 7203 and 7204 of this title and notwithstanding any other provision of law, the President may not impose a unilateral agricultural sanction or unilateral medical sanction against a foreign country or foreign entity, unless—
> (1) not later than 60 days before the sanction is proposed to be imposed, the President submits a report to Congress that—
> (A) describes the activity proposed to be prohibited, restricted, or conditioned; and
> (B) describes the actions by the foreign country or foreign entity that justify the sanction; and
> (2) there is enacted into law a joint resolution stating the approval of Congress for the report submitted under paragraph (1).

President Trump created new, unilateral sanctions when he re-imposed sanctions previously withdrawn and imposed, in Secretary of State Pompeo's words, "the strongest sanctions in history." President Trump did not submit a report to Congress

Page 8 – MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

prior to imposing the maximum pressure sanctions, nor did Congress approve those new sanctions that helped terminate humanitarian aid to Iran. It is primarily those designations that made traditional sales of goods into Iran extremely difficult if not impossible. A question: May the President accomplish by indirection what Congress has forbidden him to do? For example, may he make all financial transactions with Iran illegal by designating all the banks in Iran and then claim that the suffering, dead, and dying children are merely "collateral damage" or, perhaps, that the sanctions have not affected humanitarian aid? Plaintiffs think not.

The maximum pressure sanctions terminated the supply of humanitarian supplies to plaintiffs, and consequently those sanctions are illegal and void as applied to humanitarian devices and medicine intended for Iran. No other construction of the Trade Sanction Reform Act is reasonable.[11]

### d.    Iran Financial Sector Sanctions

Beginning in 2011, Congress authorized the President to impose financial sanctions on Iran, including the Central Bank of Iran "or another Iranian financial institution designated by the Secretary of the Treasury for the imposition of sanctions pursuant to the [IEEPA]." 22 U.S.C. § 8513a(d)(1)(A). The immediately following subsection, (d)(2), provides, "The President may not impose sanctions under paragraph (1) with respect to any person for conducting or facilitating a transaction for the sale of agricultural commodities, food, medicine, or medical devices to Iran."

When OFAC on November 5, 2018, imposed new, unilateral financial sanctions on the over 70 Iranian-linked banks and financial institutions as Specially Designated

Nationals, OFAC effectively froze the ability of those financial institutions, which constitute the bulk of Iranian financial entities, to participate in the sale and delivery of medicine and medical devices to Iran in violation of 22 U.S.C. § 8513a(d)(2).

### e. The October 25, 2019, "Safe Harbor" Scheme[12]

At this point it is appropriate to mention an action by OFAC that effectively shut down the possibility of any humanitarian aid to Iran. While OFAC has never explicitly prohibited humanitarian transfers, and often has pointed to some "general licenses" that it says authorize humanitarian aid, the fact is that, by designating virtually the entire banking system as SDNs, OFAC made it impossible for foreign banks to participate in humanitarian aid transactions. In effect, those designations have indirectly regulated humanitarian aid to Iran to the point of extinction; OFAC seems to have achieved by indirection what Congress has expressly forbidden. Perhaps recognizing this fact, on October 25, 2019, OFAC issued a Release that announced a "new humanitarian mechanism to ensure unprecedented transparency into humanitarian trade with Iran." In reality, the Release made an already terrible situation much worse.

The Release began by arguing polemically that Iran is untrustworthy and unreliable - a peculiar statement in light of the United States' unilateral repudiation and breach of the JCPOA. The Release then goes on to describe what foreign banks should do if they wish to engage safely in humanitarian aid to Iran.

The Release recognizes that foreign banks' fear of secondary sanctions has

---

[11] There are a number of other provisions in the U.S. Code that forbid the President from imposing economic sanctions on humanitarian aid to Iran; see, *e.g.*, 22 U.S.C. § 8512(b)(1)(B), *id.* § 8805(c) ("The President may not impose sanctions..."; *id.* § 8803(e).

[12] The October 25, 2019, release, "Financial Channels to Facilitate Humanitarian Trade with Iran and Related Due Diligence and Reporting Expectations" (the "Release"), accompanies this memorandum as Exhibit 7, *available at* https://home.treasury.gov/system/files/126/iran_humanitarian_20191025.pdf.

stifled if not eliminated humanitarian aid to Iran. To rectify this, the Release states that foreign governments and foreign banks wishing a "safe harbor" for engaging in humanitarian aid to Iran "*must commit* [to OFAC] to conducting enhanced due diligence . . . ." Release at 2 (emphasis added). Upon such commitment to providing extensive transactional information to OFAC, the foreign banks will be allowed "to seek written confirmation from Treasury that the proposed financial channel will not be exposed to U.S. sanctions in exchange for foreign governments and financial institutions *committing to provide to Treasury robust information on the use of this mechanism on a monthly basis*." *Id.* (emphasis added). Should a participating foreign bank suspect potential abuse by Iranian customers it is required to suspend the transaction immediately and inform OFAC. *Id.*

Then the Release lays out the price of the safe harbor: "Host nation foreign financial institutions and their governments, as appropriate, will be expected to collect, maintain, and report to Treasury, with appropriate disclosure and use restrictions, *a great deal of information on a monthly basis*." *Id.* The scope of this "great deal of information" is truly amazing; it is outlined on pages 3 and 4 of the Release, attached as Exhibit 7. Basically, the foreign bank is expected to share all details of the transaction and, in addition, to investigate and pass along to OFAC any additional information it obtains about the Iranian customer and particularly regarding why the Iranian customer might be worthy of further investigation.

Plaintiffs are unaware of any foreign bank participating in this scheme, but defendants can best provide information regarding how many foreign banks have taken up OFAC's invitation to a safe harbor. Plaintiffs believe that there are few if any because

the potential sources of humanitarian aid to Iran are scattered throughout the world (in plaintiffs' case, in Sweden and Switzerland), and it is unlikely that any single foreign bank would do sufficient business regarding humanitarian aid to Iran to justify the enormous monthly compliance cost of this scheme. But, again, defendants can best provide this information.

The very existence of the Release is exceedingly troublesome because it explicitly mentions and tacitly threatens the possibility of imposing secondary sanctions on those providing humanitarian aid to Iran. As noted previously, OFAC's imposing secondary sanctions on a foreign bank could effectively drive that bank out of business. Bank personnel generally are notoriously and extraordinarily risk averse and will take extreme measures to eliminate any possibility of threat to their banks' well-being. When told by OFAC that the only possible route to a safe harbor to avoid devastating secondary sanctions for providing humanitarian aid to Iran involves intelligence gathering against their clients and clients' customers, and when told of the high cost of collecting and reporting information to OFAC on a monthly basis, the foreign banks' logical alternative would be to eschew completely any attempt to provide humanitarian aid to Iran - which is perhaps why Mölnlycke Health Care decided to terminate all deliveries to Iran less than six months after OFAC's Release.[13]

2. <u>The Alien Tort Claims Act</u>

Plaintiff's second claim, under the Alien Tort Claims Act, 28 U.S.C. §1350, is

---

[13] Although plaintiffs are unaware of any attempt by any provider or intermediary of humanitarian aid to Iran to employ the OFAC safe harbor scheme, conditioning receipt of humanitarian aid on the understanding that any information the foreign bank obtains regarding the customer's business and other activities will be turned over to OFAC for further investigation will put an extreme chill on the likelihood that the Iranian customer would agree to such a condition. Conditioning humanitarian aid on the understanding that a hostile power will use that aid to conduct intelligence operations against the Iranian state is, frankly, shameful and far beyond the permissible bounds of the statutes discussed *supra*.

novel - it appears that there are no adjudicated cases in line with the theory of plaintiffs' claim under the ATCA. Plaintiffs' claim is that they - all of them except No Child Should Suffer - are entitled to invoke the statute, which provides, "The district courts shall have original jurisdiction of any civil action by an alien for tort only, committed in violation of the law of nations or a treaty of the United States." Here, all of the plaintiffs except No Child Should Suffer are aliens. The tort alleged is OFAC negligence consisting of the following four elements:

(1) OFAC owes a **duty** to plaintiff children as specified in the United Nations Convention on the Rights of the Child, (1989) Treaty no. 27531 (the "Convention");

(2) which duty is recognized **by customary international law**, specifically evidenced by the unanimous approval of the Convention by *all* of the member-states of the United Nations and ratification by all member-states except the United States;[14]

(3) which **duty was breached** when OFAC drafted and enforced **the maximum pressure sanctions** that made no provision for exempting humanitarian items, and

(4) which breach has **proximately caused plaintiffs to suffer grievously and face unnecessary death.**

In sum, the ATCA tort allegation, although unprecedented, fits logically - indeed, comfortably - within the framework of scope of the purpose behind the 1789 legislation creating the jurisdiction for this action. To recite the words of the ATCA is to establish that there are serious questions regarding plaintiffs' success on the merits.

C.      Plaintiffs' Irreparable Harm in Absence of Relief

In *Alliance*, the Ninth Circuit found that irreparable injury would result if a preliminary injunction were not issued to halt a proposed timber salvage sale because the sale would "harm its members' ability to 'view, experience, and utilize' the areas in their undisturbed state." 632 F.3d at 1135. In this case, it is a medical fact that if the

hundreds if not thousands of child plaintiffs do not get the relief requested – the delivery of life-enhancing and life-saving medical supplies and drugs – some of the plaintiff children who are suffering from thalassemia will continue to deteriorate physically until death overtakes them, and those suffering from epidermolysis bullosa will suffer unnecessary excruciating pain every time their wound dressings are changed.[15] The tragic harm that will result in the absence of relief is, unfortunately, not at all speculative. Consequently, both logic and the *Alliance* option provide overwhelming support that the failure to enjoin OFAC as requested herein will inflict overwhelming irreparable injury on plaintiffs - with virtually no interference in OFAC's day-to-day operations..

D.      The Balance of Equities and Hardships Tips Sharply in Plaintiffs' Favor

In the *Alliance* case, the Ninth Circuit held that the balance of hardships tipped sharply in plaintiff's favor. There, the court indicated that the plaintiff's loss would consist of two factors, *viz.*, (1) the logging of 1,652 acres would cause the irreparable loss of "work and recreational opportunities that would otherwise be available . . . ," 632 F.3d at 1138, and (2) the loss of an opportunity to participate in the administrative process. *Id.* Comparing those losses to the Forest Service's loss of revenue of $16,000 (or perhaps $70,000), the court found that the defendant's loss was, in comparison, insignificant.

Here, the balance of equities and hardships is much more overwhelmingly strong in plaintiffs' favor. Plaintiffs did absolutely nothing to justify OFAC's removal of dressings and medications that previously provided them with life-saving medications to eliminate excess iron from their bodies or the reduction of physical pain associated with treatment of their open wounds.  Thus plaintiffs' hardship is continuation of the status quo that

---

[15]  See Declaration of Dr. Parvizi, Exhibit 3.

OFAC has inflicted on them. Add to this the fact that Iran was in complete compliance with its obligations under the JCPOA when President Trump breached that agreement and imposed sanction upon sanction on Iran. In addition, although President Biden during his campaign strongly criticized the breach of the JCPOA and consequent sanctions, today President Biden is continuing and adding significantly to those sanctions. Those actions have continued and enhanced the difficulties plaintiffs face in attempting to secure the life-enhancing and life-saving items. On OFAC's side of the ledger, a preliminary injunction of OFAC's enforcement of sanctions on humanitarian goods destined for Iran would in all likelihood not interfere one whit with OFAC's activities. This is because OFAC almost certainly would not attempt to sanction such transactions because of the explicit statutory prohibitions and public outcry that would greet such a step. The reason humanitarian goods are not already flowing to Iran is the word "almost" in the preceding sentence: The mere *possibility* of an economic death sentence is why Novartis and Mölnlycke are today not sending goods to Iran. An injunction would eliminate that possibility. As a result, both the equities and the hardships sharply tip toward plaintiffs.

E.      An Injunction Is in the Public Interest

Again beginning with the *Alliance* case, the Ninth Circuit identified the public interest factors favoring plaintiffs as preserving nature and avoiding environmental injury, along with an opportunity to carefully consider alternatives and impacts. The court contrasted those factors to the public interest of the Forest Service, which it stated was to aid temporarily the health and economy of the local area. *Id.* at 1138-39.

Here, the public interest factors involved go far beyond a consideration of the

infirmities of plaintiffs and the administrative convenience of OFAC; the public interest is global. President Trump's abandonment of the JCPOA and imposition of the heaviest set of sanctions ever was almost universally condemned. For example, the European Union in 2019 created the Instrument in Support of Trade Exchanges ("INSTEX"), whose mission is to facilitate non-U.S. dollar and non-SWIFT transactions with Iran to avoid breaking U.S. sanctions.[16] The United Nations has opposed the harms President Trump's sanctions have imposed on Iranians.[17]  And there is no conceivable public interest in OFAC's retention of its power to impose sanctions on humanitarian aid – a power that Congress several times has condemned and withheld.

### III. Conclusion

When President Trump sanctioned virtually all Iranian banks he effectively closed all avenues for trade between Iran and foreign banks that need access to the U.S. banking system to survive. Those foreign banks are the critical link in the chain for the delivery of humanitarian aid to Iran, and when that link was broken humanitarian aid stopped. And Iranian children started suffering and dying unnecessarily. It is that simple.

For the foregoing reasons, plaintiffs respectfully request that the court grant their Motion for a Preliminary Injunction to prohibit OFAC from imposing sanctions on any entity, including but not limited to producers and their financial intermediaries, that engage in the provision of humanitarian medical supplies and drugs to Iran. Alternatively, plaintiffs request an injunction that would prohibit OFAC from imposing sanctions on any entity that provides or assists in providing medical treatments for thalassemia and epidermolysis bullosa. Such an injunction is the only way possibly to

---

[16] See https://instex-europe.com/about-us/.
[17] See Exhibits 5 & 6.

prevent unnecessary death and suffering.

DATED this 15th day of August, 2022, at Zigzag, Oregon.

Respectfully submitted,

/s/
Thomas H. Nelson, OSB 783150
20820 E. Glacier View Road
Zigzag, OR  97049
Tel: 503.622.3262
Email: zigzagtom@gmail.com
Of Attorneys for Plaintiffs