# EXHIBIT 1

## *Iran Thalassemia Society v. OFAC*

## MEDICAL REPORT OF DR. NOURBAKHSH

# EXHIBIT 2A

## *Iran Thalassemia Society v. OFAC*

## STATEMENT OF MR. ARAB

  

Member of Thalassaemia
International Federation

ECOSOC
United Nations
Member of United Nations Economic
and Social Council (ECOSOC)

(Patients with Thalassaemia Must Bear a High
Cost for Treatment, Please Assist Us to Support Them)

Tuesday 09 August 2022
Number : 01/55/1901

**In the name of God**

**Statement of Mr. Arab**

**Statement by Mr. Younos Arab,**

**Secretary of the Iran Thalassemia Society**

Taking the oath, Younos Arab, the Secretary of the Iranian Thalassemia Association, attests and declares as follows:

1. My name is Younos Arab, and I am the secretary of the Iranian Thalassemia Society, whose head office is in Valiye Asr Square, Tehran, Iran.
2. I am a citizen of Iran with national number 2003085084 and I am 38 years old. I, myself, am a thalassemia patient and I am being treated. I got this disease since childhood.
   I was born in 1984 in Shoush city in Khuzestan province of Iran. Despite the pain and suffering caused by thalassemia, I completed my studies up to the bachelor's degree, like my other healthy friends, in architecture in 2014 at Azad University in Dezful city. In those years, I was able to achieve many successes with my timely and appropriate medical treatment. In 2016 I was elected as the Secretary of the Iranian Thalassemia Society and I am currently holding this position. In these years, with the aim of helping thalassemia patients and trying to help with preparing an ideal life for them, I served the thalassemia patient community with all my heart and performed many activities at domestic and international levels; which briefly inter alia includes: the registration of JADENU drug manufactured by Novartis and its importation as well as obtaining significant insurance coverage for the Iranian thalassemia patients. Expansion of educational activities and media services to all corners of the country, particularly the provinces of Sistan & Baluchistan, Hormozgan, Khouzestan, Bushehr, etc. as well as providing for prevention of the birth of a new thalassemia patient and having healthy children in families with minor or mild type thalassemia, have been among other achievements of the Society.

Address: 4th Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333                    Fax: +9821 88932737
Website: www.thalassaemia.ir          E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia

  

(Patients with Thalassaemia Must Bear a High
Cost for Treatment, Please Assist Us to Support Them)

3. On behalf of all thalassemia patients in my country, and in line with my scientific and moral responsibility, I would like to inform you, in this statement, of the thalassemia disorder and disease and of the effects and sufferings caused by the unilateral and illegal sanctions of the United States and other governments on the health status of thalassemia patients in my country. The result and effects of human rights violations which have led to the inhumane and unilateral sanctions, have targeted 23,000 thalassemia patients in my country, most of whom are children and young people.

4. Thalassemia is a genetic blood disease that requires a blood transfusion to treat it. The required injections, if not treated, increase iron in the patient's blood and lead to iron poisoning, which, in turn, affects the patient's vital organs, including heart, liver, spleen, and endocrine system, and ultimately leads to the patient's death. According to statistics, 3% of the world's population are carriers of thalassemia mutations. In Iran, the prevalence of the disease is higher along the Caspian Sea, the Persian Gulf, and the Oman Sea, covering the provinces of Gilan, Mazanderan, Khouzestan, Fars, Bushehr, Hormozgan, Sistan and Baluchistan, and Kerman. In fact, the number of people suffering from this disease, in those provinces, has been higher than the global and the national rate; and the prevalence of the gene varies according to the geographical area and is between 3-4%. In total, more than 90 mutations were reported in Iranian populations, of which 15 mutations are more common than other mutations, of which beta thalassemia is the most common type in Iran.

5. Presently there are more than 23000 thalassemia patients in Iran, of which about 6000 of the patients are under 18 years of age and almost 4000 people are under 12; and the number of individuals with thalassemia minor is about 5 to 7 million people. The annual death rate of thalassemia major patients in Iran has increased from 30-40 patients to 150 patients per year during the imposed sanctions.

6. The national program to prevent the occurrence of thalassemia was started in Iran from 1997; and numerous and complementary strategies were implemented in the country, including education, screening tests and genetic diagnosis, genetic counseling, etc., to reduce the frequency of thalassemia; and, also, all the medical and treatment costs of Iranian thalassemia patients were fully covered by the support of the government of the Islamic Republic of Iran and the insurance companies. At that time (1997), a number of 1200 children with thalassemia were born every year, but nowadays it has decreased to 150 to 200 cases, and I remind you that this disease, merely, has a hereditary cause. In this direction, the Iranian Thalassemia Society was established in 1989 by the parents of Iranian children suffering from Thalassemia. The Society is a civil and social institution and a member of the World Thalassemia Federation (TIF) and it holds a consultative status with ECOSOC, the Economic and Social Council of the United Nations.

Address: 4th Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333          Fax: +9821 88932737
Website: www.thalassaemia.ir          E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia





Member of Thalassaemia
International Federation

ECOSOC
United Nations
Member of United Nations Economic
and Social Council (ECOSOC)

Iranian Thalassaemia Society

(Patients with Thalassaemia Must Bear a High
Cost for Treatment, Please Assist Us to Support Them)

7. The Society is run by public donations and we help them with providing medicine, help to patients and the cost of their traveling to Tehran, provision of the required medication and treatment for poor patients for free. We also visit patients in poorer areas. We set up a center so that patients who come to Tehran for treatment can have accommodation there, and we provide the patients with medicines. There is a law and the government is tasked to provide free medicine and treatment to those patients, and this is actually happening; but the important point is that currently there is no medicine; whether it is free or paid. Each patient meets a cost of about 250 to 300 million tomans per year; That means about 25 million tomans per month! This amount is fully covered by insurance. The government pays; Of course, if it is medicinal. If not, and even if the patient is prepared to pay for the medicine the medicine, it is not available. This is the fundamental problem; because foreign companies are the main source and provider of the domestic medicine for this disease, and those companies have brought us to the challenge of raw materials, and the supply of raw materials to domestic companies has become very difficult due to the sanctions, and it has caused many serious problems for thalassemia patients.

8. Before President Trump imposed his "maximum pressure sanctions" in 2018, Iranian patients could get, on the international market, the best iron chelator (a drug to treat iron overload), Desferal, produced by Novartis, the Swiss-American pharmaceuticals company. After the imposition of maximum pressure sanctions, Desferal was generally no longer available in the Iranian market due to the new sanctions. "Novartis" company caused enormous damage to the patients; because it is the only supplier of Desferal in the world and it created serious problems for us; because this is the vital medicine of Iran's thalassemia patients. The failure of this company to fulfill its obligations towards Iranian thalassemia patients created challenges, and despite the passage of two years, less than one million vials of Desferal have reached Iranian thalassemia patients. These drugs are also produced inside the country; but the situation is so chaotic that even the supply of this medicine inside the country has faced serious challenges; This is because European raw material supplier companies hardly provide this raw material to Iran and even some of those companies sanctioned Iran directly.

9. The fact that the food and drug sector is exempted from the unilateral sanctions of the United States of America is nothing more than a slogan. The issuance of Executive Order No. 13224, dated June 17, 2021, dated September 23, 2001, regarding the exemption of American sanctions on transactions related to dealing with the Corona virus, is a confirmation of the falsehood of the claim that the food and drug fields are exempt from the scope of American sanctions. In July 2018, the International Court of Justice ordered the United States to remove the sanctions on humanitarian goods along with the guarantee for payment system. The compliance of European companies with

Address: 4th Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333                    Fax: +9821 88932737
Website: www.thalassaemia.ir                E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia





**Member of Thalassaemia International Federation**

ECOSOC
United Nations
**Member of United Nations Economic and Social Council (ECOSOC)**

**I**ranian **T**halassaemia **S**ociety

(Patients with Thalassaemia Must Bear a High Cost for Treatment, Please Assist Us to Support Them)

American sanctions and the termination of cooperation with Iran due to American sanctions is one of the main reasons for violation of the right to health and the right to life of thalassemia patients in Iran. Preventing currency exchange and banking services, export, transportation and insurance problems, lack of primary import and sale and supply of effective substances to Iranian pharmaceutical companies, fear of pharmaceutical companies and factories and international banks in their dealings with Iran of being subjected to the US illegal punishments, is another indication for these inhumane actions. The confirmation of this matter can be found in the recent statement of the UN experts of October 19, 2021, on the impact of US sanctions on the health of the Iranian people. The statement acknowledges that excessive compliance with sanctions by many banks and businesses, including pharmaceutical and medical companies around the world, directly harms human rights and is an example of human rights violations against Iranian people. These issues have caused the shortage and lack of access to the medicine needed by thalassemia patients, which, in turn, has made the current situation more critical.

10. "Desfonac" is the Iranian version of an iron chelating drug that is prescribed in the absence of Desferal. Unfortunately, however, Desfonac is not as effective as Desferal because it causes debilitating side effects in a number of patients. (An example of the reactions of this drug on patients is attached to this statement.) Since the imposition of maximum pressure sanctions in 2018, approximately 617 Iranian thalassemia patients have lost their lives due to the unavailability of Desferal. Experts believe that the life expectancy of Iranian thalassemia patients will be reduced by 10 years due to the lack of medicine during the imposition of the drug sanctions. We have death cases in patients whose average age is below 10 years, due to lack of medicine and its embargo, but we can prevent it. If these patients receive the standard treatment on time and the drugs prescribed by the doctors reach them, they may enjoy a normal life. We have thalassemia children who have higher education, such as doctors, etc., and they have made good progress in all fields.

11. Therefore, in conclusion, considering the cruel and inhumane sanctions and the pitiful situation and the gradual death of thalassemia patients in my country, which is the result of a clear and blatant violation of the fundamental principles and binding rules of international law by the United States, I, Yunos Arab, as the representative and Secretary of the Thalassemia Society of my country, would like to urge Your Excellency that, in an era known as an era of accountability and responsibility, to use all available capacities to hold the violators of the rights of Iran's thalassemia patients accountable, and compensate them for the damage, and stop the negative effects of the cruel medicine sanctions; and support the 23 thousand thalassemia patients at risk of

Address: 4th Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333              Fax: +9821 88932737
Website: www.thalassaemia.ir           E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia





(Patients with Thalassaemia Must Bear a High
Cost for Treatment, Please Assist Us to Support Them)

Member of Thalassaemia
International Federation

Member of United Nations Economic
and Social Council (ECOSOC)

death and to prevent the injuries those patients are facing. Undoubtedly, the continuation and intensification of drug sanctions for these patients shall have harmful consequences for them and even for their families.

12. I declare, under penalty of perjury, under the laws of the United States of America, that the above is true and correct.

**Younes Arab**

**Executive director**

Address: 4ᵗʰ Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333          Fax: +9821 88932737
Website: www.thalassaemia.ir          E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia

# EXHIBIT 2B

## *Iran Thalassemia Society v. OFAC*

## RESUME OF MR. ARAB





(Patients with Thalassaemia Must Bear a High
Cost for Treatment, Please Assist Us to Support Them)

Member of Thalassaemia
International Federation

Member of United Nations Economic
and Social Council (ECOSOC)

Tuesday 09 August 2022
Number: 01/55/1902

**In the Name of the Almighty Allah**
**Résumé of Mr. Arab**

My name is Younos Arab, residing in Shush city in Khuzestan province of Iran. I was born in June 1984 in a middle-class family which had 7 other children. In the first months of my birth, I was diagnosed with thalassemia in the Golestan hospital of the city of Ahvaz. Since I was 6 months old, I, inevitably, received injection of complete blood product, and as a result of regular injections every two to three weeks, I had to take iron chelator drugs because of the increasing level of iron in my body. In those years, Khuzestan province was my place of residence, and until 1989, the province was engaged in the Iraqi imposed war. My treatment went on smoothly in the war-torn area, and contrary to what the local people said that I would die at the age of 10 due to the severity of the disease, but with the help of my family and my treatment team, not only did this not happen, but also today I am in my fourth decade of living with a hope for a better future. Moreover, I am also helping the community of 23,000 thalassemia patients and I managed to significantly increase the average life expectancy age of patients in the country with the help of the Iranian Ministry of Health. I completed my high school education at the Technical and Vocational College in of the Prophet Daniyal-e Nabi (p.b.u.h.), which is respected by all the Divine religions, I was employed there for 4 years.

On the other hand, at the same time, I continued my education in the field of architecture and after several years I succeeded in receiving a bachelor's degree in architecture.

Afterwards, I worked in Abkavosh Sarzamin Consulting Engineering Company in the field of monitoring the irrigation networks of North Khouzestan region and this cooperation continued until 2015.

Address: 4th Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333        Fax: +9821 88932737
Website: www.thalassaemia.ir        E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia

  

(Patients with Thalassaemia Must Bear a High Cost for Treatment, Please Assist Us to Support Them)

Member of Thalassaemia International Federation

ECOSOC
United Nations
Member of United Nations Economic and Social Council (ECOSOC)

On the other side, in 2014, I was elected as a member of the board of directors and treasurer of the Iranian Thalassemia Society.

Later on, in March 2017, I received the highest vote among the candidates in the elections of the Thalassemia Society, by the patient representatives, and with this high vote, since February 2018, I have been a member of the board of directors and Secretary of the Iran Thalassemia Society, which is the highest executive position in the Society.

The registration of JADENU drug manufactured by Novartis and its importation as well as obtaining significant insurance coverage for the Iranian thalassemia patients has been one of the most important executive achievements of the Society.

I should also mention the expansion of educational activities and media services to all parts of the country, especially the provinces of Sistan and Baluchistan, Hormozgan, Khouzestan, Bushehr, etc., as other significant services of the Society.

Prevention of the birth of new thalassemia patients and helping with having healthy children in families with thalassemia, minor or mild type, has been another effective measure followed during my tenure office.

**Younes Arab**
**Executive director**



Address: 4th Floor, No. 22, Keshavarz Blvd., South Side, Valiasr Sq., Tehran, Iran
Post Office Box: 15875-6156
Telephone No.:+9821 88918588-9 & 88917333                Fax: +9821 88932737
Website: www.thalassaemia.ir          E-mail: TalasemiIranSociety@gmail.com
Instagram: itsthalassaemia

# EXHIBIT 3A

# *Iran Thalassemia Society v. OFAC*

# DECLARATION OF
# DR. MOHAMMAD PARVIZI

# DECLARATION OF
# MOHAMMAD M. PARVIZI, M.D., M.P.H, Ph.D.

Upon being duly sworn, Dr. Mohammad Mahdi Parvizi deposes and states as follows.

### 1.

I am Iranian citizen with National Identity No. 2300731452. I and am over the age of 18 and suffer from no disability which would render me incompetent to make this Declaration.

### 2.

I was born on September 11, 1985, in Shiraz, Province of Fars, Iran. My identification documents are attached to this Declaration as Appendix 1 and I confirm their authenticity.

### 3.

I received my medical degree and license from the Medical Branch of Islamic Azad University in Tehran, Iran, in 2011.  After receiving my medical license, I attended the Shiraz University of Medical Sciences, from which I received a Masters Degree in Medical Education in 2013 , a Masters Degree in Public Health in 2015, a Ph.D. Degree in Persian Medicine in 2017, and a Masters Degree in Medical Journalism in 2020.  I have completed a number of specialized medical courses at a variety of workshops and conferences during these years.

Scanned with CamScanner

4.

I have been a faculty member at the Molecular Dermatology Research Center at the Shiraz University of Medical Sciences since 2012. I am currently in charge of the Center, and I also serve as the Vice Chancellor of Treatment at the University.

5.

I have authored and published a number of medical articles in Iranian and international journals on specialized topics in my field of study. Those articles are listed in Appendix 1 to this Declaration.

6.

My education and professional activities have made me quite familiar with the genetic skin disorder of epidermolysis bullosa, or "EB." EB is a recessive genetic disorder, which means that the disorder occurs when an individual inherits a copy of the same gene from each parent. This incurable disorder is characterized clinically by the formation of blisters resulting from friction on the skin. The effects of EB range from being a minor inconvenience to being completely disabling and, in some cases, EB can result in death. The blisters associated with EB, which can form anywhere there is friction on the skin, can cause extreme pain. In addition to being external, painful blisters can form in the oral cavity, on the external surface of the eye, and even in the respiratory, gastrointestinal, and genitourinary tracts. Treatment includes daily wound care, bandaging, and pain management

Scanned with CamScanner

7.

I have received and reviewed the medical records of six younger Iranian EB patients between the ages of 5 and 21. I obtained these records from the Iranian Ministry of Health and from a non-governmental charitable organization that serves EB patients and their families in Tehran. The health records include documents and photographs of the six patients. A summary of the personal details of the six patients, all Iranian nationals, is set forth in the box below. I have replaced the patients' names with their initials for privacy reasons.

| Patient # | Patient Initials | ID No | Age | Gender (M/F) |
|-----------|------------------|------------|-----|--------------|
| 1 | A.H. | 2286551030 | 7 | Female |
| 2 | H.K. | 2380865841 | 5 | Male |
| 3 | S.N. | 2285985754 | 10 | Male |
| 4 | F.E. | 2360618008 | 21 | Female |
| 5 | F.-Z.H. | 2540184707 | 18 | Female |
| 6 | M.M. | 2421247136 | 13 | Female |

8.

A skin biopsy was obtained from each of the six patients, which biopsy confirmed the presence of the disorder. In addition, a whole genome examination was conducted on some patients. Blood from each patient's parents was obtained to confirm the presence of the gene in each parent. I confirm that the results of these tests, which are

Page 3 – Declaration of Mohammad M. Parvizi, M.D., Ph.D.

Scanned with CamScanner

included in the documentation attached to this Declaration, clearly and definitely establish that each of the six patients listed above has been reliably diagnosed with EB.

9.

Beginning in 2015 I have served as a faculty member, physician, and researcher in the hospital ward at the Dermatology and Molecular Dermatology Research Center in the Shahid Faghihi Hospital in Shiraz. The six patients listed above, along with their parents or guardians, were referred to the Center for treatment. I, as a physician specialist, initiated the process of treating the six patients based on the EB diagnoses. The initial activities consisted of:

1. Taking of patients' history;

2. Complete physical examination with assistance from a dermatologist;

3. Completing any necessary laboratory tests suggested by the examination;

4. Prescribing medication, and

5. Referring patients to other EB Team specialists, as appropriate.

10.

In all six cases, the wounds caused by the disease are extensive, covering approximately 70 to 80 percent of the patients' bodies at a first level of skin. The wounds have generally spread over the entire body, but are concentrated on the back, buttocks, extremities, knees, and elbows. Severe bulla – large blisters containing serous fluid – are visible on the body, and deformities in the hands are common

11.

These six patients, like all others suffering from severe EB, require supportive

Scanned with CamScanner

care. A critical element in treatment of EB patients is the quality and type of dressing available for treatment of the wounds. While many options are available, extensive experience has established that there is only one dressing that is acceptable for patients. That is the special dressing Mepilex®,[1] which is manufactured by Mölnlycke Health Care AB of Gothenburg, Sweden.

12.

Since 2015 I have been present at, and often supervised, a variety of treatments for the six EB patients in the Center (*e.g.*, in the intensive care ward, in surgical settings, routine care operations, and post skin surgery). During those treatments I have closely examined and witnessed the use of Mepilex® along with other, competing brands of dressings, and I have concluded that Mepilex® is superior to all other specialized dressings for EB patients.

13.

Based on my review of medical records and the documents that accompany this Declaration, I declare and confirm the following conclusions:

- The six patients were hospitalized several time in the hospital because of –

  o Surgical issues (especially hand surgery) and eye surgery due to adhesion by non-Mepilex® dressings to wounds (Patient A.H.);

---

[1] According to promotional materials from Mölnlycke Health Care AB,

"Mepilex is an absorbent, atraumatic dressing made from polyurethane foam. The outer surface of the foam is bonded to a vapour-permeable polyurethane membrane, which acts as a barrier to liquid and microorganisms. The membrane, which has a wrinkled appearance, is applied in this way to accommodate the slight swelling that occurs as the dressing absorbs exudate. The wound contact surface of Mepilex is coated with a layer of soft silicone that does not stick to the surface of a wound or cause trauma to delicate new tissue upon removal."

http://www.dressings.org/Dressings/mepilex.html

Page 5 – Declaration of Mohammad M. Parvizi, M.D., Ph.D.

Scanned with CamScanner

- ○ Wounds that were treated with non-Mepilex® dressings when Mepilex® was not available became severely infected because Mepilex® was not available;

- ○ Several patients' wounds treated with non-Mepilex® dressings when Mepilex® was not available progressed to sepsis because Mepilex® was not available;[2]

- ○ Several patients' wounds treated with non-Mepilex® dressings when Mepilex® was not available suffered from anemia because Mepilex® was not available.

14.

I further declare and confirm that all available methods for care and improvement of the six patients' condition have been done correctly and according to international standards but, because Mepilex® dressings were not available, nurses had to use conventional dressings, including even Vaseline® petroleum gauze and topical ointments, and that because Mepilex® was not available these six patients suffered unnecessary bleeding, infection, and painful physical distress when non-Mepilex® dressings were removed in order to wash their wounds.

15.

I further declare and confirm that the six patients whom I witnessed and treated have suffered excruciating, severe pain because Mepilex® dressings were not available to treat their wounds. These sufferings have had a deleterious effect on the psycho-social health of the patients as well as the patients' parents and guardians who almost always accompanied the six patients as they went through various stages of treatment for EB.

---

[2] "Sepsis is the body's overwhelming and life-threatening response to **infection** that can lead to tissue damage, organ failure, and death." https://www.sepsis.org/sepsis-basics/what-is-sepsis/.

Page 6 – Declaration of Mohammad M. Parvizi, M.D., Ph.D.

Scanned with CamScanner

16.

Based on my extensive experience in the treatment of EB patients, including the six patients prominent in this Declaration, along with my review of the records and documents that accompany this Declaration, I have now reached the following conclusions and present the following opinions:

- The six EB patients featured in this Declaration fairly represent the class or category of EB sufferers;

- The six EB patients featured in this Declaration are victims of unnecessary cruelty and harm because of the political processes and sanctions that prevent them from having access to Mepilex® dressings;

- The unnecessary withholding of Mepilex® dressings has caused the six patients unnecessary excruciating pain, persistent bleeding from wounds, physical weakness and deterioration caused by anemia, deterioration of overall physical condition, and hospitalization, including treatment in intensive care units.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August _1_, 2022, in Shiraz, Iran

Mohammad M. Parvizi, MD, PhD

Scanned with CamScanner

# EXHIBIT 3B

## *Iran Thalassemia Society v. OFAC*

## CV OF DR. MOHAMMAD PARVIZI

# <u>Curriculum Vitae</u>

# Mohammad Mahdi Parvizi

<u>**PERSONAL INFORMATION:**</u>

**First/Middle  Names**: Mohammad Mahdi

**Last Name**: Parvizi

**Nationality**: Iran

**Date of birth**: September 11, 1985

**City of Birth**: Shiraz

**Marital Status**: Single

**Present Positions:**

Assistant Professor, Molecular Dermatology Research Center, Shiraz University of Medical Sciences, Shiraz, Iran.

Assistant Professor, Research Center for Traditional Medicine and History of Medicine, Shiraz University of Medical Sciences, Shiraz, Iran.

**Mailing Address**: Shahid Faghihi Hospital, Clinic of Dermatology, Molecular Dermatology Research Center, Shiraz University of Medical Sciences and Health Services, Shiraz, Iran P. O. BOX; 7134846114

**Mobile Phone**: (+98)-917-3237031

**Office Phone:** (+98)-7132125592

**Email:** mmparvizi@gmail.com**;** parvizim@sums.ac.ir

<u>**EDUCATIONAL BACKGROUND:**</u>

**Diploma (in Experimental Sciences)**                                      **2000-2004**
Shahed High School, Kazeroun, Fars Province, Iran

**Doctorate in Medicine (MD)**                                      **2004-2011**
School of Medicine, Islamic Azad University, Tehran Branch, Tehran; Iran

- **Thesis title:** Demographic Characteristics in Children with Asthma Admitted in Shahid Dastgheib Hospital, Shiraz, Iran, 1993-2003

**PhD in Traditional Persian Medicine**                            **2012-2017**
Department of Persian Medicine, School of Medicine, Shiraz University of Medical Sciences, Shiraz, Iran

- **Thesis title:** Determination of the Efficacy of Cryotherapy plus Topical Juniperus Excelsa M.Bieb, Based on Traditional Persian Medicine, Versus Cryotherapy Alone in the Treatment of Cutaneous Leishmaniasis: a Triple-BlindRandomized Clinical Trial

Relevant course work: Juniperus excelsa M. Bieb; a medicinal plant with various pharmacological activities; cutaneous leishmaniasis in Persian medicine; constipation treatment in Persian medicine

**Master's Degree in Medical Education**                           **2011-2013**
Educational Developmental Centre (EDC), School of Medicine, Shiraz University of Medical Sciences, Shiraz, Iran

- **Thesis title:** Psychometric Properties of the Persian Version of the Ambulatory Care   Learning Educational Environment Measure (ACLEEM) Questionnaire, Shiraz, Iran

**Master's Degree in Public Health (MPH)**                         **2013-2015**
Health Policy Research Centre, School of Medicine, Shiraz University of Medical Sciences, Shiraz, Iran

- **Thesis title:** Health Literacy in Patients with Epidermolysis Bullosa in Iran

**Master's Degree in Medical Journalism**                          **2018-2021**
Department of Medical Journalism, School of Paramedical Sciences, Shiraz University of Medical Sciences, Shiraz, Iran

- **Thesis title:** Investigating the Relationship between the Characteristics of Article Titles and the Value of Citation Metrics in Selected English-Language and Specialized Journal of Dermatology

## WORKSHOPS ATTENDED:

- Basics of Traditional Persian Medicine,
- Medical Journalism,
- Scientific Writing,
- Research in Traditional Persian Medicine,
- How to design and conduct a clinical trial (types and conditions),
- Systematic Review
- Cohort Study
- Case- Control Study
- Meta-analyses
- Ethical statements in medicine and researches
- How to read a paper?
- SPSS Software (Statistical Package for the Social Sciences)
- Stata software
- Medcalc software
- Endnote software
- R software

## PRESENTATIONS:

- More than 80 national and international presentations (oral and poster presentations) at different congresses

## PUBLICATIONS:

### _H-Index: 7 (According to Scopus); 9 (According to Google Scholar)_

1. <u>Parvizi MM</u>, Handjani F, Moein M, Hatam G, Nimrouzi M, Hassanzadeh J, et al. **Efficacy of cryotherapy plus topical Juniperus excelsa M. Bieb cream versus cryotherapy plus placebo in the treatment of Old World cutaneous leishmaniasis: A triple-blind randomized controlled clinical trial**. PLoS Negl Trop Dis. 2017;11(10):e0005957. **(IF=3.834)**

2. <u>Parvizi MM,</u> Nasrin SA, Parvizi Z. **Butterfly Patients in Iran Waiting to Specific Attention from Authorities**. Iranian Journal of Public Health. 2017 Jun 25;46(7):1005-6. **(IF=0.77)**

3. <u>Parvizi MM</u>, Namazi MR. **Tranilast Can be a Useful Addition to the Limited Anti-Epidermolysis Bullosa Weaponry**. Advanced pharmaceutical bulletin. 2017 Apr;7(1):1.

4. Mosavat SH, Marzban M, Bahrami M, Parvizi MM, Hajimonfarednejad M. **Sexual headache from view point of Avicenna and traditional Persian medicine.** Neurological Sciences. 2017 Jan 1;38(1):193-6. **(IF=1.7)**

5. Fattahi MR, Alorizi SM, Nimrouzi M, Zarshenas MM, Parvizi MM. **A randomized clinical trial on treatment of chronic constipation by traditional persian medicine recommendations compared to allopathic medicine: A pilot study**. International Journal of Preventive Medicine. 2017 Jan 1;8(1):50.

6. Parvizi Z, Azarpira N, Kohan L, Darai M, Kazemi K, Parvizi MM. **Association between E23K variant in KCNJ11 gene and new-onset diabetes after liver transplantation**. Molecular biology reports. 2014 Sep 1;41(9):6063-9. **(IF=1.8)**

7. Parvizi MM, Salehi A, Nimroozi M, Hajimonfarednejad M, Amini F, Parvizi Z. **The relationship between body mass index and temperament, based on the knowledge of traditional Persian medicine.** Iranian journal of medical sciences. 2016 May;41(3 Suppl):S14.

8. Parvizi MM, Amini M, Dehghani MR, Jafari P, Parvizi Z. **Psychometric properties of the Persian version of the Ambulatory Care Learning Educational Environment Measure (ACLEEM) questionnaire, Shiraz, Iran**. Advances in medical education and practice. 2016;7:559.

9. Parvizi MM, Heydari M, Namazi MR. **Successful Treatment of Chronic Scalp Seborrheic Dermatitis Using Traditional Persian Medicine: A Case Report and Literature Review**. Galen Medical Journal. 2017 Jun 25;6(2):157-9.

10. Parvizi Z, Sadati AK, Azarpira N, Parvizi MM, Tabrizi R, Heydari ST, Lankarani KB. **Study of Quality of Life Among Liver Transplant Candidates in Shiraz, Southwestern Iran.** Galen Medical Journal. 2016 Dec 30;5(4):180-87.

11. Parvizi MM, Heydari M. **Re: A Traditional Iranian Medicine (Majoon-e Loboob).** Traditional and Integrative Medicine. 2016 Dec 12;1(4):132.

12. Parvizi MM, Lankarani KB, Handjani F, Ghahramani S, Parvizi Z.**Health Literacy in Patients with Epidermolysis Bullosa in Iran**. Journal of Education and Health Promotion, J Edu Health Promot 2017, 6:105

13. Hamidizadeh N, Handjani F, Simaeetabar S, Ranjbar S, Gohari Moghadam M, Parvizi MM. **Composition of Minerals and Trace Elements at Mamasani Thermal Source; a Possible Preventive Treatment for Some Skin Diseases**. Journal of Education and Health Promotion, J Edu Health Promot 2017, 6:110

14. Parvizi MM, Lankarani KB, Nimrouzi M, Emami SA, Hajimonfarednejad M. **Health recommendations in the elderly in viewpoint of traditional Persian medicine** , Shiraz E Medical Journal, 2018, 19(1): e14201

15. Zare F, Jaladat AM, <u>Parvizi MM</u>. **Subject Index of the Medical Terms of the Holy Quran**. Quranmed. 2019 Feb 15;3(4):1-6.[Persian]

16. Haghjoo E, Shojaii A, <u>Parvizi MM</u>. **Efficacy of topical herbal remedies for insomnia in Iranian traditional medicine.** Pharmacognosy Research. 2019 Apr 1;11(2):188.

17. Heydarirad G, Choopani R, Pasalar M, <u>Parvizi MM</u>, Hajian P, Mirzaei HR. **The Effect of a Chickpea-Based Persian Diet on Cancer-Related Fatigue in Breast Cancer Patients: A Semi-Experimental Study**. Complementary medicine research. 2019 May 27:1-8. **(IF=0.88)**

18. Hamidizadeh N, Ranjbar S, Ghanizadeh A, <u>Parvizi MM</u>, Jafari P, Handjani F. **Evaluating prevalence of depression, anxiety and hopelessness in patients with Vitiligo on an Iranian population**. Health and Quality of Life Outcomes. 2020 Dec 1;18(1):20. . **(IF=2.66)**

19. Jowkar F, Godarzi H, Parvizi MM. **Can we consider silymarin as a treatment option for vitiligo? A double-blind controlled randomized clinical trial of phototherapy plus oral Silybum marianum product versus phototherapy alone**. Journal of Dermatological Treatment. 2020 Apr 2;31(3):256-60. **(IF=2.11)**

20. Nimrouzi M, Daneshfard B, Parvizi MM. **Dream in Persian medicine perspective: a narrative review**. International Journal of Dream Research. 2020 Mar 30:119-22.

21. Saki, N., Ahramiyanpour, N., Heiran, A., Alipour, S. and <u>Parvizi, M.M.</u>, 2020. **Efficacy of topical dimethyl sulfoxide (DMSO) 50% solution vs tretinoin 0.5% cream in treatment of patients with primary macular amyloidosis: A split-side single-blinded randomized clinical trial**. Dermatologic Therapy, p.e13305. **(IF=2.327)**

22. Jowkar F, Kahnooj MH, Aslani FS, <u>Parvizi MM</u>. **Clinicopathological evaluation of patients with rippled pattern pigmentation of the skin: A single-center study**. Dermatologic Therapy. 2020 Feb 19:e13278. **(IF=2.327)**

23. Niazi M, Mehrabani M, Namazi MR, Salmanpour M, Heydari M, Karami MM, <u>Parvizi MM</u>, Fatemi I, Mehrbani M. **Efficacy of a topical formulation of henna (Lawsonia inermis L.) in contact dermatitis in patients using prosthesis: A double-blind randomized placebo-controlled clinical trial.** Complementary Therapies in Medicine. 2020 Jan 15:102316. **(IF=1.97)**

24. Baniahmad M, Ghahartars M, Sari Aslani F, Sepaskhah M, <u>Parvizi MM</u>. **A 28-year-old man with an asymptomatic firm plaque on his right shin: What is your diagnosis? have been submitted**. Iranian Journal of Dermatology. 2019 Jun 1;22(2):82-4.

25. Amini F, Jaladat AM, Atarzadeh F, Mosavat SH, <u>Parvizi MM</u>, Zamani N. **A review on the management of asthma in the Avicenna's Canon of Medicine.** Journal of Complementary and Integrative Medicine. 2019 Sep 17;16(4).

26. Parvizi MM, Zare F, Handjani F, Nimrouzi M, Zarshenas MM. **Overview of herbal and traditional remedies in the treatment of cutaneous leishmaniasis based on Traditional Persian Medicine**. Dermatologic Therapy. 2020 May 13. . **(IF=2.327)**

27. Hassanshahi S, Parvizi MM, Bahrini M, Pouladi Sh, Mirzaei K. **Assessment the efficacy of inhalation of aroma of orange extract and lavender extract, in comparison with placebo, on dental anxiety in patients referred to a dental clinic in Shiraz: a double-blinded controlled randomized clinical trial.** Journal of Medicinal Plants. 2020 Jul 10;19(74):293-307.

28. Zare F, Parvizi MM, Saki N, Jaladat AM. **Applications of Ma'aljobon, a natural remedy from traditional Persian medicine, in dermatology: A journey from past to modernity**. Dermatologic Therapy. 2020 Jun 30:e13931. **(IF=2.327)**

29. Ghahartars M, Ahmadyan M, Salimkhanian M, Yazdanpanah S, Parvizi MM, Zomorodian K. **Levels of zinc and vitamin D3 in patients with pityriasis versicolor: A study in Southern Iran, Shiraz.** Dermatologic Therapy. 2020 Oct 18:e14427.Alyasin S, Nabavizadeh SH, Esmaeilzadeh H, Heydari ST, Mosavat SH, Parvizi MM, Hashemi SM, Hashempur MH. **Efficacy of oral supplementation of whey protein in patients with contact dermatitis: A pilot randomized double-blind placebo-controlled clinical trial**. Dermatologic Therapy. 2020 Sep 2:e14260. **(IF=2.327)**

30. Torabizadeh C, Rousta S, Gholamzadeh S, Kojouri J, Jamali K, Parvizi MM. **Efficacy of education delivery through multimedia and text messaging on the psychological parameters of patients scheduled for coronary angiography: a single-blind randomized controlled clinical trial.** BMC Cardiovascular Disorders. 2021 Dec;21(1):1- 9. **(IF=2.078)**

31. Ghahartars M, Zahraei SA, Sari Aslani F, Hadibarhaghtalab M, Parvizi MM. A **58-year-old man with porokeratosis ptychotropica: A successful treatment with alone cryotherapy and literature review.** Dermatologic Therapy. **(IF=2.327).**

32. Jaladat AM, Amiri-Ardekani E, Ramezani PS, Boroughani M, Emami Alorizi M, Parvizi MM. **Correlation between gastrointestinal symptoms and adherence to traditional Persian medicine dietary recommendations in patients with vitiligo; a cross-sectional study.** Journal of complementary & integrative medicine. 2021 Apr 2. doi: 10.1515/jcim- 2020-0192.

33. Pourshahidi S, Mansourian A, Habibzadeh M, Parvizi MM, Nimrouzi M. **Association Between Geographic Tongue and Personal Temperament Based on the Knowledge of Persian Medicine.** Shiraz E-Medical Journal. 2021 May 31;22(5).

34. Parvizi MM, Shabani M, Saki N, Rajabi S, Rampp T, Pasalar M. **Association of functional dyspepsia with selected dermatology complaints and sleep disturbances based on traditional Persian medicine.** Iranian Journal of Dermatology. 2021 Jun;24(2):110-6.

35. Chogani F, <u>Parvizi MM</u>, Murrell DF, Handjani F. **Assessing the Quality of Life in the Families of Patients with Epidermolysis Bullosa: The Mothers as Main Caregivers,** International Journal of Women's Dermatology, 2021 December; 7 (5): 721-726.

36. <u>Parvizi MM</u>, Fatehi N, Jaladat AM, Gholampour Z, Shahriarirad R, Erfani A. **Epidemiological Factors in Patients with Dermatologic Conditions Referring to the Clinic of Traditional Persian Medicine: A Cross-sectional Study**. International Journal of Clinical Practice. 2021 Sep 4:e14788.

37. Pasalar M, Bagheri Z, Hojati-Moghadam A, Büssing A, <u>Parvizi MM</u>. **Psychometric properties of a Persian version of the SpREUK-P questionnaire: an instrument for measuring the importance and frequency of spiritual/religious practices in Iranian patients with chronic gastrointestinal disease.** Journal of Religion and Health. (In press).

38. Mosavat SH, Mirzaei HR, Mofid B, Gharehgozlou R, <u>Parvizi MM</u>, Bradley R, Pasalar M, Heydarirad G. **Efficacy of lettuce seed syrup on insomnia in patients with breast cancer: a pilot double blind randomized placebo controlled clinical trial**. Journal of Complementary and Integrative Medicine. 2021 Aug 30.

39. Pasalar M, Tabatabaei F, Bradley R, Tajadini H, Kamali M, Hasheminasab FS, <u>Parvizi MM</u>. **Mechanistic support of traditional Persian medicine for the treatment of acne vulgaris: A scoping review**. Journal of Cosmetic Dermatology. 2021 Sep 26. (In press)

40. <u>Parvizi MM</u>, Ghahartars M, Jowkar Z, Saki N, Kamgar M, Hosseinpour P, Zare H, Sari Aslani F. **Association of Non-Melanoma Skin Cancer with Temperament from the Perspective of Traditional Persian Medicine: A Case-Control Study.** Iranian Journal of Medical Sciences. 2022 Apr 6.

41. Sepehri NZ, <u>Parvizi MM</u>, Habibzadeh S, Handjani F. **Lettuce as an Effective Remedy in Uremic Pruritus: Review of the Literature Supplemented by an In Silico Study**. Evidence-Based Complementary and Alternative Medicine. 2022 Mar 29;2022.

42. Sadati AK, <u>Parvizi MM</u>, Forouhari S, Hosseini SA, Jahromi MH, Jafferany M. **A Qualitative Study on Stigmatization Associated With COVID-19.** The Primary Care Companion for CNS Disorders. 2022 Mar 24;24(2):40320.

43. Boldaji FT, Amini M, <u>Parvizi MM</u>. **Psychometric properties of the Persian version of System for Evaluation of Teaching Qualities by students: A tool for assessing clinical tutors from students' viewpoint.** Journal of Education and Health Promotion. 2022 Jan 1;11(1):92.

44. Ghahartars M, Avandi B, Moradi Kashkooli N, Ahramiyanpour N, <u>Parvizi MM</u>. **Epidemiological and clinical features of the hospitalized patients with erythroderma: A cross-sectional study**. Iranian Journal of Dermatology. 2022 Mar 1;25(1).

45. Sadati AK, <u>Parvizi MM</u>, Forouhari S, Hosseini SA, Jahromi MH, Jafferany M. A **Qualitative Study on Stigmatization Associated With COVID-19**. The Primary Care Companion for CNS Disorders. 2022 Mar 24;24(2):40320.

46. Sepehri NZ, <u>Parvizi MM</u>, Habibzadeh S, Handjani F. **Lettuce as an Effective Remedy in Uremic Pruritus: Review of the Literature Supplemented by an In Silico Study**. Evidence-Based Complementary and Alternative Medicine. 2022 Mar 29;2022.

47. <u>Parvizi MM</u>, Ghahartars M, Jowkar Z, Saki N, Kamgar M, Hosseinpour P, Zare H, Sari Aslani F. **Association of Non-Melanoma Skin Cancer with Temperament from the Perspective of Traditional Persian Medicine: A Case-Control Study**. Iranian Journal of Medical Sciences. 2022 Apr 6.

48. Shabankareh A, Amini M, Zarifsanaey N, <u>Parvizi MM</u>. **Healthcare Staff's Attitude toward the E-learning On-the-job Courses and its Association with Self-Assessment Effectiveness of these Programs**. Interdisciplinary Journal of Virtual Learning in Medical Sciences. 2022 May 16.

49. <u>Parvizi MM</u>, Salami MH, Moini Jazani A, Javaheri R, Jaladat AM, Handjani F. **Complementary and integrative remedies in the treatment of chronic pruritus: A review of clinical trial**s. Journal of Cosmetic Dermatology. 2022 May 17.

50. Niazi M, Parvizi MM, Saki N, Parvizi Z, Mehrbani M, Heydari M. **Efficacy of a topical formulation of henna (Lawsonia inermis L.) on the itch and wound healing in patients with epidermolysis bullosa: A pilot single-arm clinical trial.** *Dermatol Pract Concept.* 2022;12(3):e2022115.

## BOOK CHAPTER:

1. <u>Parvizi MM</u>, Saki M, Handjani F, Heydari M. **Olive in Traditional Persian Medicine: An Overview.** Olives and Olive Oil in Health and Disease Prevention. 2021 Jan 1:175-92.

## PROFESSIONAL DEVELOPMENT:

- International Society for Complementary Medicine Research (ISCMR), Member since 2016
- Iranian Society of Persian Medicine, Member since 2012
- The Medical Council of the Islamic Republic of Iran, Member since 2010
- Talented office, Shiraz University of Medical Sciences, Member since 2017
- Essence of Parsyan wisdom institute, Member since 2012
- Iranian EB Home, Member, since 2015
- EB Clinet Team, Member, Since 2020

## TEACHING EXPERIENCE AND SCIENTIFIC CONSULTATION

- Principles of Iranian Traditional Medicine:Herbal Medicine:

- Traditional Persian Manuscripts
- Dermatology manuscript
- Thesis advisor of undergraduate students of medicine and para-medicine
- Scientific consultation
- Medical journalism

## PEER REVIEWER FOR FOLLOWING JOURNALS:

- Shiraz E Medical Journal
- Dermatologic Therapy
- Journal of Cosmetic Dermatology
- Iranian Journal of Medical Sciences
- Iranian Journal of Dermatology
- Galen Medical Journal
- Evidence-Based Complementary and Alternative Medicine
- Journal of JundiShapur Educational Development (In Persian language)
- Journal of Complementary and Integrative Medicine
- Complementary Medicine Journal (In Persian language)
- Traditional and Integrative Medicine
- Journal of International Medical Research
- BMC Complementary & Alternative Medicine
- Interdisciplinary Journal of Virtual Learning in Medical Sciences
- Middle East Journal of Cancer
- Journal of Integrative and Complementary Medicine
- BMC Psychology
- PLoS One
- Clinical Case Reports
- SAGE Open Medical Case Reports
- Tissue Engineering and Regenerative Medicine
- Skin Research and Technology
- Clinical, Cosmetic and Investigational Dermatology

## AWARDS

- Best researcher, School of Medicine, Islamic Azad University, 2010, 2011
- Best medical student, School of Medicine, Islamic Azad University, 2010, 2011
- Outstanding student of Shiraz University of Medical Sciences, 2015, 2016, 2017
- Statue and Prize of Alborz Endowment Foundation, 2017
- Shahid Motahhari Educational festival, 2017
- Heel award for clinical research, Berlin, Germany, 2018
- Outstanding researcher of Shiraz University of Medical Sciences, 2018

- Persian Gulf Innovations and inventions Festival, Iran's National Elites Foundation, 2018
- Outstanding professor of Shiraz University of Medical Sciences, 2022

# EXHIBIT 4

## *Iran Thalassemia Society v. OFAC*

## MOLNLYCKE REJECTION LETTER



**EB Home**
**Seyed Hamid Reza Hashemi Golpaygani**
**No. 164, Brazil St. Sheik Bahai St,**
**Tehran, Iran**

**Dear Mr. Seyed Hamid Reza Hashemi Golpaygani,**

I am referring to the letter sent from you, as founder and CEO of EB home, to Mr. Richard Twomey, CEO of Mölnlycke Healthcare.

First of all we would like to recognize the work you do for the patients diagnosed with Epidermolysis bullosa (EB), and express our appreciation for you choosing to work with Mepilex dressings as part of you treatment program. EB is indeed a terrible disease and we do express our greatest sympathy for the patients suffering from it.

Unfortunately, due to the US Economic sanctions in force Mölnlycke Healthcare have decided not to conduct any business in relation to Iran for the time being. This also applies to business conducted under any form of exemption to the US Economic sanctions. We are constantly monitoring the situation and hope to be able to support your need in the near future.

We sincerely regret the situation.

Sincerely yours,

Kristin Hedlund
Executive Vice President, Legal
General counsel

# EXHIBIT 5

## *Iran Thalassemia Society v. OFAC*

## RAPPORTEUR DOULAN COMMENTS

*Persian unofficial translation below*

## Preliminary findings of the visit to the Islamic Republic of Iran by the Special Rapporteur on the negative impact of unilateral coercive measures on the enjoyment of human rights

<u>Tehran (18 May 2022), the United Nations Special Rapporteur on the negative impact of unilateral coercive measures on the enjoyment of human rights, Prof. Alena Douhan, visited the Islamic Republic of Iran from 7 to 18 May 2022 to assess the negative impact of unilateral coercive measures on the enjoyment of human rights of the Iranian people and others.</u>

Good afternoon, ladies and gentlemen,

As a UN Human Rights Council mandate holder I have had a country visit to the Islamic Republic of Iran (Iran) from 7 to 18 May 2022 to collect information in the spirit of comprehensiveness, independence, impartiality and verification issues pertaining to      the negative impact of unilateral coercive measures on the enjoyment of human rights, secondary sanctions, as well as measures that demonstrate over-compliance. Everything in this report is of a preliminary character. A final report will be presented to the Human Rights Council in September of this year.

I wish to warmly thank all my interlocutors for their availability to meet and for the submitted information. All input will be thoroughly processed and analysed.

I also wish to thank the Government and the High Council for Human Rights for the transparent and constructive way in which they facilitated this visit and arranged all requested official meetings. I met many Government representatives and their respective teams, including the Secretary General of the Islamic Republic of Iran's High Council for Human Rights; Vice-President for Women and Family Affairs; Minister of Foreign Affairs; Minister of Justice; Minister of Interior; Head of the Foreign Policy and National Security Commission; Head of the Human Rights Committee and member of the Health Commission of the Iranian Parliament; Deputy Minister of Health, Treatment and Medical Education; Deputy Minister for Agricultural Affairs of the Ministry of Agriculture-Jihad; Deputy Minister for International Affairs of the Ministry of Science, Research and

Technology; Deputy Minister for Legal and International Affairs of the Ministry of Foreign Affairs; Deputy Minister of the Ministry of Economic Affairs and Finance and Head of Foreign Investment Organization; Deputy Minister of Petroleum; Deputy Minister of Sport and Youth; Head of the Health Insurance Organization; Head of the Food and Drug Organization; Head of the Center for International Affairs of the Ministry of Education; Head of the State Welfare Organization; Head of the Crisis Management Organization; Head of Civil Aviation  Organization; Head of Iran's Chamber of Commerce; Head of the Social Security Organization; Governor of Isfahan Province; as well as representatives from the Ministry of Energy; Ministry of Industry, Mine and Trade; Ministry of Roads and Urban Development; Ministry of Cooperatives, Labour and Social Welfare; Ministry of Cultural Heritage, Tourism and Handicrafts; Plan and Budget Organisation and Central Bank.

I met also with representatives of a number of civil society organisations from different areas and sectors, healthcare providers, associations and charities, representatives of public and private financial institutions, humanitarian actors, businesses and academia. I also held consultations with UN entities, including specialized agencies and programmes present in Iran, and with members of the diplomatic community.

I take this opportunity to express my appreciation to the UN Resident Coordinator and the whole UN country team for all their support during the visit.

## **Context**

The United States has imposed economic, trade and financial sanctions on Iran since the late -1970s, with a comprehensive trade ban since 1995 and measures to isolate Iran from the international commercial and financial system. These were expanded in the mid-2000s and again after 2010, extending to many economic sectors. U.S. sanctions also targeted the Iranian Central Bank and commercial banks.

The European Union adopted restrictive measures and comprehensive economic and trade sanctions against Iran in 2010, supplemented by an oil embargo in 2012 and trade prohibitions involving key sectors, and the freezing of assets of the Central Bank, the Iranian shipping and ship-building sector and a number of

persons and entities, with significant restrictions on financial services and exports and imports.

After the conclusion of the JCPOA, endorsed by the UN Security Council resolution 2231 which terminated all the UNSC sanctions, the EU lifted its sanctions except an arms and military technology embargo; and the United States ceased application of sanctions as set forth in the JCPOA while still banning trade and investment with Iran. On 8 May 2018 the United States unilaterally withdrew from the JCPOA. It re-imposed all lifted sanctions, added new financial sanctions, including by designating the Central Bank and several other Iranian banks. Most foreign financial institutions have now left the Iranian market. Iranian assets frozen in foreign accounts are estimated at USD 100-120 billion, and the US list of designations includes more than 1700 individuals and entities.

Currently, the EU, the UK, Australia, Republic of Korea and others have unilateral sanctions, asset freezes and travel bans against a vast number of individuals, entities and  trade restrictions. Canada imposed sanctions against key Iranian economic sectors and restricts financial activity, and currently has above 200 listed individuals and entities.

This environment has led to de-risking and over-compliance, and many actors have disengaged from activities or relationships with Iran for fear of severe consequences.

**Impact of unilateral sanctions on special areas**

Unilateral sanctions have been reported to have a multifaceted negative impact on Iran's economy and almost all sectors. Numerous studies demonstrate direct links between trade bans and financial and other restrictions on economic indicators. Sanctions on key sectors, including oil, which represented more than two third of the country's exports, led to a radical reduction in public revenues. Statistics show that the re-imposition of unilateral sanctions since 2018 has had major adverse effects on Iran's trade and economy.

Furthermore, Iran's GDP went from growing 3.8% in 2017 to minus 6% in 2018, after the US withdrawal from the JCPOA and minus 6.3% in 2019, before the COVID-19 outbreak, while it showed signs of slight recovery in 2020 and 2021. Interlocutors highlighted the inflationary consequences of sanctions, with spiking prices in basic goods and services, as well as medicines and medical devices,

challenging the Government's capacity to support those in need. Together with the devaluation of the national currency, high unemployment and disruptions from the COVID-19 pandemic, this has put enormous pressure on poor and vulnerable segments of the population, causing additional social harm. Poverty rates have been rising with over 3 million new poor in the period 2017-2019.

Numerous interlocutors have expressed their concerns about the serious effects of Iran's financial isolation. In practical terms, all sectors of the Iranian economy, and the lives of Iranians inside and outside of the country, have been severely impacted by the inability to make international payments using Iranian accounts, even for staffs of international organizations and foreign diplomats. The designation of Iran's main financial institutions, including the Central Bank, asset freezes and over-compliance by foreign financial institutions and businesses have been key elements in this process. I have heard a number of testimonies spanning from the inability to import and export goods and services, including for humanitarian assistance, to suspensions of major infrastructure and development projects, the inability to maintain memberships in international organisations and associations, as well as the inability to implement joint academic and scientific projects, among others.

There is evidence of a clear link between the imposition of sanctions and financial and trade isolation policies on the one hand, and their adverse    impacts on the capabilities of the national healthcare system on the other. These not only concern the supply and availability of medicines and medical devices but also budget allocations for existing healthcare services as well as research and development of new therapies and procedures. With the re-imposition of sanctions resulting in rising costs and reduced supplies, including of raw materials for domestic pharmaceutical production, a deterioration is observed in Iran's national health standards with particular impact on children, despite reported Government initiatives to strengthen overall healthcare capacity through the development of medical and pharmaceutical self-sufficiency with the strengthening of local production and the increased number of general and specialized clinics, pharmacies, and hospital beds in 2018-2020.

Of particular concern are significant challenges and obstacles in procuring and delivery of life-saving medicines and medical devices to treat rare and severe diseases, including certain cancers, thalassemia, haemophilia, multiple sclerosis,

autism, epidermolysis bullosa (EB) and HIV/AIDS due to foreign companies' over-compliance and restrictions on processing payments through the banking system and deliveries. I was also informed about the reluctance of insurance companies to insure air cargos, and about significant delays that caused deliveries of medicines close to their expiration dates.

I received disturbing testimonies of shortages and exorbitant prices for medicines and the loss of lives they have caused, and cases in which patients ration doses as their dire economic situations force them to resell part of their medicine to cover basic needs, including food. Prohibition of trade in some medical products deemed by OFAC to be of dual use (civilian and military), such as asthma sprays, inhalers, spectrophotometry, radioisotopes and radiology technologies has even worsened the situation.

Although medicines and medical devices are technically not subject to sanctions, the vagueness and complexity of the licensing processes, the persistent fear among producers and suppliers, the restrictions in the processing of payments, and the obstacles to shipping these goods have rendered them inaccessible to the Iranian public, in particular to those most in need, in particular in remote and rural areas. Government institutions and humanitarian non-government actors are striving to find alternatives, incurring additional costs due to the involvement of brokers and intermediaries.

The adverse effects of sanctions on healthcare have also been compounded by the dire impact of COVID-19 in Iran.  The government's management of the pandemic has been hindered by challenges in the procurement of vaccines through third countries and the COVAX mechanism, due to delays in the approval of funds transfers by foreign financial institutions to the World Health Organisation and other problems due to unilateral sanctions, and the need to rely on the assistance and responsiveness of UN specialised agencies and other sources to exceptionally facilitate these transfers.

During the visit, I had also met with actors in the areas of social protection and humanitarian assistance. The economic hardships coupled with the pandemic, unilateral sanctions and over-compliance have led to a staggering rise in the number of people needing support, with a reported five-fold to eight-fold increase in the last two years. The sharp fall in Government revenues and private

businesses' donations and the inability to transfer international donors' financial support have led to a decrease in governmental and non-governmental social support programmes.

Sanctions and the resulting economic pressures also have a pronounced gender perspective. Economic sectors that traditionally employ women have been particularly affected and an increasing number of women have entered the informal economy to respond to the financial needs of their households. Per the information received, the women's unemployment rate is approximately twice that of men (48% and 25% respectively). Several interlocutors also raised concerns about the precarity of approximately 3 million female-headed households and of the vulnerability of 9 million women who find themselves in low-income categories of the population, and face difficulties in accessing basic services, including healthcare. Worsening economic conditions and bank transfer bans have also affected the elderly population. The high inflation has slashed their purchasing power and increased significantly their medical costs.

Another important issue is the situation of persons with physical and mental disabilities and the challenges they face in accessing the appropriate medicines and medical devices, assistive and rehabilitation equipment, due to foreign suppliers' over-compliance and obstacles in processing international payments, not to mention the impact of the sanctions-induced economic downturn and its consequences for the value of the social security benefits they receive. Costs of some medicines and rehabilitation equipment have reportedly risen ten-fold between 2018 and this year.

Iran hosts more than 5 million migrants and refugees, mostly of Afghan origin and undocumented, and in need of humanitarian aid. The situation worsened after the 2021 Taliban takeover forced more than 850,000 Afghans to cross into Iran. The Government has expressed its commitment to keep implementing inclusive policies, including equal access to education and healthcare. However, due to the economic impact of sanctions, the restrictions on financial transactions and delivery of provisions, and donors' reported reduced interest, compounded by the pandemic outbreak, the costs of humanitarian assistance have jumped almost 50%. This has harmed the ability of the Government and humanitarian actors to implement projects, including providing basic goods and building schools and health centers to benefit this vulnerable population

Insufficient revenues have also undermined the Government's capability to maintain and improve essential infrastructure and engage in vital development projects. The lack of access to the international financial system, disruptions in processing payments and foreign businesses' refusal to accept foreign currency guarantees issued by Iranian banks have seriously affected Iran's engagement in international partnerships for such projects, and for developing and modernizing Iran's industries. Information received refers to the suspension of hydropower, irrigation and water supply projects due to the non-disbursement of foreign funds and the impossibility to attract investments and new technologies for necessary upgrades in key industrial sectors, such as oil refineries, gas fields, power plants, pipelines and power grids, with serious adverse effects on the daily lives of people, as well as heightened environmental risks. Similar concerns have been raised in the area of infrastructure, including roads, airports, land and air transport. As a result of the Iranian airlines and shipping companies being designated by the US Treasury, they cannot procure spare parts, equipment and associated services to maintain and upgrade their respective fleets, raising the risks for airline passengers for the former and the risks for water pollution due to leakages for the latter.

It has also been reported that sanctions prevent Iran – a disaster-prone country experiencing 45 of the 47 types of natural disasters – from investing in disaster response and recovery. Delays in receiving financial allocations for emergency interventions and in the delivery of life-saving medicines and equipment are reported to extend from 1 week up to a year, due to banking transaction restrictions. The restrictions also prevent aid organisations from receiving financial support and donations from abroad, while procurement of search-and-rescue helicopters and air-ambulances is almost impossible due to the failure to secure financing and the fact that they may be deemed "dual-use".

Similar impediments are reported by interlocutors engaged in the arts and in matters pertaining to cultural heritage. I received information about the discontinuation of international donations, the inability to participate in international events due to travel restrictions or to host international events due to the reluctance of foreign counterparts to collaborate for fear of repercussions, and the inability to maintain memberships and international partnerships, including for the scientific assessment and preservation of cultural heritage sites.

Prohibition of exports, bank transfers, secondary sanctions and the mere fear of sanctions, have translated into a pervasive climate of over-compliance, undermining transfers of technology, knowledge, intellectual and cultural cross-fertilisation. They have hampered mutual enrichment through the access to exchanges of experience, knowledge and expertise between Iranian and foreign researchers. Iranian scientists report on having limited or no access to international medical and other scientific fora; foreign scientists, scholars and researchers have refused or hesitated to risk attending scientific events in Iran, out of fear of reputational risk or of being refused future entry into the United States. Subscriptions to medical and other scientific journals, as sources of research and knowledge, have been suspended or stopped because Iranian subscribers could not pay the subscription fees.

Research and academic articles submitted to international journals for publication have been refused simply because their authors were Iranian. Access to foreign universities, institutes or research centres have been restricted or prohibited. Student exchanges and scholarships to study abroad have been cancelled. Scientists on editorial boards of scientific journals have been reluctant to work with Iranian counterparts, and have either hesitated or refused to review or publish their research papers because they fear problems due to US sanctions. Parents in Iran have not been able to transfer enough money to the bank accounts of their children studying abroad because, according to the banks, the money was coming from Iran. Iranian students abroad have had their bank accounts closed due to their nationality. Iranians going abroad for professional reasons cannot book hotel rooms because they do not have international credit or payment cards, and must pay in cash or through third parties.

The re-imposition of sanctions has also led to a sharp fall in tourism and the loss of thousands of jobs, both in the tourism sector and among those – often women – in rural areas who make handicrafts. They have also prevented foreign tourists from enjoying Iran's rich cultural heritage as one of the oldest civilisations, due to the impossibility to pay in ways other than cash. Iran's artistic scene has also suffered from the sanctions.

In breach of the Olympics Charter, which provides that sport and politics should not be mixed, Iranian athletes have been unable to procure internationally approved

sporting equipment; they have been denied training opportunities abroad and entry visas to participate in some of international competitions.

A local NGO researching international best practices to treat child drug addicts has been refused access to models developed by a US institution. It has taken 8 months for the same organisation, which also assists Afghan refugees, to identify a bank in Europe that would accept receiving EU funding to support one of its projects in Iran.  The Iranian Autism Association, which provides assistance to 6,000 families, has not been able to access new therapies which are being developed outside the country because relevant institutions are refusing to cooperate with it.

Similar situation concerns participation of Iran in international cooperation. In particular, Iran's membership in international organisations, including the United Nations system, has been suspended because the state could not transfer its dues via the banking system. Among others, it was unable to pay its fees to UNESCO and its voting rights in the WHO were suspended for the same reason. The Iranian Chamber of Commerce has not been able to pay its fees to the International Chamber of Commerce, risking losing its membership and the advantages attached to it, as well as inability to transfer funds to international arbitral tribunals. Iranian diplomats in Europe have been denied the right to open bank accounts in countries where they were posted, making the payment of their salaries and of their living expenses complicated. Foreign diplomats posted in Iran have not been able to transfer money from their banks at home to Iran.

**United Nations assistance, over-compliance and humanitarian exemptions**

The work of UN agencies, be it development, technical assistance or humanitarian, is often hampered by sanctions. Often, more than sanctions themselves, the fear of sanctions fosters a climate of over-compliance by banks, suppliers and other foreign actors, public as well as private, which has undermined the UN's work by hurting its efforts more than sanctions themselves.

According to OFAC, food and medicine are supposed to be exempt from sanctions on humanitarian grounds. While this may be true on paper, the procurement of these goods implies the cooperation of producers, suppliers, transporters and banks – a cooperation which is not forthcoming amid their fear of sanctions. Humanitarian exemptions have been granted on a case by case basis and their effective implementation requires good planning, transparent negotiation,

communication and effective logistics. Even in such cases, over-compliance by intermediary banks can hinder the process. Almost always, banks – relying on their legal and risk advisors – refuse the transactions, delaying or obstructing the stream of humanitarian aid.

Fears of sanctions has sometimes depended on individual perceptions of the risks, much unpredictability, and a tendency by relevant actors (banks, suppliers, donors) to take zero risk and protect their interests. As procurement processes to implement projects usually takes a lot of time and involves lengthy discussions, procedures and negotiations due to sanctions; often orders are cancelled at the last minute and must be re-advertised, prolonging delays, raising costs and deferring the delivery of aid.

As for critical health supplies, this has had detrimental, irreparable and sometimes lethal effects on patients. An experienced UN official noted that he had never faced so much difficulty to bring life-saving equipment into a country. As a result, for instance, UN assistance efforts in 2019-2020 were seriously hampered when 25 provinces were affected by severe floods, affecting an estimated 2 million people. Several countries that were ready to provide aid, could not, because of sanctions. Access to foreign satellite imagery was denied. Iran, which is earthquake-prone, has not been able to purchase specialised equipment to reduce the risks: shaking tables for buildings, which are made in Japan, cannot be purchased.

Helicopters, sometimes the only way to reach affected areas and victims, cannot be bought often with reference to their possible dual use, and those available cannot always be maintained because of the difficulty or impossibility to obtain spare parts. The same applies to the maintenance, renovation or replacement of ambulances and other medicalised vehicles.

Because of over-compliance, the difficulties and concerns reported by humanitarian actors in procuring essential goods, which often include life-saving ones, are shared by private businesses. They indeed confirmed that the same constraints have been so stringent that they have made life very difficult, discouraging them to invest because of the difficulties or impossibility to conduct financial transactions. A key trade actor confirmed that the weight of secondary sanctions deepened the negative impact of sanctions, undermining the economy, increasing poverty and threatening the health and nutrition of the most vulnerable,

and that "secondary sanctions were worse than the sanctions themselves". For these reasons, private actors have stated that doing business with Iran had become a high-risk venture.

**Assessment of legality**

In view of the complexity of unilateral sanctions imposed against Iran's economy, nationals and companies, the current assessment reflects only a few relevant aspects.

In particular, the state of national emergency announced by the U.S. Government in 1995 as the ground for sanctions against Iran, last extended in March 2022 for another year, does not correspond to the requirements of art. 4 of the International Covenant on Civil and Political Rights (ICCPR), such as the existence of a threat to the life of the nation, the limiting of measures to the exigencies of the situation, a limited duration, the absence of discrimination, and the prohibition to derogate from the right to life or to punish activity that does not constitute a criminal offence.

I reiterate that under international law unilateral measures without or beyond authorization of the UN Security Council may only be taken if they do not violate international obligations of states (retortions) or if their wrongfulness can be excluded as countermeasures taken in accordance with standards of law of international responsibility: to be applied against states for violations of international legal norms, to aim to restore the fulfillment of international obligations, to be proportional to the breach occurred, to be necessary, and to not violate peremptory norms of international law and fundamental human rights.

I also remind that Central Bank assets and property used for public purposes is recognized to enjoy full immunity from foreign jurisdiction and seizure, so states can exercise the obligation to guarantee enjoyment of human rights on their territory.

Furthermore, maximum pressure policies and campaigns as well as threats addressing third states, companies and individuals violate the principle of cooperation between states, the principle of peaceful settlement of international disputes, and the principles of sovereign equality and non-intervention in the domestic affairs of states.

I am also concerned that existing unilateral targeted sanctions as a punitive action violate, at the very least, obligations arising from universal and regional human rights instruments, many of which have a peremptory character, including procedural guarantees and presumption of innocence.

Besides that, applying extraterritorial jurisdiction to nationals and companies of third states for cooperation with Iranian public authorities, nationals and companies, companies cooperating with Iran or dealing with Iranian products, or with reference to the use of the USD for payment or as an instrument in the process of converting money, by imposing secondary sanctions, and alleged threats to such third-state parties, is illegal under international law and increases the risks of over-compliance.

Preventing Iranian diplomatic, consular and special missions and staff members from opening and maintaining bank accounts and exercising diplomatic and consular functions do not conform to provisions of the Vienna conventions on diplomatic and consular relations. Impeding payments of Iran's assessed and voluntary contributions to international organizations prevents its engagement with them, creating the risk of suspension of voting rights and violating the principles of sovereign equality of states and cooperation in good faith.

It follows that unilateral sanctions against Iran do not conform to a broad number of international legal norms, are introduced to apply pressure on a state, cannot be justified as countermeasures under the law of international responsibility, and therefore can be qualified as unilateral coercive measures repeatedly condemned in resolutions of the UN Human Rights Council and the UN General Assembly.

### Conclusions

Primary unilateral sanctions, secondary sanctions, threats of sanctions, de-risking policies and over-compliance with sanctions have been substantially exacerbating humanitarian situations in Iran.

Sanctions imposed on main export goods, designation of all Iranian banks along with a long list of companies and nationals, including some engaged in pharmaceuticals and food production, have resulted in reduced state revenue, inflation, growing poverty, insufficient resources to guarantee basic needs of people with low incomes and other vulnerable groups, including people suffering

from rare or severe diseases, disabled people, Afghan refugees, women-led households and children.

They have also prevented the Government from having resources to develop and maintain essential infrastructure including hospitals, schools, housing, refineries, roads, civil aviation, tankers and many others, and to maintain the necessary level of readiness to respond to natural disasters; and have resulted in the reduction of social support programs and prevented implementation of academic, cultural, environment and development projects, with a devastating effect on Iran's whole population.

The stated readiness and threats to impose secondary sanctions, criminal and civil penalties against individuals and companies circumventing unilateral sanctions regimes, as well as de-risking policies and over-compliance by third-country banks and private companies has resulted in growing problems to transfer or receive money when natural or legal persons of Iran are participants in the transactions, including closing long-established bank accounts; extending the length and costs of bank transfers, and creating the need to do transactions via third-country nationals or seek alternative ways of payments and procurement, which are often impossible or entail long delays, misuse of the situation by the third parties, deliveries of low-quality or counterfeit materials, reagents, medicine may cause various challenges in economic, social, crime prevention, and cultural fields

Preventing Iran from participating in international cooperation by impeding its ability to pay membership fees for international organizations, or to have inter-parliamentary cooperation, hampers Iran from international cooperation and prevents the fulfillment of the right to development.

I note with concern that due to the unavailability of new machinery, spare parts, software and technologies, frozen assets in a number of countries, and the lack of access to emergency loans, Iran's people are affected by impediments to gasoline supplies, health care, adequate mechanisms of monitoring and responding to natural disasters, and face deteriorating situations with transportation and environmental security, maintenance of critical infrastructure, implementation of innovative technologies, growing risks of oil, air and land pollution, and deteriorating working conditions that affect economic and social rights and the rights to health and to life.

I underline that reduced revenues from the export of goods, low salaries and the deteriorating economic situation, and inflation have reduced the capability of the Government to maintain the level of social support it used to exercise in the spheres of food, health and housing, affecting thus the right to food, freedom from poverty, right to a decent life, right to health, and economic and social rights.

While recognizing the existence of OFAC general licenses for procuring and delivering with exemptions medical and agricultural goods to Iran, in practice humanitarian exemptions for food and medicine appear ineffective and nearly non-existent due to the real or alleged fear of secondary sanctions, civil and criminal charges, reported "advice" not to do any business in Iran, the impossibility, complexity, uncertainty and length of bank payments and good deliveries. This affects the whole scope of human rights of the Iranian people.

The refusal by producers of medicines and medical devices, raw materials,  food stuff and agricultural  commodities , spare parts, software, vaccines for human beings and livestock, seeds, fertilizers and other essential goods to conclude contracts with Iranians, the rejection of banks to do any transaction, and of transportation companies to guarantee deliveries, has resulted in documented growing mortality and disability rates of people with rare and severe diseases; greater deliveries and use of low-quality, expired and counterfeit medicine and medical equipment; deterioration of health status; and lower food production, reducing the life expectancy of people with disabilities and inevitably violating the rights to food and to health and eroding their quality of life, violating the right to live in dignity without pain and the right to life.

The whole scope of unilateral sanctions together with secondary sanctions and over-compliance, rejection of producers, banks and delivery companies to deliver essential goods has forced Iranian public institutions, private companies and individuals to look for alternative ways to participate in international trade by involving third parties, using informal and opaque mechanisms of trade, payments and delivery, facilitating poverty and low living standards, and violating economic and social rights.

The reported reluctance of foreign partners to cooperate with Iranian educational institutions, professional and amateur sport societies, cultural institutions, artists, technology and other companies, as well as cutting the possibility to transfer

money, difficulties in getting visas, exclusion of Iranian scholars from editorial boards abroad and growing rejection of journals to assess and edit articles submitted by Iranian scholars, shrinking possibilities for Iranian students and scholars for research grants and scholarships, or getting access to foreign academic, technological and medical databases and libraries due to their Iranian nationality, and discrimination based on the country of the IP address all constitute discrimination on the ground of nationality, affecting the right to education as well as international academic, sports and cultural cooperation, innovation, academic freedoms and cultural rights, preventing cooperation and dialogue in all of the abovementioned areas.

Economic challenges arising from UCMs and lack of international cooperation based on shared responsibility prevent the Government of Iran from providing sustainable assistance to the most vulnerable categories of the population, including the Afghan refugees. While welcoming Iran's efforts to provide equal access for Afghan refugees, both documented and undocumented, I note that insufficient revenue prevents the Government from developing schools, hospitals and urban infrastructure,

Unilateral sanctions and over-compliance, alongside with reduced bilateral and international cooperation, deteriorate economy and adversely affect the right to employment, right to decent work, especially for the poorest population groups, and hamper effective crime prevention, increase drug use and also hamper economic and social security.

I welcome the efforts and measures of the Government of the Islamic Republic of Iran to mitigate the negative impact of unilateral sanctions in different sectors, especially for the most vulnerable population categories, including Afghan refugees. However, while this reduces the direct impact on human rights, it shall not be used as a ground to legitimize the use of unilateral sanctions.

Unilateral sanctions on deliveries, insurance of transportation and Iran's banking system and over-compliance by companies and banks seriously impede humanitarian organizations and associations from providing humanitarian assistance and deliveries, being somehow easier for international humanitarian non-governmental organizations receiving donations from the EU and its member states. The above impediments result in higher legal and bank fees, delays in

deliveries even of life-saving medicine and medical devices, reduced donations from private donors, and the reported impossibility to transact and transfer money to procure and deliver goods, forcing the use of alternative, often non-secure ways of delivery, with risks for the quality of medicine and equipment, raising costs and therefore reducing operational capabilities. Humanitarian organizations are reported to function while risking civil and criminal charges from the United States for interacting with Iranian entities and their humanitarian activity in Iran. The application process for licenses is lengthy, unsure and very expensive, undermining the possibility of delivery to Iran even of purely humanitarian goods like medicine, medical equipment and food.

### Recommendations

I remind all parties of their obligation under the UN Charter to observe principles and norms of international law, including principles of sovereign equality, political independence, non-intervention in the domestic affairs of states, and peaceful settlement of international disputes.

I urge all international and national stakeholders to stop immediately using the rhetoric of sanctions as a political instrument or a means to get economic advantages, and to engage in dialogue to settle disputes in accordance with principles and norms of international law, while assessing, preventing and monitoring the humanitarian impact.

I call on sanctioning states, in particular the United States, to lift all unilateral measures imposed against Iran, Iranian nationals and companies without authorization of the UN Security Council and whose use cannot be justified as retortions or countermeasures in accordance with international law, especially as concerns trade, delivery, insurance and payment impediments for the development and maintenance of critical infrastructure including food, medicine and medical equipment, water, sanitation and electricity supply systems, mechanisms allowing for communications and transportation, among other things, that are essential for the population to enjoy the entire range of human rights and guarantees of health, food and transportation security. I also remind that no good intention justifies the violation of fundamental human rights.

I urge the U.S. Government to cease the state of national emergency that is not in accordance with the ICCPR, and to align national legislation with international law, including human rights law, refugee law and the law of international responsibility.

I call on all interlocutors (including states, international organizations, banks, private companies , civil society and other stakeholders) to avoid coercion, written or oral threats or any other act which may cause or result in the application of own or third country unilateral sanctions or over-compliance, and to interpret all limitations including the qualification of goods and equipment as dual-use, in the narrowest possible way in the interim period before the lifting of unilateral sanctions.

I urge States that froze assets of the Central bank of Iran to unfreeze them in accordance with customary norms of international law on the immunity of state property, so the Government may fully carry out its responsibility to implement fully its obligation to promote and protect human rights.

I call on all banks and private companies to act in accordance with the Guiding Principles on Business and Human Rights to avoid over-compliance and the consequent violation of rights of nationals and residents of Iran, especially as regards critical infrastructure, on the first hand – delivery of medical equipment, spare parts, medicine, raw materials for medicine production, especially as concerns rare and serious diseases. I also recommend the Government to consider the possibility of alternative ways of payment for the delivery of humanitarian goods.

I remind all states and regional organizations of the obligation to comply with the principle of due diligence, and to take all necessary measures to guarantee that activity under their jurisdiction and control will not affect the human rights of people within and beyond national borders. Violating international obligations by states – including the one of due diligence to guarantee that activity under their jurisdiction and control does not cause damage to nationals, residents and companies of third states – establishes a valid ground for responsibility in accordance with international law. I also call on regional and national judicial institutions to consider sanctions-related cases with due diligence, preventing the

prioritization of de-risking policies and economic concerns over international economic and human rights obligations.

I urge states which impose sanctions against Iran, Iranian nationals and companies to ensure that the Islamic Republic of Iran is able to pay assessed and voluntary contributions to international organizations, Iranian diplomatic, consular and special missions, and that staff members receive entrance permits without any impediments, enjoy the possibility to open and keep bank accounts and exercise diplomatic and consular functions free from any risk of freezing mission accounts in full conformity with the principle of sovereign equality of states, immunity of state property and the Vienna conventions on diplomatic, consular relations and special missions.

I urge the states participating in the JPCOA and the USA to continue negotiations in the good faith.

I also request banks, sports, cultural and academic institutions, organizations and associations to guarantee and facilitate the possibility for Iranian scholars, artists and sportsmen to engage in international cooperation under the uniformly recognized (including within the UN, UNESCO and other) obligations and initiatives that educational, sports and cultural cooperation and exchanges are inalienable means of achievement of the Sustainable Development Goals, conflict prevention and maintenance of peace and security worldwide. I urge all parties to ensure free access to information and the possibility to exercise freedom of expression, with any limitations in the digital world fully conforming with Art. 19–20 of the ICCPR.

I welcome the reported cooperation of the Government with the UN Country Team and UN specialized agencies present in Iran in the humanitarian area, and encourage the Government and the OHCHR to engage in a genuine and mutually respectful dialogue aimed at promoting and protecting human rights through a programme of technical cooperation as well as through interaction with Special Procedures mandate holders.

I urge UNCT, UNICEF, UNDP and UNAIDS to further engage with producers and relevant states, and help Iran procure proper quality medicines, raw materials, medical equipment and spare parts for treating rare and severe diseases including EB, thalassemia, hemophilia, HIV, cancer, hemophilia, autism, MSA and diabetes.

While welcoming and acknowledging efforts and measures to host the growing number of Afghan refugees, besides lifting unilateral sanctions to enhance the Government's capability to provide necessary services and care to them, I call on the international community to provide adequate substantial assistance for Iran for this activity.

I call on the UN Country Team in Iran, UN specialized agencies and organizations, and relevant humanitarian organizations to engage in meaningful cooperation with Iran to mitigate the negative impact of unilateral sanctions on human rights in Iran within their spheres of responsibility, to ensure observance of the rule of law and human rights, and the achievement of the Sustainable Development Goals.

Mindful of the obligation of all states to settle international disputes by peaceful means, I welcome the submission of the case to the ICJ on the violation of the 1955 Treaty of Amity, Economic Relations, and Consular Rights, and call on all parties to use judicial mechanisms to settle existing disputes, to cooperate in good faith to prevent such disputes through negotiations, and to use all available mechanisms to protect human rights affected by UCMs, including the UN treaty bodies, European Court of Justice and the ECHR. I call on other Special Procedures to pay due attention to the impact of unilateral sanctions against Iran on the people of Iran.

I call on the office of the High Commissioner, UN treaty bodies, OCHA and other UN institutions working together with the Special Rapporteur to get engaged in developing compensation, remedial and redress mechanisms for victims of human rights violations due to UCMs. I also invite all stakeholders – states, international organizations, NGOs, banks and businesses – to launch multilevel discussions to develop Guiding Principles on secondary sanctions, over-compliance and human rights in order to protect human rights, prevent de-risking that entails over-compliance, and introduce due diligence principles in international cooperation, banking and business activity.

(ترجمه غیررسمی از متن انگلیسی)

## یافته‌های اولیه بازدید گزارشگر ویژه سازمان ملل متحد از جمهوری اسلامی ایران در مورد آثار منفی اقدامات یک‌جانبه قهرآمیز بر بهره‌مندی از حقوق بشر

<u>تهران، ۲۸ اردیبهشت ۱۴۰۱ - پروفسور آلنا دوهان، گزارشگر ویژه سازمان ملل متحد در مورد آثار منفی اقدامات یک‌جانبه قهرآمیز بر بهره‌مندی از حقوق بشر، از ۱۷ الی ۲۸ اردیبهشت ۱۴۰۱ برای ارزیابی آثار منفی اقدامات یک‌جانبه قهرآمیز بر بهره‌مندی مردم ایران و اتباع دیگر از حقوق بشر ، از جمهوری اسلامی ایران بازدید کرد.</u>

عصر بخیر خانم‌ها و آقایان،

در چارچوب مأموریت خود در شورای حقوق بشر سازمان ملل متحد، در تاریخ ۱۷ الی ۲۸ اردیبهشت ۱۴۰۱ از جمهوری اسلامی ایران بازدید کردم تا با حفظ اصول جامعیت، استقلال، بی‌طرفی، و راستی‌آزمایی، درباره مسائل مربوط به آثار منفی اقدامات یک‌جانبه قهرآمیز بر بهره‌مندی از حقوق بشر، تحریم‌های ثانویه، و نیز رعایت افراطی تحریم‌ها، اطلاعات و مستنداتی را گردآوری کنم. گزارش حاضر هنوز گزارشی مقدماتی است و گزارش نهایی در سپتامبر سال جاری به شورای حقوق بشر ارائه خواهد شد.

مایلم از همه مشارکت‌کنندگان که برای انجام دیدارها و در اختیار گذاشتن اطلاعات وقت صرف کردند، صمیمانه تشکر کنم. تمام نظرات جمع آوری شده به طور کامل پردازش و تحلیل خواهد شد.

همچنین مایلم از دولت و ستاد حقوق بشر ایران برای تسهیل این بازدید و ترتیب دادن کلیه جلسات رسمی درخواست شده با روشی شفاف و سازنده، تشکر کنم. من با بسیاری از مسئولین دولتی و همکاران آنان، از جمله دبیر ستاد حقوق بشر جمهوری اسلامی ایران؛ معاون رئیس جمهور در امور زنان و خانواده؛ وزیر امور خارجه؛ وزیر دادگستری؛ وزیر کشور؛ رئیس کمیسیون سیاست خارجی و امنیت ملی؛ رئیس کمیسیون حقوق بشر و عضو کمیسیون بهداشت و درمان مجلس شورای اسلامی؛ معاون وزیر بهداشت، درمان و آموزش پزشکی؛ معاون امور زراعت وزارت جهاد کشاورزی؛ معاون امور بین الملل وزارت علوم، تحقیقات و فناوری؛ معاون حقوقی و امور بین‌الملل وزارت امور خارجه؛ معاون وزیر امور اقتصادی و دارایی و رئیس سازمان سرمایه گذاری‌های خارجی؛ معاون وزیر نفت؛ معاون وزیر ورزش و جوانان؛ رئیس سازمان بیمه سلامت؛ رئیس سازمان غذا و دارو؛ رئیس مرکز امور بین الملل وزارت آموزش و پرورش؛ رئیس سازمان بهزیستی کشور؛ رئیس سازمان مدیریت بحران کشور؛ رئیس سازمان هواپیمایی کشوری؛ رئیس اتاق بازرگانی ایران؛ رئیس سازمان تامین اجتماعی؛ استاندار اصفهان؛ و

همچنین نمایندگانی از وزارت نیرو؛ وزارت صنعت، معدن و تجارت؛ وزارت راه و شهرسازی؛ وزارت تعاون، کار و رفاه اجتماعی؛ وزارت میراث فرهنگی، گردشگری و صنایع دستی؛ سازمان برنامه و بودجه؛ و بانک مرکزی ملاقات کردم.

من همچنین با نمایندگان تعدادی از سازمان‌های جامعه مدنی فعال در حوزه‌ها و بخش‌های مختلف، ارائه دهندگان خدمات بهداشتی، انجمن‌ها و موسسات خیریه، نمایندگان مؤسسات مالی دولتی و خصوصی، فعالان امور بشردوستانه، مشاغل و دانشگاه‌ها دیدار کردم. همچنین با نهادهای سازمان ملل متحد، از جمله کارگزاری‌ها و برنامه‌های تخصصی حاضر در ایران، و با اعضای جامعه دیپلماتیک نیز رایزنی کردم.

فرصت را مغتنم شمرده از هماهنگ‌کننده مقیم سازمان ملل متحد و کل تیم کشوری سازمان ملل متحد برای همه حمایت‌هایشان در طول این دیدار قدردانی می‌کنم.

پس زمینه

ایالات متحده آمریکا از اواخر دهه ۱۹۷۰ میلادی تحریم‌های اقتصادی، تجاری و مالی و از ۱۹۹۵ ممنوعیت گسترده تجارت و اقداماتی برای منزوی کردن ایران از سیستم تجاری و مالی بین‌المللی علیه این کشور اعمال کرده است. این تحریم‌ها در اواسط دهه ۲۰۰۰ و دوباره پس از ۲۰۱۰ تشدید شدند و به بسیاری از بخش‌های اقتصادی گسترش یافتند. تحریم‌های آمریکا، بانک مرکزی ایران و بانک‌های تجاری را نیز هدف قرار داده است.

اتحادیه اروپا در ۲۰۱۰ تمهیدات محدودکننده و تحریم‌های اقتصادی و تجاری جامعی را علیه ایران به تصویب رساند که تحریم نفتی در ۲۰۱۲ و ممنوعیت‌های تجاری مربوط به بخش‌های مهم و اساسی و مسدود کردن دارایی‌های بانک مرکزی، بخش کشتیرانی و صنعت کشتی‌سازی ایران و تعدادی از افراد و نهادها، و نیز محدودیت‌های قابل توجه در خدمات مالی و صادرات و واردات نیز به آن اضافه شد.

پس از انعقاد برجام، که با تایید قطعنامه ۲۲۳۱ شورای امنیت سازمان ملل متحد تمامی تحریم‌های شورای امنیت سازمان ملل متحد را خاتمه داد، اتحادیه اروپا نیز همه تحریم‌های خود را به استثنای تحریم‌های تسلیحاتی و فناوری نظامی لغو کرد. ایالات متحده اعمال تحریم‌های مندرج در برجام را متوقف کرد، اما تجارت با ایران و سرمایه گذاری در این کشور را همچنان ممنوع اعلام کرده بود. سرانجام در ۱۸ اردیبهشت ۱۳۹۷ ایالات متحده به طور یکجانبه از برجام خارج شد، همه تحریم‌های لغو شده را دوباره وضع کرد، و محدودیت‌های مالی جدیدی اضافه و از جمله بانک مرکزی ایران و چندین بانک دیگر ایرانی را در لیست تحریم‌ها قرار داد. اکثر موسسات مالی خارجی اکنون بازار ایران را ترک کرده اند. دارایی‌های مسدود شده ایران در حساب‌های خارجی بین ۱۰۰ تا ۱۲۰ میلیارد دلار تخمین زده می شود و فهرست نهادها و افراد تحریم شده توسط ایالات متحده شامل بیش از ۱۰۰۰ شخص و نهاد است.

در حال حاضر، اتحادیه اروپا و چندین کشور از جمله بریتانیا، استرالیا و جمهوری کره تحریم‌های یکجانبه، مسدود کردن دارایی‌ها و ممنوعیت سفر علیه تعداد زیادی از افراد و نهادها و محدودیت‌های تجاری خاصی را علیه ایران اعمال کرده اند. کانادا علیه بخش‌های کلیدی اقتصاد ایران تحریم‌هایی تحمیل

کرده و فعالیت‌های مالی را محدود می‌کند و در حال حاضر بیش از ۲۰۰ فرد و نهاد را در فهرست تحریم‌های خود قرار داده است.

این فضا منجر به ریسک زدایی و تبعیت بیش از حد از تحریم‌ها شده است و بسیاری از شرکت‌ها از بیم مجازات‌های شدید از روابط تجاری با ایران کناره‌گیری کرده‌اند.

تاثیر تحریم‌های یکجانبه در حوزه‌های مختلف

گزارش شده است که تحریم‌های یکجانبه آثار منفی چندجانبه بر اقتصاد ایران و تقریبا همه بخش‌های مختلف داشته‌است. مطالعات متعددی ارتباط مستقیم بین ممنوعیت‌های تجاری و محدودیت‌های مالی و سایر محدودیت‌ها بر شاخص‌های اقتصادی را نشان می‌دهد. اعمال تحریم‌ها بر بخش‌های اساسی از جمله صنعت نفت، که بیش از دو سوم صادرات کشور را تشکیل می‌داد، منجر به کاهش شدید درآمدهای عمومی شده است. آمارها نشان می‌دهد که اعمال مجدد تحریم‌های یکجانبه از ۲۰۱۸ اثرات نامطلوب عمده ای بر تجارت و اقتصاد ایران داشته است.

علاوه بر این، تولید ناخالص داخلی ایران از رشد ۳.۸ درصدی در ۲۰۱۷ به منفی ۶ درصد در ۲۰۱۸ یعنی پس از خروج آمریکا از برجام، و منفی ۶.۳ درصد در ۲۰۱۹ قبل از شیوع کووید-۱۹ رسید، در حالی که نشانه‌هایی از بهبود جزئی در سال‌های ۲۰۲۰ و ۲۰۲۱ دیده می‌شود. مصاحبه شوندگان بر اثرات تورمی تحریم‌ها و در نتیجه افزایش قیمت کالاها و خدمات اساسی و همچنین دارو و تجهیزات پزشکی تاکید کردند که در نتیجه آن، توان دولت برای حمایت از نیازمندان کاهش یافته است. این امر همراه با کاهش ارزش پول ملی، تشدید بیکاری و مشکلات ناشی از بیماری همه گیر کووید-۱۹، فشار زیادی را بر اقشار فقیر و آسیب پذیر جامعه وارد کرده و آسیب‌های اجتماعی بیشتری را به دنبال داشته است. نرخ فقر با بیش از ۳ میلیون فقیر جدید در دوره ۲۰۱۷-۲۰۱۹ افزایش یافته است.

بسیاری از مصاحبه شوندگان نگرانی‌های خود را درباره اثرات جدی انزوای مالی ایران ابراز کرده‌اند. در عمل، همه بخش‌های اقتصاد ایران و زندگی ایرانیان داخل و خارج از کشور، به علت عدم امکان پرداخت‌های بین‌المللی با استفاده از حساب‌های بانکی ایرانی، به شدت آسیب دیده است؛ این امر حتی کارکنان سازمان‌های بین‌المللی و دیپلمات‌های خارجی را نیز تحت تأثیر قرار داده است . تحریم موسسات مالی اصلی ایران، از جمله بانک مرکزی، مسدود شدن دارایی‌های کشور و تبعیت افراطی از تحریم‌ها توسط موسسات مالی و تجاری خارجی از تبعات مهم این اقدام بوده است. شواهد متعددی به اطلاع من رسید که شامل عدم امکان واردات و صادرات کالاها و خدمات، حتی برای کمک‌های بشردوستانه، تعلیق پروژه‌های زیربنایی و توسعه‌ای بزرگ، عدم امکان حفظ عضویت در سازمان‌ها و انجمن‌های بین‌المللی، و همچنین ناتوانی در اجرای پروژه‌های مشترک دانشگاهی و علمی بود.

شواهدی مبنی بر ارتباط آشکار بین اعمال تحریم‌ها و سیاست‌های انزوای مالی و تجاری از یک سو و آثار منفی آن بر توانمندی‌های نظام سلامت کشور موجود است. این شرایط نه تنها تامین و دسترسی به دارو و تجهیزات پزشکی بلکه تخصیص بودجه برای خدمات مراقبت‌های بهداشتی موجود و همچنین تحقیق و توسعه در زمینه روش‌های جدید درمانی را با چالش‌های بزرگی روبرو کرده است. با اعمال مجدد تحریم‌ها که منجر به افزایش هزینه‌ها و کاهش عرضه از جمله مواد خام برای تولید داروی داخلی شده

است، با وجود طرح‌های گزارش‌شده دولت برای تقویت ظرفیت عمومی مراقبت‌های بهداشتی از طریق اجرای برنامه‌های توسعه خودکفایی پزشکی و دارویی با تقویت تولید داخلی و افزایش تعداد کلینیک‌های عمومی و تخصصی، داروخانه‌ها و تخت‌های بیمارستانی در سال‌های ۲۰۱۸-۲۰۲۰، با این حال کاهش شدید استانداردهای ملی سلامت ایران با تأثیرات ویژه بر کودکان مشاهده می‌شود.

مشکلات و موانع عدیده ای در خرید و دریافت دارو و تجهیزات پزشکی نجات دهنده برای درمان بیماری‌های نادر و حاد، از جمله سرطان‌های خاص، تالاسمی، هموفیلی، ام اس، اوتیسم، بیماری پروانه ای و اچ آی وی/ایدز به دلیل تبعیت افراطی شرکت‌های خارجی از تحریم‌ها و محدودیت در انجام پرداخت‌ها از طریق سیستم بانکی گزارش شده است. همچنین از عدم تمایل شرکت‌های بیمه برای بیمه کردن محموله‌های هوایی ایران و تاخیرهای قابل توجهی که باعث تحویل داروهایی با تاریخ انقضای بسیار محدود شده است، مطلع شدم.

من روایت‌های نگران کننده‌ای از کمبود و قیمت‌های گزاف داروها و فوت بیماران دریافت کردم که در آن بیماران به دلیل شرایط وخیم اقتصادی ناچار به فروش مجدد بخشی از داروهای خود برای تامین نیازهای اولیه از جمله غذا می‌کنند. از سوی دیگر، ممنوعیت خرید لوازم و تجهیزات پزشکی مانند اسپری‌های آسم، اسپری‌های استنشاقی، اسپکتروفوتومتری، رادیوایزوتوپ‌ها و فناوری‌های رادیولوژی به این علت که از نظر دفتر کنترل سرمایه‌های خارجی ایالات متحده دارای کاربرد دوگانه (غیر نظامی و نظامی) است، اوضاع را وخیم تر کرده است.

اگرچه دارو و تجهیزات پزشکی از نظر فنی مشمول تحریم نیستند، اما ابهام و پیچیدگی فرآیندهای صدور مجوز، ترس مداوم تولیدکنندگان و تامین‌کنندگان، محدودیت‌ها در پردازش پرداخت‌ها و موانع ارسال این کالاها، آنها را از دسترس مردم ایران، به ویژه برای اقشار نیازمند و به خصوص در مناطق دورافتاده و روستایی خارج کرده است. نهادهای دولتی و فعالان غیردولتی بشردوستانه در تلاش برای یافتن راه‌حل‌هایی جایگزین برای خرید ملزومات هستند که این روش‌ها به دلیل دخیل شدن دلالان و واسطه‌ها موجب افزایش هزینه‌ها می‌شود.

اثرات نامطلوب تحریم‌ها بر مراقبت‌های بهداشت و درمان همزمان با اثرات وخیم کووید-۱۹ در ایران چند برابر شده است. نحوه مدیریت همه‌گیری کرونا توسط دولت به علت مشکلات در تهیه واکسن از طریق کشورهای ثالث و سازوکار بین‌المللی کوواکس به دلیل تأخیر موسسات مالی خارجی در تأیید انتقال وجوه به سازمان جهانی بهداشت و مشکلات دیگر مربوط به تحریم‌های یکجانبه و متکی بودن به کمک‌ها و اقدامات کارگزاری‌های تخصصی سازمان ملل متحد که استثنائاً عهده دار تسهیل این نقل و انتقالات شده بودند، با موانع زیادی روبرو شده است.

من در این مدت با فعالان حوزه حمایت‌های اجتماعی و امور بشردوستانه نیز دیدارهایی داشتم. مشکلات اقتصادی ناشی از تحریم‌های یکجانبه و اجرای شدید آن که با همه‌گیری کووید-۱۹ همراه شده بود، منجر به افزایش قابل توجه تعداد افراد نیازمند و حمایت‌جو شده است، به طوری که طی دو سال گذشته این رقم پنج تا هشت برابر افزایش یافته است. کاهش شدید درآمدهای دولت و کمک‌های مالی شرکت‌های

خصوصی داخلی از یک سو، و عدم امکان دریافت حمایت‌های مالی بین‌المللی از سوی دیگر باعث کاهش برنامه‌های حمایت اجتماعی دولتی و غیردولتی شده است.

تحریم‌ها و فشارهای اقتصادی ناشی از آن، تبعات جنسیتی آشکاری را نیز موجب شده است. بخش‌های اقتصادی که به‌طور سنتی زنان را به استخدام می‌گرفتند به طور خاص آسیب دیده‌اند و در نتیجه، تعداد فزاینده‌ای از زنان برای رفع نیازهای مالی خانوار خود به ناچار به فعالیت‌های اقتصادی غیررسمی روی آورده‌اند. بر اساس اطلاعات دریافتی، نرخ بیکاری زنان تقریباً دو برابر مردان است (به ترتیب ۴۸ و ۲۵ درصد). به گفته چندین مصاحبه شونده، نگرانی‌های زیادی در مورد وضعیت درآمدی بی‌ثبات حدود ۳ میلیون زن سرپرست خانوار و آسیب‌پذیری ۹ میلیون زن در دهک‌های کم درآمد جامعه و مشکلات عدیده آنان در دسترسی به خدمات اولیه از جمله مراقبت‌های بهداشتی وجود دارد. وخیم شدن اوضاع اقتصادی و ممنوعیت نقل و انتقالات بانکی بر جمعیت سالمندان نیز تأثیر گذاشته است. تورم بالا قدرت خرید سالمندان را کاهش داده و هزینه‌های درمانی آنها را به میزان قابل توجهی افزایش داده است.

موضوع مهم دیگر وضعیت افراد دارای معلولیت‌های جسمی و ذهنی و مشکلات موجود در دسترسی آنها به داروها و تجهیزات پزشکی، کمکی و توانبخشی مناسب به دلیل رعایت افراطی تحریم‌ها توسط تامین‌کنندگان خارجی و موانع موجود در پرداخت‌های بین‌المللی است. این موضوع در کنار رکود اقتصادی ناشی از تحریم‌ها و کاهش ارزش کمک‌های مالی دریافتی از دولت در قالب حمایت‌های اجتماعی، مشکلات این قشر را دو چندان کرده است. بنا بر گزارش‌ها، هزینه‌های برخی داروها و تجهیزات توانبخشی از سال ۱۳۹۷ تا سال جاری ده برابر افزایش یافته است.

از سوی دیگر، ایران میزبان بیش از ۵ میلیون مهاجر و پناهنده است که اکثراً اتباع افغانستان و فاقد مدارک اقامتی و نیازمند کمک‌های بشردوستانه هستند. پس از به قدرت رسیدن طالبان در ۱۴۰۰ که منجر به ورود اجباری بیش از ۸۵۰۰۰۰ تبعه افغانستان به ایران شد، وضعیت این گروه وخیم تر شد. دولت ایران تعهد خود را برای ادامه اجرای سیاست‌های همه شمول از جمله دسترسی برابر به آموزش و بهداشت همگانی ابراز کرده است. اما به دلیل آثار اقتصادی تحریم‌ها، محدودیت در تراکنش‌های مالی و ارائه خدمات، و کاهش تمایل اهداکنندگان به فراهم کردن کمک‌ها که با شیوع همه‌گیری کرونا همراه شد، هزینه‌های کمک‌های بشردوستانه تقریباً ۵۰ درصد افزایش یافته است. این وضعیت توانایی دولت و فعالان بشردوستانه را در اجرای پروژه‌ها از جمله تامین کالاهای اساسی و ساخت مدارس و مراکز بهداشتی برای این جمعیت آسیب پذیر به شدت کاهش داده است.

کاهش شدید درآمدها موجب تضعیف توانایی دولت در حفظ و بهبود زیرساخت‌های ضروری و مشارکت در پروژه‌های توسعه اساسی شده است. عدم دسترسی به نظام مالی بین‌المللی، اختلال در پردازش پرداخت‌ها و امتناع شرکت‌های خارجی از پذیرش ضمانت‌نامه‌های ارزی صادر شده توسط بانک‌های ایرانی، به حضور ایران در مشارکت‌های بین‌المللی برای چنین پروژه‌هایی و توسعه و نوسازی صنایع ایران به شدت آسیب وارد کرده است. من اطلاعاتی دریافت کردم مبنی بر تعلیق پروژه‌های برق آبی، آبیاری و آبرسانی به دلیل عدم پرداخت وجوه خارجی و عدم امکان جذب سرمایه‌گذاری و فناوری‌های جدید لازم برای ارتقای بخش‌های مهم صنعتی مانند پالایشگاه‌های نفت، میادین گازی، نیروگاه‌ها، خطوط

لوله و شبکه‌های برق که آثار نامطلوب جدی بر زندگی روزمره مردم برجای گذاشته و همچنین افزایش خطرات زیست محیطی را موجب شده است. نگرانی‌های مشابهی در زمینه حفظ و توسعه زیرساخت‌های کشور از جمله جاده‌ها، فرودگاه‌ها، حمل و نقل زمینی و هوایی مطرح شده است. شرکت‌های هواپیمایی و کشتیرانی ایران، در نتیجه تحریم‌های خزانه‌داری ایالات متحده، قادر به تامین قطعات یدکی، تجهیزات و خدمات مربوطه برای نگهداری و ارتقای ناوگان مربوطه خود نیستند که این امر خطرات زیادی را برای مسافران خطوط هوایی ایجاد کرده و خطرات آلودگی آب ناشی از حوادث نشتی در کشتی‌ها را نیز افزایش داده است.

همچنین گزارش شده است که تحریم‌ها مانع از سرمایه‌گذاری ایران در زمینه مقابله با بلایا و بازسازی شده است و این در حالی است که ایران همواره در معرض حوادث و بلایای طبیعی قرار داشته است و مستعد ۴۵ نوع از مجموع ۴۷ نوع بلایای طبیعی شناخته شده در جهان بوده است. گزارش شده است که به دلیل محدودیت تراکنش‌های بانکی، دریافت اعتبارات تخصیصی برای مداخلات اضطراری و تحویل دارو و تجهیزات نجات با تاخیر از یک هفته تا حتی یک سال انجام می‌شود. این محدودیت‌ها سازمان‌های امدادی را از دریافت کمک‌های مالی خارجی نیز باز می‌دارد، چرا که خرید بالگردهای جستجو و نجات و آمبولانس‌های هوایی به دلیل عدم تأمین مالی و این که ممکن است «کارکردی دو منظوره» برای آنها تلقی شود، تقریباً غیرممکن است.

موانع مشابهی از سوی فعالان هنری و در موضوعات مربوط به میراث فرهنگی گزارش شده است. من اطلاعاتی راجع به متوقف شدن کمک‌های بین‌المللی، عدم امکان شرکت در رویدادهای بین‌المللی به دلیل محدودیت‌های سفر یا میزبانی رویدادهای بین‌المللی به دلیل عدم تمایل همتایان خارجی به همکاری به دلیل ترس از عواقب، و عدم امکان پرداخت حق عضویت و مشارکت‌های بین‌المللی از جمله برای ارزیابی علمی و حفاظت از سایت‌های میراث فرهنگی دریافت کردم.

ممنوعیت صادرات، نقل و انتقالات بانکی، تحریم‌های ثانویه و واهمه از مجازات‌های ناشی از عدم رعایت تحریم‌ها به فضای فراگیر تبعیت افراطی از تحریم‌ها تبدیل شده است که انتقال فناوری، دانش، بارورسازی فکری و فرهنگی را تضعیف می‌کند. تحریم‌ها دسترسی به تبادل تجربه، دانش و تخصص بین محققان ایرانی و خارجی را ناممکن ساخته و در نتیجه، مانع از غنی سازی متقابل علمی شده است. دانشمندان ایرانی از دسترسی محدود یا عدم دسترسی به مجامع بین‌المللی پزشکی و سایر مجامع علمی گزارش می‌دهند. دانشمندان، محققان و پژوهشگران خارجی به دلیل ترس از لطمه به اعتبار یا خطر عدم پذیرش اجازه ورود آنها به ایالات متحده، از حضور در رویدادهای علمی در ایران امتناع یا ابراز تردید کرده اند. اشتراک مجلات پزشکی و سایر مجلات علمی به عنوان منابع پژوهشی و دانشی به دلیل عدم پرداخت هزینه اشتراک توسط مشترکین ایرانی به حالت تعلیق در آمده یا متوقف شده است.

مقالات علمی و پژوهشی ارسال شده به مجلات بین‌المللی صرفاً به دلیل ایرانی بودن پدیدآورندگان آنها رد شده است. دسترسی به دانشگاه‌ها، موسسات یا مراکز تحقیقاتی خارجی محدود یا ممنوع شده است. مبادلات دانشجویی و بورسیه‌های تحصیل در خارج از کشور لغو شده است. دانشمندان هیأت تحریریه مجلات علمی تمایلی به همکاری با همتایان ایرانی خود ندارند و به دلیل ترس از مشکلات ناشی از تحریم‌های

آمریکا، در بررسی یا انتشار مقالات تحقیقاتی ارائه شده از ایران تردید داشته و یا از آن خودداری کرده‌اند. والدین در ایران نتوانسته‌اند پول کافی را به حساب‌های بانکی فرزندان خود که در خارج از کشور تحصیل می‌کنند واریز کنند، زیرا به گفته بانک‌ها، منشا این پول از ایران بوده است. حساب بانکی دانشجویان ایرانی خارج از کشور به دلیل ملیت آنها بسته شده است. ایرانیانی که به دلایل (مختلف از جمله) کاری و شغلی به خارج از کشور سفر می‌کنند به دلیل نداشتن کارت اعتباری یا پرداخت بین‌المللی نمی‌توانند در هتل‌ها اتاق رزرو کنند و باید به صورت نقدی یا از طریق اشخاص ثالث پرداخت کنند.

اعمال مجدد تحریم‌ها همچنین منجر به کاهش شدید گردشگری و از دست رفتن هزاران شغل، هم در بخش گردگری و هم در تولید صنایع دستی شده است در حالی که اغلب فعالان حوزه صنایع دستی، زنان در مناطق روستایی هستند. تحریم‌ها همچنین به دلیل ناممکن ساختن پرداخت با روش‌های غیرنقدی، گردشگران خارجی را از بهره‌مند شدن از میراث غنی فرهنگی ایران به عنوان یکی از کهن ترین تمدن‌ها محروم کرده است. عرصه هنری ایران نیز از تحریم‌ها آسیب دیده است.

بر خلاف منشور المپیک که دخیل کردن مسائل سیاسی را در ورزش منع کرده است، ورزشکاران ایرانی نتوانسته‌اند تجهیزات ورزشی مورد تایید بین‌المللی را تهیه کنند و از فرصت‌های آموزشی در خارج از کشور و ویزای ورود برای شرکت در برخی مسابقات بین‌المللی محروم شده‌اند.

یک سمن محلی که در حال تحقیق در مورد بهترین شیوه‌های بین‌المللی برای درمان کودکان معتاد به مواد مخدر است، از دسترسی به مدل‌های توسعه یافته توسط یک موسسه آمریکایی منع شده است. هشت ماه طول کشیده است تا همین سازمان که به پناهندگان افغانستانی در ایران نیز خدمات ارائه می‌دهد، بانکی را در اروپا شناسایی کند که پذیرفته است برای حمایت از یکی از پروژه‌هایش در ایران، مبلغ اهدایی اتحادیه اروپا را انتقال دهد. انجمن اوتیسم ایران که به ۶۰۰۰ خانواده کمک می‌کند، به دلیل خودداری نهادهای مربوطه خارجی از همکاری با آن، نتوانسته است به درمان‌های جدیدی که در خارج از کشور در حال توسعه است دسترسی پیدا کند.

وضعیت مشابهی مربوط به مشارکت ایران در همکاری‌های بین‌المللی به وجود آمده است. به ویژه عضویت ایران در سازمان‌های بین‌المللی از جمله نهادهای سازمان ملل متحد، به دلیل عدم امکان انتقال حق عضویت از طریق سیستم بانکی به حالت تعلیق درآمده است. به عنوان نمونه، ایران قادر به پرداخت حق عضویت خود به یونسکو نبوده و حق رای این کشور در سازمان جهانی بهداشت نیز به همین دلیل به حالت تعلیق درآمده است. اتاق بازرگانی ایران نتوانسته حق عضویت خود را به اتاق بازرگانی بین‌المللی بپردازد و با خطر از دست دادن عضویت و مزایای ناشی از آن و همچنین ناتوانی در انتقال وجه به دیوان‌های داوری بین‌المللی مواجه شده است. دیپلمات‌های ایرانی در اروپا از حق باز کردن حساب‌های بانکی در کشورهای محل ماموریتشان محروم هستند و این امر دریافت حقوق و پرداخت هزینه‌های زندگی‌شان را پیچیده کرده است. دیپلمات‌های خارجی مستقر در ایران قادر به انتقال پول از بانک‌های کشور خود به ایران نبوده اند.

کمک‌های سازمان ملل متحد، تبعیت افراطی از تحریم‌ها و معافیت‌های بشردوستانه

فعالیت‌های کارگزاری‌های سازمان ملل متحد در ایران، شامل کمک‌های توسعه‌ای و ارائه کمک‌های فنی یا بشردوستانه، اغلب به دلیل تحریم‌ها با مشکل مواجه شده است. در بیشتر مواقع، ترس و واهمه از تحریم‌ها، بیش از خود تحریم‌ها، فضایی را ایجاد می‌کند که بانک‌ها و شرکت‌های تامین‌کننده دولتی و خصوصی خارجی را به رعایت افراطی و بیش از حد تحریم‌ها وادار می‌کند، که این امر تلاش‌های سازمان ملل متحد را بیش از خود تحریم‌ها تضعیف کرده است.

طبق گفته اداره کنترل دارایی‌های خارجی وزارت خزانه‌داری ایالات متحده، غذا و دارو قرار است به دلایل بشردوستانه از تحریم‌ها مستثنی شوند. ممکن است این ادعا در ظاهر درست باشد، اما خرید این کالاها مستلزم همکاری تولیدکنندگان، تامین‌کنندگان، حمل‌ونقل‌کنندگان و بانک‌ها است، اما این همکاری‌ها در عمل به علت ترس از تحریم‌ها انجام نمی‌شود. معافیت‌های بشردوستانه به صورت موردی اعطا شده است و اجرای موثر آنها مستلزم برنامه ریزی دقیق، مذاکرات شفاف، ارتباطات و تدارکات موثر است. حتی در چنین مواردی، رعایت بیش از حد تحریم‌ها توسط بانک‌های واسطه می‌تواند این روند را مختل کند. بانک‌ها تقریباً همیشه با تکیه بر مشاوران حقوقی و ریسک خود از  انجام این معاملات امتناع می‌ورزند و جریان کمک‌های بشردوستانه را به تاخیر می‌اندازند یا مانع می‌شوند.

ترس از تحریم‌ها گاهی به درک فردی از خطرات، غیرقابل پیش بینی بودن زیاد و تمایل طرف‌های مربوطه (بانک‌ها، تامین کنندگان، اهداکنندگان) به اجتناب مطلق از ریسک کردن و حفاظت از منافع خود مربوط می‌شود. از آنجایی که فرآیندهای تدارکاتی برای اجرای پروژه‌ها معمولاً مستلزم صرف زمان زیادی است و به دلیل تحریم‌ها شامل بحث‌ها، رویه‌ها و مذاکرات طولانی می‌شوند، اغلب سفارش‌ها در آخرین لحظه لغو می‌شوند و باید مجدداً آغاز شوند. این امر تاخیرها را طولانی‌تر می‌کند، هزینه‌ها را افزایش می‌دهد و تحویل کمک‌ها را به تعویق می‌اندازد.

در مورد لوازم بهداشتی حیاتی، این وضعیت آثار مضر، جبران ناپذیر و گاه کشنده‌ای بر بیماران داشته است. یک مقام باتجربه سازمان ملل متحد خاطرنشان کرد که هرگز برای وارد کردن تجهیزات نجات‌بخش به کشوری با این همه مشکل مواجه نشده بود. در نتیجه، به عنوان مثال، تلاش‌های کمک‌رسانی سازمان ملل متحد در سال‌های ۲۰۲۰-۲۰۱۹ زمانی که جمعیتی حدود ۲ میلیون نفر در ۲۵ استان تحت تأثیر سیل‌های شدید آسیب دیده بودند، به طور جدی با مشکل مواجه شد. چندین کشور که آماده کمک بودند به دلیل تحریم‌ها نتوانستند کمک‌های خود را ارسال کنند. دسترسی به تصاویر ماهواره‌ای خارجی ممنوع شد. ایران که کشوری زلزله خیز است قادر به خرید تجهیزات تخصصی، از جمله میز لرزه برای ساختمان‌ها که ساخت ژاپن است، برای کاهش خطرات زلزله نبوده است.

بالگردها، که گاهی تنها وسیله رسیدن به مناطق آسیب دیده و قربانیان هستند، اغلب با توجه به امکان کاربرد دوگانه احتمالی آنها قابل خریداری نیستند و به دلیل دشواری یا عدم امکان تهیه قطعات یدکی، نگهداری مناسب و مستمر این بالگردها امکانپذیر نیست. همین امر در مورد تعمیر و نگهداری، نوسازی یا تعویض آمبولانس‌ها و سایر وسایل نقلیه پزشکی نیز صدق می‌کند.

به دلیل رعایت افراطی تحریم‌ها، شرکت‌های خصوصی نیز مشکلات و نگرانی‌های مشابه فعالان امور بشردوستانه در تهیه کالاهای ضروری را گزارش کرده اند، که اغلب شامل کالاهای نجات‌بخش می‌شود.

این شرکت‌ها تأکید کردند که محدودیت‌های مزبور آنقدر سختگیرانه بوده است که ادامه فعالیت را عملاً بسیار مشکل کرده است و به دلیل دشواری یا عدم امکان انجام معاملات مالی آنها را از سرمایه‌گذاری منصرف کرده است. یک فعال مهم تجاری تأکید کرد که سنگینی تحریم‌های ثانویه آثار منفی تحریم‌ها را عمیق‌تر کرده، اقتصاد را تضعیف کرده، فقر را افزایش داده و سلامت و تغذیه آسیب‌پذیرترین اقشار را تهدید می‌کند و این که «تحریم‌های ثانویه بدتر از خود تحریم‌ها بوده است». به همین دلایل، شرکت‌های خصوصی اعلام کرده اند که تجارت با ایران به یک سرمایه‌گذاری پرخطر تبدیل شده است.

بررسی قانونی بودن

با توجه به پیچیدگی تحریم‌های یکجانبه اعمال شده علیه اقتصاد کشور و علیه شهروندان و شرکت‌های ایرانی، ارزیابی فعلی تنها به بررسی چند جنبه مرتبط می‌پردازد.

به طور خاص، وضعیت اضطراری ملی اعلام شده توسط دولت آمریکا در ۱۹۹۵ به عنوان زمینه اعمال تحریم‌ها علیه ایران که آخرین بار در مارس ۲۰۲۲ برای یک سال دیگر تمدید شد، با الزامات ماده ۴ میثاق بین‌المللی حقوق مدنی و سیاسی مطابقت ندارد که عبارتند از: وجود تهدید جانی علیه شهروندان، محدود کردن اقدامات به مقتضیات موقعیت، مدت زمان محدود، تبعیض قائل نشدن و ممنوعیت تخطی از حق حیات یا مجازات فعالیتی که جرم کیفری محسوب نمی‌شود.

تاکید می‌شود که طبق قوانین بین‌الملل، اتخاذ اقدامات یکجانبه بدون مجوز شورای امنیت سازمان ملل متحد یا فراتر از آن، تنها در صورتی ممکن است که تعهدات بین‌المللی دولت‌ها را نقض نکند (اقدامات تلافی‌جویانه یا مقابله به مثل) یا اگر نادرستی آن‌ها را بتوان به عنوان اقدامات متقابل اتخاذ شده مطابق با استانداردهای حقوقی مسئولیت بین‌المللی مستثنی نمود: در این صورت اعمال این اقدامات بر علیه دولت‌ها باید به دلیل نقض هنجارهای حقوقی بین‌المللی (توسط آن دولت) باشد، با هدف برقراری اجرای تعهدات بین‌المللی انجام پذیرد، با نقض صورت گرفته متناسب باشد، ضروری باشد، و در تعارض با هنجارهای قطعی و تعلل‌ناپذیر حقوق بین الملل و حقوق اساسی بشر نباشد.

همچنین یادآوری می‌کنم که دارایی‌های بانک مرکزی و دارایی‌هایی مورد استفاده برای مصارف و مقاصد عمومی از مصونیت کامل در برابر احکام قضایی خارجی و توقیف خارجی برخوردار است، بنابراین دولت‌ها باید تعهد خود را برای تضمین برخورداری از حقوق بشر در قلمرو خود اعمال کنند.

به علاوه، سیاست‌ها و کارزارهای فشار حداکثری و همچنین تهدیدهای خطاب به کشورها، شرکت‌ها و افراد ثالث، در تناقض با اصل همکاری بین دولت‌ها، اصل حل و فصل مسالمت‌آمیز اختلافات بین‌المللی، اصول برابری حاکمیتی و عدم مداخله در امور داخلی کشورها است.

همچنین نگران این هستم که کمترین اثر تحریم‌های یکجانبه هدفمند به عنوان اقدامی تنبیهی، نقض تعهدات ناشی از اسناد بین‌المللی و منطقه‌ای حقوق بشر بوده است که بسیاری از آنها از جمله تضمین‌های رویه‌ای و فرض برائت، ماهیتی قطعی و لازم الاجرا دارند.

به علاوه، صدور احکام قضایی فراسرزمینی علیه اتباع و شرکت‌های کشورهای ثالث برای همکاری با مقامات دولتی، شهروندان و شرکت‌های ایرانی، از جمله مبادلات شرکت‌های کشورهای ثالث با ایران یا

خرید محصولات ایرانی و یا استفاده از دلار آمریکا برای پرداخت یا به عنوان ابزاری در فرآیند تبدیل پول، با اعمال تحریم‌های ثانویه و تهدیدات ادعا شده علیه این گونه اشخاص ثالث، بر اساس قوانین بین‌المللی غیرقانونی است و خطرات ناشی از رعایت افراطی تحریم‌ها را افزایش می‌دهد.

ممانعت از افتتاح و حفظ حساب‌های بانکی توسط نمایندگی‌های دیپلماتیک، کنسولی و ویژه ایران با مفاد کنوانسیون‌های وین در مورد روابط دیپلماتیک و کنسولی مطابقت ندارد و مأمورین دیپلماتیک و کارکنان باید بتوانند به انجام فعالیت‌های دیپلماتیک و کنسولی خود بدون هیچ‌گونه خطر مسدود شدن حساب‌های بانکی بپردازند. ممانعت از پرداخت حق عضویت مقرر و کمک‌های داوطلبانه ایران به سازمان‌های بین‌المللی، مانع تعامل این کشور با این نهادها و موجب خطر تعلیق حق رای این کشور و نقض اصول برابری حاکمیتی دولت‌ها و همکاری با حسن نیت می‌شود.

بدین ترتیب تحریم‌های یکجانبه علیه ایران ناقض چندین هنجار حقوقی بین‌المللی است، برای اعمال فشار بر یک دولت وضع شده است، به‌عنوان اقدام متقابل بر اساس قانون مسئولیت بین‌المللی قابل توجیه نیست و بنابراین می‌تواند به‌عنوان اقدامات قهری یک‌جانبه تلقی شود که در قطعنامه‌های شورای حقوق بشر سازمان ملل متحد و مجمع عمومی سازمان ملل متحد به‌طور مکرر محکوم شده است.

## نتیجه گیری

تحریم‌های یکجانبه اولیه، تحریم‌های ثانویه، تهدید به اعمال تحریم، سیاست‌های کاهش خطر و رعایت افراطی تحریم‌ها همگی به میزان چشمگیری منجر به تشدید و وخامت اوضاع بشردوستانه در ایران شده است.

تحریم‌های اعمال شده بر کالاهای اصلی صادراتی، تحریم تمامی بانک‌های ایرانی به همراه فهرست بلندبالایی از شرکت‌ها و شهروندان ایرانی، از جمله برخی که در زمینه تولید دارو و مواد غذایی فعالیت می‌کنند، منجر به کاهش درآمد دولت، تورم ، فقر روزافزون، و منابع ناکافی برای تضمین نیاز های اساسی اقشار کم درآمد و سایر گروه‌های آسیب‌پذیر، از جمله افرادی که از بیماری‌های نادر یا شدید رنج می‌برند، افراد با معلولیت، پناهندگان افغانستانی، خانواده‌های زن سرپرست و کودکان در کشور شده است.

این تحریم‌ها همچنین دولت را از دسترسی به منابع لازم برای توسعه و حفظ زیرساخت‌های ضروری کشور از جمله بیمارستان‌ها، مدارس، مسکن، پالایشگاه‌ها، جاده‌ها، هوانوردی غیرنظامی، مخازن و بسیاری دیگر، و حفظ سطح آمادگی لازم برای پاسخ به حوادث و بلایای طبیعی محروم کرده‌است، منجر به کاهش برنامه‌های حمایت اجتماعی و جلوگیری از اجرای طرح‌های دانشگاهی، فرهنگی، زیست‌محیطی و عمرانی شده و آثار مخربی بر کل جمعیت ایران داشته است.

اعلام آمادگی و تهدید برای اعمال تحریم‌های ثانویه، مجازات‌های کیفری و مدنی علیه افراد و شرکت‌هایی که رژیم‌های تحریمی یک‌جانبه را دور می‌زنند، همچنین سیاست‌های ریسک‌زدایی و رعایت افراطی تحریم‌ها توسط بانک‌ها و شرکت‌های خصوصی کشورهای ثالث، منجر به مشکلات زیر شده است: مشکلات فزاینده انتقال یا دریافت پول از جمله بسته شدن حساب‌های بانکی با سابقه افراد حقیقی یا حقوقی ایرانی در صورت مشارکت آنان در معاملات، افزایش مدت و هزینه‌های حواله‌های بانکی و نیاز ایجاد

شده برای انجام تراکنش‌ها از طریق شهروندان کشورهای ثالث یا جستجوی راه‌های جایگزین برای پرداخت و خرید که اغلب غیرممکن یا مستلزم تاخیرهای طولانی است، سوء استفاده از این وضعیت توسط اشخاص ثالث، تحویل دادن مواد، واکنشگرها، داروها و مواد بی‌کیفیت یا تقلبی، که این وضعیت می‌تواند چالش‌های مختلفی را در زمینه‌های اقتصادی، اجتماعی، پیشگیری از جرم و فرهنگی ایجاد کند.

ممانعت از مشارکت ایران در همکاری‌های بین‌المللی از طریق ایجاد مانع در پرداخت حق عضویت سازمان‌های بین‌المللی یا همکاری‌های بین‌المجالس، از ادامه همکاری‌های بین‌المللی ایران جلوگیری می‌کند و مانع احقاق حق توسعه می‌شود.

با نگرانی متذکر می‌شوم که به دلیل در دسترس نبودن ماشین آلات، قطعات یدکی، نرم افزارها و فناوری‌های جدید، همچنین مسدود شدن دارایی‌های ایران در تعدادی از کشورها و عدم دسترسی به وام‌های اضطراری، مردم ایران با مشکلات عدیده‌ای مواجه هستند، از جمله در زمینه عرضه بنزین، مراقبت‌های بهداشتی، نبود سازوکارهای کافی برای پایش و پاسخ به بلایای طبیعی و مواجهه با شرایط رو به وخامت حمل‌ونقل و امنیت زیست‌محیطی، نگهداری زیرساخت‌های اساسی کشور، استفاده از فناوری‌های نوآورانه، خطرات فزاینده آلودگی هوا و خاک و آلودگی‌های نفتی، و وخامت شرایط کاری که بر حقوق اقتصادی و اجتماعی و حقوق سلامت و حیات تأثیر می‌گذارد.

تاکید می‌کنم که کاهش درآمدهای حاصل از صادرات کالا، کاهش دستمزدها و وخامت اوضاع اقتصادی و تورم، توان دولت را برای حفظ میزان حمایت‌های اجتماعی در حوزه غذا، بهداشت و مسکن تقلیل داده است، و این شرایط موجب تضییع حق غذا، حق رهایی از فقر، حق زندگی آبرومندانه، حق سلامت و حقوق اقتصادی و اجتماعی مردم شده است.

با اذعان به وجود مجوزهای عمومی اداره کنترل دارایی‌های خارجی وزارت خزانه داری ایالات متحده برای فروش و تحویل کالاهای پزشکی و کشاورزی با معافیت به ایران، در عمل معافیت‌های بشردوستانه برای غذا و دارو بی اثر بوده و تقریباً وجود ندارد. این به دلیل ترس واقعی یا ادعایی شرکت‌ها از تحریم‌های ثانویه، ترس از اتهامات مدنی و کیفری علیه آنها، «توصیه» های گزارش شده به آنان مبنی بر عدم انجام هیچ گونه فعالیت تجاری با ایران، و بالاخره عدم امکان، پیچیدگی، عدم قطعیت و طولانی بودن پرداخت‌های بانکی و تحویل کالا است. تحریم‌ها بر طیف گسترده حقوق انسانی مردم ایران آثار منفی برجای گذاشته است.

خودداری تولیدکنندگان دارو و تجهیزات پزشکی، مواد اولیه، مواد غذایی و محصولات کشاورزی، قطعات یدکی، نرم‌افزار، واکسن‌های انسان و دام، بذر، کود و سایر کالاهای ضروری از انعقاد قرارداد با ایرانیان، خودداری بانک‌ها از انجام هرگونه معامله و امتناع شرکت‌های حمل‌ونقل از ارائه تضمین تحویل کالا، در مجموع منجر به افزایش مستند نرخ مرگ و میر و ناتوانی افراد مبتلا به بیماری‌های نادر و حاد، تحویل اضافی و ارسال داروها و تجهیزات پزشکی بی کیفیت، تاریخ مصرف گذشته و تقلبی، بدتر شدن وضعیت سلامت، کاهش تولید مواد غذایی، کاهش امید به زندگی افراد دارای معلولیت و ناگزیر نقض حقوق غذا و سلامت و کاهش کیفیت زندگی آنها، و نقض حق زندگی با کرامت بدون درد و حق حیات شده است.

اعمال طیف گسترده تحریم‌های یکجانبه همراه با تحریم‌های ثانویه و رعایت افراطی آنها، و امتناع تولیدکنندگان، بانک‌ها و شرکت‌ها از تحویل کالاهای اساسی به ایران موجب شده است که نهادهای دولتی، شرکت‌های خصوصی و شهروندان ایرانی بناچار به استفاده از راه‌های جایگزین برای حضور در تجارت بین‌الملل روی بیاورند. در نتیجه، دخالت شرکت‌های ثالث و واسطه و استفاده از سازوکارهای غیررسمی و غیرشفاف تجارت، پرداخت و تحویل کالا نتیجه‌ای جز گسترش فقر و کاهش سطح زندگی مردم و تضییع حقوق اقتصادی و اجتماعی آنان ندارد.

عدم تمایل شرکای خارجی به همکاری با مؤسسات آموزشی، انجمن‌های ورزشی حرفه‌ای و آماتور، مؤسسات فرهنگی، هنرمندان، شرکت‌های فناوری و سایر نهادهای ایرانی و همچنین قطع شدن امکان انتقال پول، مشکلات در اخذ ویزا، حذف شدن دانش‌پژوهان ایرانی از عضویت در هیئت‌های تحریریه خارجی و رد شدن فزاینده مقالات ارائه شده توسط محققان ایرانی برای ارزیابی و ویرایش از سوی نشریات علمی، کاهش امکان دریافت کمک هزینه‌های تحقیقاتی و بورسیه‌های تحصیلی برای دانشجویان و دانش پژوهان ایرانی، محرومیت از دسترسی به پایگاه‌ها و کتابخانه‌های دانشگاهی، فناوری و پزشکی خارجی به دلیل ملیت ایرانی، و تبعیض بر اساس آدرس IP (سایت‌های ایرانی) همگی تبعیض بر اساس ملیت است که حق آموزش و همچنین همکاری‌های بین‌المللی دانشگاهی، ورزشی و فرهنگی، نوآوری، آزادی‌های دانشگاهی و حقوق فرهنگی را تضییع می‌کند و مانع همکاری و گفتگو در همه حوزه‌های مذکور می‌شود.

چالش‌های اقتصادی ناشی از اقدامات یکجانبه قهرآمیز و عدم همکاری بین‌المللی مبتنی بر مسئولیت مشترک، دولت ایران را از ارائه کمک‌های پایدار به آسیب‌پذیرترین اقشار جمعیت، از جمله پناهندگان افغانستانی باز می‌دارد. ضمن تقدیر از تلاش‌های ایران برای فراهم کردن دسترسی برابر برای پناهندگان افغانستانی، اعم از دارندگان مدرک اقامتی قانونی و پناهندگان ثبت نشده، خاطرنشان می‌کنم که درآمد ناکافی دولت مانع از توسعه مدارس، بیمارستان‌ها و زیرساخت‌های شهری لازم برای ارائه این خدمات شده است.

تحریم‌های یکجانبه و رعایت افراطی آنها، در کنار کاهش همکاری‌های دوجانبه و بین‌المللی، اقتصاد کشور را وخیم کرده و بر حق اشتغال، حق کار شایسته به ویژه برای فقیرترین گروه‌های جمعیتی تأثیر نامطلوب می‌گذارد و مانع تلاش‌ها برای پیشگیری مؤثر از جرم و مقابله با افزایش مصرف مواد مخدر و نیز مختل شدن امنیت اقتصادی و اجتماعی می‌شود.

از تلاش‌ها و اقدامات دولت جمهوری اسلامی ایران برای کاهش آثار منفی تحریم‌های یکجانبه بر بخش‌های مختلف به‌ویژه برای اقشار آسیب‌پذیر جامعه شامل پناهندگان افغانستانی استقبال می‌کنم. با این حال، در حالی که این اقدامات آثار منفی مستقیم تحریم‌ها را بر برخورداری از حقوق انسانی کاهش می‌دهد، اما نباید از آن به عنوان زمینه‌ای برای مشروعیت بخشیدن اعمال تحریم‌های یکجانبه استفاده شود.

تحریم‌های یکجانبه در مورد تحویل کالا و خدمات به ایران، بیمه‌های حمل و نقل و سیستم بانکی ایران و رعایت بیش از حد تحریم‌ها توسط شرکت‌ها و بانک‌ها، تلاش‌های سازمان‌ها و انجمن‌های بشردوستانه را در ارائه کمک‌ها و تحویل اقلام انسان دوستانه به ایران با مشکلات جدی روبرو کرده است و تنها دریافت

کمک‌های مالی از کشورهای اتحادیه اروپا تا حدی برای سازمان‌های غیر دولتی بین‌المللی بشردوستانه آسان‌تر بوده است. موانع فوق منجر به افزایش هزینه‌های قانونی و بانکی، تأخیر در تحویل کالاها حتی دارو و تجهیزات نجات بخش، کاهش کمک‌های مالی اهداکنندگان خصوصی و عدم امکان تبادل و انتقال پول برای خرید و دریافت کالا می‌شود و در نتیجه، استفاده از روش‌های جایگزین را، که اغلب غیرایمن هستند، ناگزیر می‌سازد. این وضعیت نیز به نوبه خود موجب افزایش احتمال دریافت دارو و تجهیزات پزشکی با کیفیت غیراستاندارد، قیمت‌های بالاتر و در نتیجه کاهش قابلیت‌های عملیاتی می‌شود. گزارش شده است که سازمان‌های بشردوستانه فعال در ایران با خطر اتهامات مدنی و کیفری از سوی ایالات متحده به دلیل تعامل با نهادهای ایرانی و فعالیت‌های بشردوستانه آنها در ایران روبرو هستند. روند درخواست مجوزها طولانی، نامطمئن و بسیار پرهزینه است و امکان تحویل کالاهای صرفاً بشردوستانه مانند دارو، تجهیزات پزشکی و غذا به ایران را تضعیف می‌کند.

توصیه‌ها

به همه طرف‌ها تعهدشان بر اساس منشور سازمان ملل متحد برای رعایت اصول و هنجارهای حقوق بین‌الملل از جمله اصول برابری حاکمیتی، استقلال سیاسی، عدم مداخله در امور داخلی کشورها و حل و فصل مسالمت آمیز اختلافات بین‌المللی را یادآوری می‌کنم.

از همه طرف‌های ذینفع بین‌المللی و ملی می‌خواهم که استفاده از لفاظی تحریم‌ها به عنوان ابزاری سیاسی یا ابزاری برای کسب منافع اقتصادی را فورا متوقف کنند و برای حل و فصل اختلافات مطابق با اصول و هنجارهای حقوق بین‌الملل، ضمن ارزیابی، پیشگیری و نظارت بر تأثیرات انسانی، وارد گفت‌وگو شوند.

از کشورهای تحریم کننده به خصوص ایالات متحده امریکا می‌خواهم که تمام اقدامات یک جانبه تحمیل شده علیه کشور ایران، شهروندان و شرکت‌های ایرانی را لغو کنند. این تحریم‌ها بدون مجوز شورای امنیت سازمان ملل متحد وضع شده اند و استفاده از آن‌ها را نمی‌توان به عنوان اقدام متقابل یا معامله به مثل مطابق با قوانین بین‌المللی توجیه کرد، به ویژه در مورد تجارت، تحویل (کالا و خدمات)، بیمه و موانع پرداخت برای توسعه و نگهداری زیرساخت‌های حیاتی از جمله غذا، دارو و تجهیزات پزشکی، سیستم‌های تأمین آب، فاضلاب و برق، ارتباطات، حمل‌ونقل و غیره که متضمن بهره‌مند شدن مردم از همه انواع حقوق بشر شامل سلامت، غذا، امنیت حمل و نقل و سایر حقوق انسانی است. همچنین یادآوری می‌کنم که هیچ نیت خیری نقض حقوق اساسی بشر را توجیه نمی‌کند.

از دولت ایالات متحده می‌خواهم که وضعیت اضطراری ملی را که در تناقض با میثاق بین‌المللی حقوق مدنی و سیاسی است، متوقف کند و قوانین ملی خود را با قوانین بین‌المللی، از جمله قوانین حقوق بشر، قانون پناهندگان و قانون مسئولیت بین‌المللی همسو کند.

از همه دولت‌ها، سازمان‌های بین‌المللی، بانک‌ها، شرکت‌های خصوصی، جامعه مدنی و دیگر نهادهای مربوطه می‌خواهم از اجبار، تهدیدات کتبی یا شفاهی یا هر عمل دیگری که ممکن است موجب یا منجر به رعایت افراطی تحریم‌های یکجانبه کشور خود یا کشور ثالث شود، اجتناب کنند و از تفسیر محدودیت‌ها و تلقی کاربرد دوگانه برای کالاها و تجهیزات در این دوره موقت قبل از لغو تحریم‌های یکجانبه بپرهیزند.

از کشورهایی که دارایی‌های بانک مرکزی ایران را مسدود کرده‌اند می‌خواهم که طبق هنجارهای متعارف حقوق بین‌الملل مربوط به مصونیت اموال دولتی، از این دارایی‌ها رفع توقیف کنند تا دولت بتواند به طور کامل مسئولیت اجرای همه تعهدات خود را برای ارتقا و حمایت از حقوق بشر انجام دهد.

از همه بانک‌ها و شرکت‌های خصوصی می‌خواهم که مطابق با اصول راهنمای تجارت و حقوق بشر، از اجرای افراطی تحریم‌ها که منجر به نقض حقوق شهروندان ایرانی و اتباع خارجی ساکن در ایران می‌شود، به‌ویژه در زمینه زیرساخت‌های حیاتی، تحویل تجهیزات پزشکی، قطعات یدکی، دارو، و مواد اولیه تولید دارو، به ویژه در مورد بیماری‌های خاص و حاد، خودداری کنند. من همچنین به دولت ایران توصیه می‌کنم که امکان روش‌های جایگزین پرداخت برای دریافت کالاهای بشردوستانه را بررسی کند.

به همه دولت‌ها و سازمان‌های منطقه‌ای یادآوری می‌کنم که باید از اصل مراقبت بایسته پیروی کنند و تمام اقدامات لازم را انجام دهند تا مطمئن شوند که اقدامات تحت صلاحیت و کنترل آنها بر حقوق بشر مردم در داخل و خارج از مرزهای ملی تأثیری نخواهد گذاشت. نقض تعهدات بین‌المللی توسط دولت‌ها از جمله مراقبت بایسته برای تضمین این که فعالیت تحت صلاحیت و کنترل آنها به شهروندان، ساکنان و شرکت‌های کشورهای ثالث آسیبی وارد نمی‌کند، زمینه معتبری برای مسئولیت‌پذیری و پاسخگو بودن مطابق با قوانین بین‌المللی ایجاد می‌کند. همچنین از نهادهای قضایی منطقه‌ای و ملی می‌خواهم که بدون مقدم دانستن سیاست‌های کاهش خطر و نگرانی‌های اقتصادی بر تعهدات بین‌المللی اقتصادی و حقوق بشری، پرونده‌های مرتبط با تحریم‌ها را به نحو مقتضی بررسی کنند.

به کشورهایی که علیه ایران، شهروندان و شرکت‌های ایرانی تحریم وضع کرده اند توصیه می‌کنم اطمینان حاصل کنند که جمهوری اسلامی ایران قادر باشد حق عضویت مقرر و کمک‌های داوطلبانه خود را به سازمان‌های بین‌المللی پرداخت کند، که نمایندگی‌های دیپلماتیک، کنسولی و ویژه ایران و کارکنان آن بدون هیچ مانعی مجوز ورود دریافت کنند و از امکان افتتاح و نگهداری حساب‌های بانکی و انجام فعالیت‌های دیپلماتیک و کنسولی برخوردار باشند، و از هرگونه خطر مسدود شدن حساب‌های مأموریتی در انطباق کامل با اصل برابری حاکمیتی دولت‌ها، مصونیت اموال دولتی و کنوانسیون‌های وین در مورد روابط دیپلماتیک، کنسولی و ماموریت‌های ویژه در امان باشند.

از کشورهای شرکت کننده در برجام و ایالات متحده می‌خواهم که با حسن نیت به مذاکرات ادامه دهند.

همچنین از بانک‌ها، نهادهای ورزشی، فرهنگی و دانشگاهی، سازمان‌ها و انجمن‌ها درخواست می‌کنم تا امکان مشارکت دانشمندان، هنرمندان و ورزشکاران ایرانی را در همکاری‌های بین‌المللی تضمین و تسهیل کنند. این امر در راستای تعهدات و ابتکارات بین‌المللی است (از جمله یونسکو و سایر نهادهای سازمان ملل متحد) ناظر بر این که همکاری‌ها و مبادلات آموزشی، ورزشی و فرهنگی ابزاری جدا نشدنی برای دستیابی به اهداف توسعه پایدار، پیشگیری از منازعات و حفظ صلح و امنیت در سراسر جهان است. من از همه طرف‌ها می‌خواهم که دسترسی آزاد به اطلاعات و امکان اعمال آزادی بیان را بدون هرگونه محدودیت در دنیای دیجیتال و مطابق با مواد ۱۹-۲۰ میثاق بین‌المللی حقوق مدنی و سیاسی تضمین کنند.

من ضمن استقبال از همکاری گزارش شده دولت با تیم کشوری و آژانس‌های تخصصی سازمان ملل متحد حاضر در ایران در زمینه عملیات بشردوستانه، دولت ایران و کمیساریای عالی حقوق بشر سازمان ملل

متحد را تشویق می‌کنم که با هدف ترویج و حمایت از حقوق بشر در کشور از طریق یک برنامه همکاری‌های فنی و همچنین تعامل با گزارشگران رویه‌های ویژه، در یک گفت‌وگوی جدی و توأم با احترام متقابل با یکدیگر شرکت کنند.

من از تیم کشوری سازمان ملل متحد در ایران به خصوص UNICEF، UNDP، و UNAIDS می‌خواهم که با تولیدکنندگان و کشورهای مربوطه تعامل بیشتری داشته باشند و به ایران در تهیه داروها، مواد اولیه، تجهیزات و اقلام پزشکی با کیفیت مناسب برای درمان بیماری‌های خاص و حاد از جمله بیماری پروانه ای، تالاسمی، هموفیلی، اچ آی وی، سرطان، هموفیلی، MSA (بیماری اتروفی سیستم چندگانه)، دیابت و غیره کمک کنند.

ضمن استقبال و قدردانی از تلاش‌های ایران برای میزبانی تعداد فزاینده پناهندگان افغانستانی، علاوه بر درخواست لغو تحریم‌های یکجانبه به منظور افزایش توان دولت برای ارائه خدمات و مراقبت‌های لازم به این افراد، از جامعه بین‌المللی نیز می‌خواهم که برای این منظور کمک‌های اساسی کافی برای ایران فراهم کند.

من از کارگزاری‌ها و نهادهای تخصصی تیم کشوری سازمان ملل متحد و سایر سازمان‌های بشردوستانه فعال در ایران می‌خواهم که برای اطمینان از رعایت حاکمیت قانون و حقوق بشر و دستیابی به اهداف توسعه پایدار، در زمینه کاهش آثار منفی تحریم‌های یکجانبه بر حقوق بشر در ایران به طور جدی و در چارچوب مسئولیت خود با ایران همکاری کنند.

با توجه به تعهد همه دولت‌ها برای حل و فصل اختلافات بین‌المللی از طریق راه‌های مسالمت‌آمیز، از ارائه پرونده نقض عهدنامه مودت و روابط اقتصادی و حقوق کنسولی (۱۹۵۵) به دیوان بین‌المللی دادگستری استقبال می‌کنم و از همه طرف‌ها می‌خواهم که به طور مشابه از سازوکارهای قضایی برای حل و فصل اختلافات موجود استفاده کنند و با حسن نیت همکاری کنند تا از طریق مذاکره و استفاده از تمام سازوکارهای موجود برای حمایت از حقوق بشر تضییع شده در اثر اقدامات یکجانبه قهرآمیز، از جمله نهادهای ناظر بر معاهدات (حقوق بشر) سازمان ملل متحد، دیوان دادگستری اتحادیه اروپا، دادگاه حقوق بشر اروپا و غیره، از بروز چنین اختلافاتی جلوگیری شود. از دیگر رویه‌های ویژه نیز می‌خواهم که به آثار منفی تحریم‌های یکجانبه علیه ایران بر مردم ایران به‌ویژه گروه‌های آسیب‌پذیر توجه لازم را داشته باشند.

من از دفتر کمیساریای عالی، نهادهای ناظر بر معاهدات (حقوق بشر)، دفتر هماهنگی امور بشردوستانه سازمان ملل متحد و سایر نهادهای سازمان ملل متحد که با گزارشگر ویژه همکاری می‌کنند، می‌خواهم که در بررسی امکان تقاضای پرداخت غرامت، ترمیم و جبران خسارت برای قربانیان نقض حقوق بشر ناشی از اقدامات یکجانبه قهرآمیز مشارکت کنند. من همچنین از همه ذینفعان از جمله دولت‌ها، سازمان‌های بین‌المللی، سازمان‌های غیردولتی، بانک‌ها، و شرکت‌ها دعوت می‌کنم تا برای تدوین اصول راهنمای مربوط به تحریم‌های ثانویه، رعایت افراطی تحریم‌ها و حمایت از حقوق بشر، جلوگیری از خطرزدایی که مستلزم تبعیت افراطی از تحریم‌ها است، و معرفی اصول مراقبت بایسته در همکاری‌های بین‌المللی، بانکی و فعالیت‌های تجاری، گفتگوهای چندسطحی را آغاز کنند./

# EXHIBIT 6

## *Iran Thalassemia Society v. OFAC*

## UN SUMMARY OF DOULAN COMMENTS

# UN Special Rapporteur on the negative impact of unilateral coercive measures concludes visit to Iran

22 May 2022



Photo: © UN Iran/Kamyar Minoukadeh

Independent UN rights expert analyses the impact of unilateral coercive measures on human rights in Iran.

On May 18, Alena Douhan, UN Special Rapporteur on the Negative Impact of Coercive Measures on the Enjoyment of Human Rights, concluded a 12-day trip to Iran to examine the impact of UCMs on the country.

At a press conference held at Iran's National Library on May 18, 2022, the independent expert underlined that the complex set of unilateral sanctions against Iran, coupled with secondary sanctions against third-parties, overcompliance and zero-risking policies by businesses and financial institutions, exacerbate existing humanitarian and economic challenges and negatively affect the lives of the people, in particular the most vulnerable.

The Special Rapporteur will present a final report to the Human Rights Council in September 2022.

For more information, visit OHCHR's [website](website).

# EXHIBIT 7

## *Iran Thalassemia Society v. OFAC*

## OFAC SAFE HARBOR RELEASE

**Financial Channels to Facilitate Humanitarian Trade with Iran and Related Due Diligence and Reporting Expectations**

The U.S. Government has levied unprecedented economic pressure to disrupt the Iranian regime's ability to covertly and illicitly access the international financial system to finance terrorism abroad, increase its domestic oppression, support the brutal Assad regime, procure ballistic missile technology, and broadly destabilize the Middle East. These U.S. government efforts are directed at the Iranian regime. They are not directed at the people of Iran, who themselves are victims of the regime's oppression, corruption, and economic mismanagement.

The United States maintains broad exceptions and authorizations for the sale of agricultural commodities, food, medicine, and medical devices to Iran by U.S. and non-U.S. persons, provided such transactions do not involve persons designated in connection with Iran's proliferation of weapons of mass destruction (WMD), or Iran's support for international terrorism. These exceptions and authorizations are clearly outlined by Treasury's Office of Foreign Assets Control (OFAC) in Frequently Asked Questions (FAQs) regarding Iran sanctions, Guidance on Humanitarian Assistance and Related Exports to the Iranian People (2013), and Guidance on the Sale of Food, Agricultural Commodities, Medicine, and Medical Devices by Non-U.S. Persons to Iran (2013).

Unfortunately, the U.S. government has seen the Iranian regime abuse the goodwill of the international community, including by using so-called humanitarian trade to evade sanctions and fund its malign activity. The U.S. government also knows that the regime and its proxies are looking for new ways to generate funds and launder money. In fact, we have grown increasingly concerned as we have uncovered Iranian and Iranian-proxy schemes to access illicitly the international financial system under the cover of seemingly humanitarian organizations or through shell companies or exchange houses.

Today, October 25, 2019, the U.S. Departments of the Treasury and State announced a new humanitarian mechanism to ensure unprecedented transparency into humanitarian trade with Iran. Given the Iranian regime's history of squandering its wealth on corruption and terrorism instead of supporting the Iranian people, we have developed a framework to guard against such theft and assist foreign governments and foreign financial institutions in establishing a payment mechanism to facilitate legitimate humanitarian exports to Iran. Through this mechanism, no revenue or payment of any kind will be transferred to Iran.

Importantly, this path restricts the Central Bank of Iran's (CBI) role in facilitating humanitarian trade, which is critical because the CBI and its senior officials have facilitated significant funds transfers to terrorist organizations. Iran's deceptive financial practices and its deficient anti-money laundering and countering the financing of terrorism (AML/CFT) regimes can make it extremely difficult to determine who is on the other end of an Iranian transaction. Our designation of CBI under Executive Order 13224 puts governments and financial institutions on notice that engaging in transactions with the CBI may make them complicit in the CBI's support of terrorism.

This mechanism, designed solely for the purpose of commercial exports of agricultural commodities, food, medicine, and medical devices to Iran, will provide unprecedented transparency into humanitarian trade to Iran and help ensure that humanitarian goods go to the Iranian people, and are not diverted by the Iranian regime to fund its nefarious purposes. To achieve this transparency, participating governments and financial institutions must commit to conducting enhanced due diligence to mitigate the higher risks associated with transactions involving Iran. Such stringency is merited given Iran's status as the largest state sponsor of terrorism, as well as its continued failure to implement key AML/CFT safeguards established by the Financial Action Task Force (FATF), the global standard-setting body for combating money laundering and the financing of terrorism and proliferation. The enhanced due diligence requirements are informed by appropriate FATF standards.

As set forth below in greater detail, this framework will enable foreign governments and foreign financial institutions to seek written confirmation from Treasury that the proposed financial channel will not be exposed to U.S. sanctions in exchange for foreign governments and financial institutions committing to provide to Treasury robust information on the use of this mechanism on a monthly basis.

If foreign governments or financial institutions detect any potential abuse of this mechanism by Iranian customers, or the involvement of designated individuals or entities, they will be required to immediately restrict any suspicious transactions and provide relevant information to Treasury.

This mechanism also can be used by U.S. persons and U.S.-owned or -controlled foreign entities, as well as other non-U.S. persons. Of course, U.S. persons and U.S.-owned or -controlled entities must still comply with existing requirements under the Trade Sanctions Reform and Export Enhancement Act of 2000 (TSRA) for humanitarian exports to Iran, as implemented through OFAC's regulations.

### **Enhanced Due Diligence and Reporting Expectations**

Provided that foreign financial institutions commit to implement stringent enhanced due diligence steps, the framework will enable them to seek written confirmation from Treasury that the proposed financial channel will not be exposed to U.S. sanctions

Host nation foreign financial institutions and their governments, as appropriate, will be expected to collect, maintain, and report to Treasury, with appropriate disclosure and use restrictions, a great deal of information on a monthly basis. Treasury will evaluate the information it receives in making any determination about whether the transactions continue to meet the stated due diligence and reporting expectations. Treasury will seek to protect information identified by the submitter, consistent with applicable laws and regulations.

The following is an illustrative list of documentation and information that Treasury and State may require depending on the nature of transactions:

1. The information used to identify the Iranian customers and to verify their identities and beneficial ownership;

   a. For legal persons or arrangements, this would include the information used to identify and verify the existence of the entity or arrangement (company name, legal form and status, proof of incorporation, basic regulating powers, the registered address, list of directors, and principal place of business), and information sufficient to understand the nature of the Iranian customers' business, ownership, and control structure;

   b. For legal persons, information sufficient to identify and verify the identities of the natural person(s) who are beneficial owners. For legal arrangements, information sufficient to identify and verify the identities of the natural person(s) who are the settlor, trustee(s), protector (if any), the beneficiaries or class of beneficiaries, and any other natural person exercising ultimate effective control over the legal arrangements;

2. The information used by both the host nation's foreign financial institutions and any Iranian financial institution involved to understand the purpose and intended nature of the business relationship between the seller of the humanitarian goods and the Iranian customer;

3. Monthly statement balances with the value, currency, and balance date of any account of an Iranian financial institution held at the participating host nation's foreign financial institutions that is being used for humanitarian transactions, in .csv format;

4. A list of Iranian designated individuals or entities[1] with which the Iranian customers indicate they currently have business relationships;

5. Detailed information regarding the commercial elements and logistics of the transaction that would be transmitted between the seller of humanitarian goods and the customer in the normal course of financial messaging, which could include:

   a. customer information, including the identities of all consignees and intermediaries involved in the transactions;

   b. information about the Iranian customer and the seller of the humanitarian goods and the Iranian financial institution's payment order explanation or narrative linked to the contracts for the sale of humanitarian goods;

---

[1] Persons designated on the List of Specially Designated Nationals and Blocked Persons under a program other than solely the Iranian Transactions and Sanctions Regulations (31 C.F.R. Part 560), and carrying a tag other than solely the "[IRAN]" tag.

     c.   order transaction amount and currency;

     d.   date of transaction order;

     e.   names of all involved financial institutions;

     f.   bills of lading, airway bills and invoices, as well as other relevant documents that verify the export to and entry into Iran of the goods;

     g.   the beneficiary's identity; and

     h.   the beneficiary's bank.

6. A written commitment from any Iranian distributors involved in the transactions that they will not allow the goods to be sold or resold to Iranian designated individuals or entities and that the Iranian distributor will impose this obligation on downstream customers;

7. Additional information obtained regularly throughout the course of the host nation foreign financial institutions' ongoing due diligence of the business relationship that is necessary to verify the consistency of the transaction with the purposes of the humanitarian channel, including host nation's foreign financial institutions' knowledge of the Iranian customers and their business and risk profiles;

8. If, through the course of the host nation's foreign financial institutions' enhanced due diligence, Iranian customers are found to have attempted, or are suspected of, misuse of the humanitarian channel, the participating host nation's foreign financial institution will immediately restrict any suspicious transactions and provide relevant information to Treasury when permitted; and

9. If a host nation foreign financial institution finds that an Iranian customer had previous ties (within five years) to U.S.-, U.N.-, or EU-designated entities or individuals, the host nation foreign financial institution will provide to Treasury detailed information regarding any changes to those ties, such as a change in beneficial ownership or control of the Iranian customer.

In certain circumstances, Treasury and State may require other information.

Interested foreign governments and foreign financial institutions should reach out to Treasury for more information or with any questions.