IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IRAN THALASSEMIA SOCIETY, a nonprofit organization; EB HOME, a nonprofit organization; H.K., an individual; A.M., an individual; S.N., an individual; M.M., an individual; FZ.H., an individual; F.E., an individual; and NO CHILD SHOULD SUFFER, a nonprofit organization, | No. 3:22-cv-01195-HZ  OPINION & ORDER |
| Plaintiffs, | |
| v. | |
| OFFICE OF FOREIGN ASSETS CONTROL; JANET YELLEN, in her official capacity as Secretary of the Treasury; and ANDREA GACKI, in her official capacity as Director of the Office of Foreign Assets Control, | |
| Defendants. | |

Thomas H. Nelson
Thomas H. Nelson & Associates
20820 E. Glacier View Road
Zigzag, OR 97049

1 – OPINION & ORDER

Brandon Mayfield
The Law Office of Brandon Mayfield
14631 SW Millikan Way
Beaverton, OR 97003

     Attorneys for Plaintiff

Brian M. Boynton
Principal Deputy Assistant Attorney General
Alexander K. Haas
Director, Federal Programs Branch
Diane Kelleher
Assistant Director, Federal Programs Branch
Stephen M. Elliott
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005

     Attorneys for Defendants


HERNÁNDEZ, District Judge:

Defendants move to dismiss Plaintiffs' Second Amended Complaint ("SAC") in this suit challenging the "maximum pressure" sanctions imposed on Iran by the Office of Foreign Assets Control ("OFAC"). For the following reasons, the Court grants Defendants' motion.

## BACKGROUND

Plaintiffs are an Iranian organization representing the interests of individuals in Iran suffering from thalassemia, a genetic blood disorder; an Iranian organization representing the interests of individuals in Iran suffering from epidermolysis bullosa ("EB"), a genetic skin disorder; six Iranian citizens suffering from EB; and an Oregon domestic nonprofit formed to support Iranian children impacted by the United States Government's sanctions on Iran.

Plaintiffs assert that OFAC's "maximum pressure" sanctions on Iran are unlawfully preventing necessary medical supplies and medications from reaching individuals in Iran suffering from thalassemia and EB.

### I.    The Sanctions

The SAC alleges that on May 8, 2018, then-President Donald Trump announced the United States' withdrawal from the Joint Comprehensive Plan of Action ("JCPOA"), a 2015 agreement to which the United States and Iran were parties. SAC ¶ 15, ECF 26. At the same time, he announced both a re-imposition of economic sanctions that had been lifted as part of the JCPOA and new "maximum pressure" sanctions to pressure Iran into a new agreement. *Id.* Plaintiffs allege that authorized sanctions include imprisonment and fines of up to $1 million. *Id.* ¶ 16. They allege that these sanctions "ultimately targeted virtually the entire Iranian commercial banking sector." *Id.* ¶ 17. They allege that as a result, "foreign banks ceased dealing with their blocked Iranian counterparts[.]" *Id.* Thus, transactions with Iranian businesses became "extremely difficult if not impossible." *Id.* ¶ 18.

Plaintiffs allege that European businesses that had once been willing to do business in Iran, including those that provided humanitarian aid, terminated those agreements. *Id.* ¶ 20. Before OFAC imposed the "maximum pressure" sanctions on Iran, Plaintiffs could obtain the necessary medicines and medical supplies "through normal commercial channels." *Id.* ¶ 2. After the "maximum pressure" sanctions were imposed, they could not. *Id.* ¶ 15. According to Plaintiffs, foreign banks and other financial institutions "fear that defendant OFAC will impose secondary sanctions upon them." *Id.* ¶ 25. Plaintiffs explain that "[t]his fear is due in large part because of the uncertain scope and complexity of the maximum pressure sanctions, and also because the normal fees or commissions from acting as an intermediary bank are minimal." *Id.*

Plaintiffs allege that on October 25, 2019, OFAC announced that it intended to create a process to allow foreign banks to participate in the delivery of humanitarian aid to Iran without fear of secondary sanctions. SAC ¶ 26. They allege that the policy required participating financial institutions to provide extensive information to the U.S. Department of the Treasury each month. *Id.* Plaintiffs allege that this amounts to a requirement that participating financial institutions "actively seek and turn over to OFAC intelligence information gleaned from espionage on Iranian customers of humanitarian aid." *Id.* According to Plaintiffs, none of the foreign banks that previously facilitated delivery of humanitarian aid to the Iranian Plaintiffs chose to participate in this program. *Id.* ¶ 27. Plaintiffs assert that these third party entities will engage in the transactions again if the "maximum pressure" sanctions are lifted. *Id.*

Plaintiffs also allege that because of the sanctions, Iran later "began relaxing its compliance with the terms of the JCPOA and repositioning its economic system away from Europe and the West and in close alignment with Eastern economic powers, initially with China, and more recently with Russia." *Id.* ¶ 19.

## II.    The Plaintiffs

Plaintiffs are individuals and organizations representing the interests of those in Iran who suffer from two genetic conditions: thalassemia and EB. The SAC explains that "[t]halassemia is a genetic blood disorder that is treated by blood transfusions." SAC ¶ 22. Frequent blood transfusions "cause excess iron to be concentrated in the patient's blood which, unless treated, can cause iron toxicity, compromise vital organs (heart, liver, spleen, endocrine system), and ultimately lead to death." *Id.* The two most effective medications to treat this problem are Desferal and Jadenu, both of which are manufactured by Novartis Pharmaceutical, a Swiss company. *Id.* ¶¶ 1, 22. Before the "maximum pressure" sanctions were imposed, these

medications were generally available in Iran. *Id.* ¶ 22. Since the advent of the "maximum

pressure" sanctions, patients have had to rely on Desfonac, the Iranian version of the drug, which

is less effective and has negative side effects. *Id.* Plaintiffs allege that "over 600 thalassemia

patients have died unnecessarily" since the "maximum pressure" sanctions were announced

because they could not receive the necessary medication. SAC ¶¶ 4, 23. They allege that "[t]he

annual mortality rate for afflicted Iranians suffering from thalassemia has jumped from 30-40

deaths per year to 150 deaths per year since imposition of the maximum pressure sanctions." *Id.*

¶ 21. They allege that if the foreign medications became available again, most patients could

fully recover. *Id.* ¶ 23.

According to the SAC, the Iran Thalassemia Society is "an Iranian non-governmental

organization formed in 1989 by a number of parents with children suffering from thalassemia

major and physicians involved in the treatment of those patients." SAC ¶ 7. The Secretary of the

Society, Younos Arab, was born with thalassemia, as were all other members. *Id.* Plaintiffs

allege that the lack of suitable iron-chelating drugs has frustrated the Society's mission and

diverted its resources. *Id.*

The SAC explains that "EB is a genetic skin disorder that causes the skin to

become very fragile to the point that the slightest friction can cause blistering and open

sores." SAC ¶ 24. Mepilex, a specialized wound dressing, is the best treatment for these sores.

*Id.* Mepilex is manufactured by Mölnlycke Health Care A.B. of Gothenberg, Sweden, and is not

available from other sources. *Id.* According to the SAC, "Mölnlycke Health Care has announced

publicly that it is not willing to sell its products to Iran because of OFAC's illegal threats of

sanctions." *Id.* ¶ 5. Plaintiffs allege that other dressings are inferior and "stick to the healing

wound and thus rip off the scab and healing skin from the child's body, which in turn can lead to

a deterioration in general health and possible death of the afflicted child." *Id.* ¶ 24. Plaintiffs

allege that "hundreds of infant, toddler, and child EB patients have suffered excruciating pain as

their tender, healing skin was torn away when their wound dressings were changed." *Id.* ¶ 5.

According to the SAC, the six individual Plaintiffs, all afflicted with EB, have not been

able to obtain enough of the specialized wound dressings since the "maximum pressure"

sanctions were imposed. *Id.* ¶ 8. Plaintiff EB Home is "an Iranian NGO that began its work in

2015." *Id.* It has over 500 members who suffer from EB. *Id.* ¶ 24.

Plaintiff No Child Should Suffer "is an Oregon domestic nonprofit corporation formed

for the purpose of supporting Iranian children suffering as a result of OFAC's maximum pressure

sanctions." SAC ¶ 9. The SAC alleges that this Plaintiff "is ready, willing, and able to, among

other things, donate funds for the purchase of life-saving humanitarian aid in the form of drugs

and medical devices to the two plaintiff Iranian NGOs but, because of the maximum pressure

sanctions, No Child Should Suffer is unable to arrange such donations." *Id.*

### III.    Procedural History

Plaintiffs' First Amended Complaint alleged two causes of action: (1) violation of federal

statutory provisions governing humanitarian aid and (2) negligence under the Alien Tort Claims

Act, also known as the Alien Tort Statute ("ATS"). ECF 6. Plaintiffs previously moved for a

preliminary injunction enjoining Defendants from enforcing the "maximum pressure" sanctions

against entities providing humanitarian aid to Iran. ECF 2. The Court denied that motion because

Plaintiffs did not show a likelihood of success on the merits of their claims or serious questions

going to the merits. Op. & Ord. 7, ECF 15. The Court held that Plaintiffs failed to establish

Article III standing. *Id.* at 8-11. Plaintiff No Child Should Suffer failed to establish an injury in

fact. *Id.* at 9. All Plaintiffs failed to establish causation and redressability because "a redress of

Plaintiffs' harms requires the cooperation of third parties not before this Court": intermediary banks that would facilitate donations in Iran, and the makers of the medication and medical supplies Plaintiffs require, which have chosen not to do business with Iranian banks due to the sanctions. *Id.* at 9-11. The Court further held that Plaintiffs had no private right of action to enforce federal statutes relating to sanctions. *Id.* at 11-15. Finally, the Court held that Plaintiffs had no cause of action under the ATS. *Id.* at 15-18. After appealing to the Ninth Circuit, Plaintiffs voluntarily dismissed their appeal. Mandate, ECF 20. The Court then granted Plaintiffs' motion to file the SAC. Order, ECF 25.

In the SAC, Plaintiffs abandon their ATS claim and clarify their arguments for relief based on alleged violations of federal statutes governing sanctions. Plaintiffs base their claims on the Administrative Procedure Act ("APA") and nonstatutory review of ultra vires actions by government officials. SAC ¶¶ 34-47. The SAC also provides more information about Plaintiff No Child Should Suffer, alleging that it is ready, willing, and able to donate funds to provide humanitarian aid to Plaintiffs Iran Thalassemia Society and EB Home, but cannot do so because of the sanctions. SAC ¶ 9. The SAC seeks injunctive and declaratory relief. SAC 20-21. In particular, Plaintiffs request "[a]n injunction prohibiting OFAC from threatening to impose, or actually imposing, economic sanctions on any entity that provides or assists in the provision of humanitarian aid to Iran." *Id.* at 21. They seek declaratory relief to the same effect. *Id.* at 20-21.

Defendants move to dismiss the SAC for lack of Article III standing and failure to state a claim. Def. Mem. in Support of Mot. to Dismiss 1-2, ECF 27. The Court will only address Defendants' motion with respect to standing because that issue is dispositive.

**STANDARDS**

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1)

addresses the court's subject matter jurisdiction. The party asserting jurisdiction bears the burden

of proving that the court has subject matter jurisdiction over his or her claims. *Kokkonen v.*

*Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A challenge to Article III standing is

appropriately raised pursuant to Rule 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th

Cir. 2011) ("[L]ack of Article III standing requires dismissal for lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1).") (emphasis omitted); *Chandler v.*

*State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing and

ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule

12(b)(1) motion to dismiss.").

In evaluating a facial attack under Rule 12(b)(1), the court accepts all factual allegations

in the complaint as true and determines whether they are sufficient to invoke federal jurisdiction.

*Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014). The court does not accept

legal conclusions as true, even if they are "cast in the form of factual allegations." *Id.* (internal

quotations omitted).

A Rule 12(b)(1) motion may also attack the substance of the complaint's jurisdictional

allegations even though the allegations are formally sufficient. *See Corrie v. Caterpillar, Inc.*,

503 F.3d 974, 979-80 (9th Cir. 2007) (court treats motion attacking substance of complaint's

jurisdictional allegations as a Rule 12(b)(1) motion); *Dreier v. United States*, 106 F.3d 844, 847

(9th Cir. 1996) ("[U]nlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the

substance of a complaint's jurisdictional allegations despite their formal sufficiency[.]") (internal

quotation omitted). Additionally, the court may consider evidence outside the pleadings to

resolve factual disputes. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *see also*

*Dreier*, 106 F.3d at 847 (a challenge to the court's subject matter jurisdiction under Rule

12(b)(1) may rely on affidavits or any other evidence properly before the court).

## DISCUSSION

The SAC fails to establish that Plaintiffs have Article III standing to pursue the relief they

seek. Defendants challenge the SAC both facially and factually, but the Court need only address

the facial attack because it is dispositive.

## I.    Article III Standing

Article III of the Constitution limits the subject matter jurisdiction of federal courts to

"Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[S]tanding is an essential and

unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must show three elements to establish standing.

First is "an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete

and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S.

at 560 (quotation marks and citations omitted). Second, that injury must be "fairly traceable to

the challenged action of the defendant," and not "the result of the independent action of some

third party not before the court." *Id.* (quotation marks and alternations omitted). Third, "it must

be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." *Id.* at 561 (internal quotations omitted). "The party invoking federal jurisdiction bears

the burden of establishing these elements." *Id.* (citations omitted).

//

//

//

A.    Injury in Fact

Defendants argue that Plaintiff No Child Should Suffer fails to establish an injury in fact. Def. Mem. 14-15.[1] "[A]n organization may establish injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [injurious behavior] in question." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (internal quotations omitted). The Ninth Circuit previously held that an organization that helped Central Americans apply for asylum had standing to challenge the Executive Office of Immigration Review's practice of providing incomplete and inadequate interpretation at deportation hearings. *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 748 (9th Cir. 1991).

In denying Plaintiffs' motion for a preliminary injunction, the Court held that Plaintiff No Child Should Suffer failed to establish an injury in fact because it provided almost no information about itself. Op. & Ord. 9. The SAC remedies this defect in part by alleging that "Plaintiff No Child Should Suffer is ready, willing, and able to, among other things, donate funds for the purchase of life-saving humanitarian aid in the form of drugs and medical devices to the two plaintiff Iranian NGOs but, because of the maximum pressure sanctions, No Child Should Suffer is unable to arrange such donations." SAC ¶ 9. Defendants argue that this allegation is conclusory and unsupported by the rest of the SAC. Def. Mem. 15. They are correct that the rest of the SAC does not address this Plaintiff. The Court accepts for the purposes of this motion that No Child Should Suffer is ready, willing, and able to donate funds.

---

[1] Defendants challenge this element of standing for Plaintiff No Child Should Suffer only. The Court previously held that the other Plaintiffs established an injury in fact. Op. & Ord. 8-9. Defendants do not challenge this.

However, no factual allegations establish that the "maximum pressure" sanctions have impeded a donation. The SAC contains no allegations explaining when or how No Child Should Suffer tried to make a donation or even inquired about making a donation; rather, the SAC relies on the conclusory allegation that No Child Should Suffer cannot make a donation because of the sanctions. The Ninth Circuit has rejected similarly unadorned and unsupported allegations, even in the context of First Amendment claims, where a fear of future harm may be enough to establish standing. *See Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011) (holding that plaintiffs' allegation that "Proposition M was intended to, and does, impact their operations as landlords" was conclusory and insufficient on its own to establish standing). *See also Alvarado v. Univ. of S. California*, No. CV 17-3671-GW(AJWX), 2017 WL 8116092, at *4 (C.D. Cal. Sept. 21, 2017) ("Plaintiffs' conclusory allegations that they are at increased risk of identity theft and credit or debit card fraud are insufficient to establish Article III standing.").

Plaintiffs argue that No Child Should Suffer does not need to independently establish standing. Pl. Resp. 16, ECF 30. They assert that if one Plaintiff has established standing, the Court need not consider whether the other Plaintiffs have standing, and there may be supplemental jurisdiction over the other Plaintiffs. *Id.* (citing *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977); *Baggett v. Bullitt*, 377 U.S. 360, 366 n.5 (1964)). Defendants counter that "[t]he concept of supplemental jurisdiction is simply inapposite." Def. Reply 6, ECF 31. Defendants are correct. Supplemental jurisdiction provides a mechanism for a federal court to exercise jurisdiction over claims for which it would not otherwise have subject matter jurisdiction where those claims are sufficiently related to claims over which the federal court does have subject matter jurisdiction. *Arroyo v. Rosas*, 19 F.4th

1202, 1209 (9th Cir. 2021). Supplemental jurisdiction is irrelevant in this case because both of Plaintiffs' claims arise under federal law, as the SAC alleges. SAC ¶ 13.

Defendants are also correct in asserting that each plaintiff must establish Article III standing for each form of relief sought. Def. Reply 7 (citing *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993); *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 771 (9th Cir. 2006)). The cases on which Plaintiffs rely in arguing otherwise do not stand for the proposition for which Plaintiffs cite them. In *Village of Arlington Heights*, the Supreme Court declined to consider whether Metropolitan Housing Development Corporation ("MHDC") had standing to assert the constitutional rights of its prospective tenants because an individual plaintiff had standing to assert those rights, so it was unnecessary to decide whether MHDC also had standing to assert them. 429 U.S. at 263-264. The Supreme Court held that MHDC only had standing to assert its own rights. *Id.* at 263. And in *Baggett*, the Supreme Court agreed with state-employed teachers who alleged that certain loyalty oath statutes were facially unconstitutional, and concluded that there was no need to address whether student plaintiffs also had standing to challenge those statutes, as the relief granted to the teachers would protect the students' interests. 377 U.S. at 366 n.5. In short, the Supreme Court avoided deciding more difficult issues of standing when it was unnecessary to do so. It did not relieve any plaintiffs of the obligation to establish standing to seek relief. Plaintiff No Child Should Suffer has failed to establish an injury in fact and cannot rely on the injuries to the other Plaintiffs to establish standing.

B.    Causation

All Plaintiffs fail to establish the causation element of standing. Causation may be indirect. *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). "But when a plaintiff alleges that government action caused injury by influencing the conduct of third parties, . . . more

particular facts are needed to show standing." *Id.* at 1013 (internal quotations omitted). "To

plausibly allege that the injury was not the result of the *independent* action of some third party,

the plaintiff must offer facts showing that the government's unlawful conduct is at least a

substantial factor motivating the third parties' actions." *Id.* (citation and quotation marks

omitted). The plaintiff may not rely on "speculation or guesswork." *Id.* (internal quotations

omitted). *See also Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir.

2000) ("[T]he causal connection put forward for standing purposes cannot be too speculative, or

rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of

the litigation as to demonstrate that the plaintiffs would succeed on the merits.").

      In *Mendia*, the Ninth Circuit held that the plaintiff adequately alleged that he could not

use the services of a bail bondsman because Immigration & Customs Enforcement ("ICE") had

issued an immigration detainer, even though he was never in ICE custody. 768 F.3d at 1013. The

plaintiff alleged that every bail bondsman he spoke with cited the immigration detainer as the

reason for denying services. *Id.* at 1014. In contrast, in *Novak v. United States*, the plaintiffs

failed to show that the cabotage provisions of the Jones Act allowed two companies (which were

not party to the suit) "to establish a duopoly whereby they are able to dominate the Hawaii

shipping market and charge exorbitant rates." 795 F.3d 1012, 1019 (9th Cir. 2015). The

complaint itself acknowledged that the Hawaii shipping market had features that made it easy to

keep prices high independent of the Jones Act. *Id.*

      In *Clapper v. Amnesty International USA*, 568 U.S. 398, 404 (2013), the Supreme Court

addressed a challenge to a provision of the Foreign Intelligence Surveillance Act ("FISA") that

allowed the federal government to seek "authorization of certain foreign intelligence surveillance

targeting the communications of non-U.S. persons located abroad." Various entities and

individuals based in the United States who communicated with individuals abroad sued and argued that they had established standing because they feared that their communications would be monitored. *Id.* at 406. The Supreme Court held that the plaintiffs' alleged harm relied on "their highly speculative fear" that the government would seek to intercept communications of individuals with whom the plaintiffs communicated, that the supervising court would approve the request, that such communications would in fact be intercepted, and that the plaintiffs would be parties to those communications. *Id.* at 410. Accordingly, the plaintiffs failed to demonstrate an injury in fact. *Id.*

Plaintiffs' injury is not fairly traceable to OFAC's actions but rather to the speculative fears of third-party banks. According to Plaintiffs, foreign banks and other financial institutions have stopped facilitating transactions for humanitarian aid to Iran because they "fear that defendant OFAC will impose secondary sanctions upon them." SAC ¶ 25. Plaintiffs explain that "[t]his fear is due in large part because of the uncertain scope and complexity of the maximum pressure sanctions, and also because the normal fees or commissions from acting as an intermediary bank are minimal." *Id.* The SAC does not allege that any of these third-party banks tried to facilitate a transaction for humanitarian aid and were prevented from doing so or were sanctioned or threatened with sanctions. It only alleges that "defendants have, since the inception of their maximum pressure sanctions, threatened to impose sanctions on intermediary foreign banks that were otherwise willing to participate in the supply of humanitarian aid that plaintiffs require to stay alive." SAC ¶ 48. These allegations are insufficient. *See Sacks*, 466 F.3d at 772-74 (holding that plaintiff donor lacked standing to challenge OFAC's restrictions on donation of medical supplies to Iraq where he could not show he faced "imminent, or even likely, prosecution" for violating those restrictions). It is speculative that any intermediary bank will

face secondary sanctions based on any particular transaction facilitating humanitarian aid to the Iranian Plaintiffs. Plaintiffs' causal chain relies on third-party banks' speculative fear of future harm, similar to the injury alleged by the plaintiffs in *Clapper*.

The Court will not address the factual attack on the complaint because Defendants' facial attack is sufficient. The generalized allegations in the SAC do not establish that any transaction facilitating aid to Plaintiffs is likely to result in sanctions imposed on the intermediary bank involved. The SAC alleges only a possibility that any of the intermediary banks could face sanctions for facilitating such transactions. Plaintiffs' injury is traceable to third-party banks' risk-avoidance policies. *See* Def. Mem. 10. Plaintiffs have failed to establish the causation element of Article III standing.

C.    Redressability

Plaintiffs also fail to establish the redressability element of standing. While Plaintiffs need not show that a grant of relief is guaranteed to redress their injuries, they must show that a grant of relief would cause a "change in a legal status" that "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Novak*, 795 F.3d at 1019-20.[2] Redressability is not established where relief "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). To illustrate, in *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1124 (9th Cir. 1996), individuals and organizations

---

[2] Plaintiffs suggest that the "significant likelihood" standard is "inappropriately stringent" in this case because they make their claim under the APA. Pl. Resp. 13. As discussed below, standing under the APA is a separate inquiry from standing under Article III, so Plaintiffs' argument is misplaced.

challenged the constitutionality of the Violent Crime Control and Law Enforcement Act of 1994.
The plaintiffs alleged that the Act caused a steep increase in the price of certain firearms,
burdening their constitutional rights. *Id.* at 1130. The Ninth Circuit held that a grant of relief
would not redress the harm because third-party gun manufacturers, not the government
defendants, raised the price of firearms. *Id.* And in *Glanton ex rel. ALCOA Prescription Drug
Plan v. AdvancePCS Inc*, 465 F.3d 1123, 1125 (9th Cir. 2006), the Ninth Circuit held that
participants in prescription drug plans lacked standing to sue a pharmacy benefits management
company for overcharging the drug plans because even if they prevailed on their claims, it would
not force the plans to lower costs charged to participants.

　　　Plaintiffs' complaint as amended still fails to establish redressability. With respect to the
injunction, the relief Plaintiffs seek continues to depend on the cooperation of third parties not
before the Court: the intermediary banks that could facilitate donations to persons and entities in
Iran. If the requested injunction were granted, third-party banks would still be free to refuse to do
business with Iran. Plaintiffs acknowledge that relief hinges on the decisions of these banks.
They state: "A well-crafted injunction, enforced against OFAC and communicated to the small
number of potential intermediary banks, should remove any reluctance for them to assist in the
provision of humanitarian [aid] to Iran and thus to plaintiffs." SAC ¶ 42. *See also* Pl. Resp. 6-7,
10 (agreeing that "over-compliance" on the part of sellers and intermediary banks contributed to
the difficulty in delivering humanitarian aid to Iran).

　　　Plaintiffs' assertion about how the banks will respond to an injunction against OFAC is
speculative. The SAC notes other factors relevant to the banks' decision-making, including
political and economic changes in Iran since the "maximum pressure" sanctions were imposed,
SAC ¶ 19 (alleging that Iran has become less compliant with the JCPOA and has more closely

aligned its economic system with China and Russia in recent years), and the low fees banks

receive for serving as intermediaries, SAC ¶ 25. Further, as Plaintiffs acknowledge, the requested

injunction would leave the "maximum pressure" sanctions largely unaffected. Pl. Resp. 13.

Plaintiffs have not shown a reasonable likelihood that the third-party banks would resume

business with Iran if the requested injunction were granted. As Plaintiffs acknowledge the relief

they seek depends on the cooperation of these banks, they have failed to establish that an

injunction against OFAC would redress their injury.

      Plaintiffs also seek a declaratory judgment on the legality of the current sanctions regime

and the scope of OFAC's authority in enforcing it. SAC 20-21. For the same reasons they fail to

establish standing for injunctive relief, Plaintiffs fail to establish standing for declaratory relief.

A declaration on the legality of the sanctions regime and OFAC's authority would not redress

Plaintiffs' injury because intermediary banks would still be free to refuse to do business with

Iranian banks. *See Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (declaratory

judgment that portions of the FISA were unconstitutional would not redress the plaintiff's injury

because it would not prohibit the government from retaining materials that were obtained in

reliance on the allegedly unconstitutional portions of the statute).

      Plaintiffs argue that a grant of the requested relief would constitute a change in legal

status that would make it likely aid would resume. Pl. Resp. 12. However, cases finding

redressability based on a change in legal status generally involve situations where a court order

directed at a defendant does not rely on the actions of third parties in response to that order. *E.g.*,

*Utah v. Evans*, 536 U.S. 452, 464 (2002) (holding that the State of Utah had standing to seek an

injunction requiring the Secretary of Commerce to order a new census counting); *Fed. Election*

*Comm'n v. Akins*, 524 U.S. 11, 25 (1998) (holding that group of voters had standing to challenge

the Federal Election Commission's decision not to deem an organization a "political committee"). In contrast, where a court order directed at a defendant will not grant the plaintiffs relief absent decisions by third parties not bound by that order, courts regularly find that the plaintiff has failed to establish redressability. *E.g.*, *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 43 (1976) (holding that it was speculative whether invalidation of a tax rule that allegedly "encouraged" hospitals to deny services to indigent patients would lead the hospitals to begin providing such services); *Novak*, 795 F.3d at 1020 (holding that plaintiffs had failed to show that invalidating provisions of the Jones Act would reduce shipping prices because other market features permitted two non-party shipping companies to maintain high prices).

Plaintiffs also argue that the third-party banks' choices are not truly "unfettered" because they are made in response to the regulatory environment the sanctions created. Pl. Resp. 8. The caselaw establishes that "unfettered choices" does not mean the absence of all constraint. For instance, in *Simon*, the Supreme Court noted that the third-party hospitals might be financially dependent on the favorable tax treatment accorded to charitable hospitals. 426 U.S. at 43. Such hospitals theoretically faced a choice between retaining favorable tax status and serving indigent patients, and foregoing favorable tax status and retaining the option to decline to serve indigent patients. *See id.* This reasoning, the Supreme Court concluded, was speculative. *Id.* Here, third-party banks theoretically face a choice between facilitating transactions for humanitarian aid and collecting the associated transaction fees, or foregoing those fees and avoiding doing business with Iran while the "maximum pressure" sanctions are in force. It is speculative that the banks would face sanctions for facilitating transactions for humanitarian aid to Iran. And it is speculative that the relief Plaintiffs seek would change these banks' business calculus, particularly because the relief sought would leave the "maximum pressure" sanctions largely in

place. *See* SAC 20-21; Pl. Resp. 13. Plaintiffs have failed to establish that the requested relief
will redress their injury.

**II.    Statutory Standing**

Plaintiffs assert that the standing requirements in this case are reduced because they bring
their claim under the APA as opposed to an organic act. Pl. Resp. 4-6. Defendants counter that
standing requirements under the APA are distinct and in addition to the requirements of Article
III. Def. Reply. 5-6. Defendants are correct.

The requirement to establish injury, causation, and redressability is "the irreducible
constitutional minimum of standing." *Lujan*, 504 U.S. at 560. "[A] person suing under the APA
must satisfy not only Article III's standing requirements, but an additional test: The interest he
[or she] asserts must be 'arguably within the zone of interests to be protected or regulated by the
statute' that he [or she] says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi
Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Association of Data Processing Serv.
Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The "zone of interests" test "is not
meant to be especially demanding." *Id.* at 225 (internal quotations omitted). But here, because
Plaintiffs lack Article III standing, the Court need not consider whether they have statutory
standing under the APA.

The SAC fails to establish that Plaintiffs have Article III standing. Accordingly, the Court
will not address whether Plaintiffs have stated a claim for relief. *See Tunac v. United States*, 897
F.3d 1197, 1201 (9th Cir. 2018) ("[A] federal court generally may not rule on the merits of a
case without first determining that it has jurisdiction.") (internal quotations omitted). Because the
Court lacks subject matter jurisdiction over this case, it must be dismissed.

**CONCLUSION**

The Court GRANTS Defendants' Motion to Dismiss [27]. This case is dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED.


DATED:_____May 1, 2023_____.



_____
MARCO A. HERNÁNDEZ
United States District Judge